## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **GERMMA HAMMOND, on behalf of himself and others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-01099** |
| | ) | **Judge Aleta A. Trauger** |
| **FLOOR AND DECOR OUTLETS OF AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Germma[1] Hammond brings this collective action on behalf of himself and others similarly situated nationwide against Floor and Decor Outlets of America, Inc. ("F&D"), asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19 for unpaid overtime compensation. Now before the court is F&D's Motion to Compel Arbitration or in the Alternative Dismiss and/or Strike. (Doc. No. 29.) For the reasons set forth herein, the motion will be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Collective Action Complaint ("Complaint") asserts that F&D is a Delaware corporation operating "warehouse-format" retail stores in twenty-eight states, including Tennessee. (Doc. No. 1 ¶¶ 17, 3.) It sells "hard-surface flooring and related accessories." (*Id.* ¶ 30.) F&D employs "non-supervisory Hourly Workers . . . in a variety of positions," including those of Warehouse Associate, Pro Services Associate, Customer Services Sales Associate, and so forth.

---

[1] The defendant represents that its records reflect that the plaintiff's first name is actually "Gemma." (Doc. No. 29-1, at 1 n.1.)

(*Id.* ¶ 32.) The Hourly Workers are paid an hourly wage and do not receive commissions or bonuses. (*Id.* ¶¶ 35–36.) According to Hammond, "F&D applies uniform employment policies, practices, and procedures" to "all similarly situated Hourly Workers nationwide," including with respect to its time-keeping system, Kronos. (*Id.* ¶ 34.) F&D operates a retail store in Antioch, Tennessee (the "Antioch store"). (*Id.* ¶ 39.)

Plaintiff Hammond is an individual residing in Davidson County, Tennessee. (*Id.* ¶ 15.) Hammond began working at F&D's Antioch store as a Warehouse Associate in October 2016, and he remained in that position until F&D terminated his employment in November 2018. (*Id.* ¶¶ 41–42.) The manager of the Nashville store was, at all times relevant to this case, James "JJ" Donelson; Samantha Remmick was the Regional Operations Manager. (*Id.* ¶¶ 43–44.)

Throughout the time Hammond was employed by F&D as an Hourly Worker, he was regularly scheduled to work and did work six nine-hour shifts per week, for a total of 54 hours of scheduled working time per week. (*Id.* ¶ 46.) Hammond alleges, "[o]n information and belief," that "all similarly situated Hourly Workers were scheduled to work and did work hours similar to Hammond's." (*Id.* ¶ 47.)

Pursuant to F&D policy, Hammond and all other similarly situated Hourly Workers clocked in on Kronos when they started a shift and clocked out of Kronos when their shifts terminated. (*Id.* ¶ 48.) Kronos captured all the time that Hammond and similarly situated Hourly Workers actually worked. (*Id.* ¶ 49.) Hammond alleges, however, that F&D "did not compensate [him] and all other similarly situated Hourly Workers for all hours worked over 40 hours in a workweek at 1.5 times their regular rates of pay," as required by the FLSA. (*Id.* ¶ 50.) Instead, "F&D managers, including Donelson, would reduce the number of hours worked over 40 in a workweek, and which were recorded in Kronos," engaging in a process referred to by the plaintiff

as "time-shaving" or "shaving time." (*Id.* ¶¶ 9, 10, 51.) Hammond alleges that F&D, by engaging in time-shaving, "denied Hammond and all other similarly situated Hourly Workers the overtime compensation required by law." (*Id.* ¶ 52.)

Hammond first noticed in March or April 2018 that F&D was "shaving" his hours. (*Id.* ¶ 54.) He complained to his manager, Donelson, about the time-shaving and his resulting loss of compensation. (*Id.* ¶ 55.) Donelson did not offer an explanation for the error or deny that time had been shaved from Hammond's hours, but he gave Hammond a "rapid! PayCard," loaded with "additional wages," after Hammond complained. (*Id.* ¶¶ 56–57.) The PayCard did not fully compensate Hammond for all of the overtime hours he had worked. (*Id.* ¶ 58.)

Later in 2018, Hammond again noticed that his hours over 40 had been shaved, and he complained again to Donelson. Donelson, again, did not explain or deny, but F&D subsequently deposited in Hammond's bank account additional wages following his complaint. (*Id.* ¶¶ 59–62.) F&D did not provide any documentation showing that the additional wages fully compensated Hammond for his overtime hours at 1.5 times his regular rate of pay. (*Id.* ¶ 63.)

Hammond noticed for a third time, later the same year, that his hours had again been "shaved." (*Id.* ¶ 64.) When he complained this time to Donelson, Donelson informed him that he could not help and referred him to Remmick. Remmick told Hammond that she would investigate. (*Id.* ¶¶ 65–67.) Although Hammond specifically asked her to investigate whether similar time-shaving was happening at other stores, she refused to do so, and she later told Hammond, after investigating, that "she could not determine who was editing Hammond's time in Kronos." (*Id.* ¶¶ 68–70.) She also claimed that "she could not pay Hammond the unpaid-overtime compensation due to him because she allegedly could not determine the source of the time shaving." (*Id.* ¶ 71.)

Based on these allegations, Hammond asserts a claim for unpaid overtime wages under the FLSA, not only on his own behalf, but also on behalf of a "Putative Collective" of "non-exempt employees entitled to be paid overtime compensation at 1.5 times their regular rates of pay for all hours worked over 40 in a workweek." (*Id.* ¶ 73.)

Since filing the Complaint, the plaintiff has given notice that three other individuals, Craig Cheuvront, Amy Collins Hayes, and Mark A. Turner, have consented to become party plaintiffs in this action to recover overtime wages and other relief. (*See* Doc. Nos. 14, 15.) One of the three, Hayes, resides in Tennessee. The other two individuals reside in Ohio and New York.

Rather than answering the Complaint, F&D filed its Motion to Compel Arbitration (Doc. No. 29), supported by a Memorandum of Law (Doc. No. 29-1) and the Declaration of Joel Fox (Doc. No. 30). It argues, first, that Hammond executed a valid and enforceable arbitration agreement that specifically extends to FLSA claims and requires him to arbitrate his wage and hour claim individually, as a result of which the court should dismiss the claims brought on behalf of the collective and the opt-in plaintiffs and compel Hammond to pursue his claim through an individual arbitration. In the alternative, F&D argues that (1) the court lacks jurisdiction over a nationwide collective, so any claims brought on behalf of individuals employed by F&D outside of Tennessee must be dismissed under Rule 12(b)(2); (2) the allegations in support of a collective action are too conclusory and vague to support a collective action, so the claims on behalf of a putative collective should be dismissed in their entirety under Rule 12(b)(6) or stricken under Rule 12(f); and (3) any claims brought by individuals subject to arbitration agreements must be dismissed or stricken. (Doc. No. 29-1.)

In his Memorandum of Law in Opposition to Defendant's Motion to Compel, the plaintiff denies signing an arbitration agreement or in any way agreeing to arbitrate his claims and asserts

that the defendant has failed to offer credible evidence to the contrary. Regarding the defendant's alternative arguments, the plaintiff acknowledges that courts are split on the question but urges this court to adopt the reasoning of those that have concluded that jurisdiction over the claims of the named plaintiff and other Tennessee plaintiffs "is all that is required to establish personal jurisdiction in a collective action brought pursuant to the FLSA." (Doc. No. 34, at 3.)[2] He also argues that the defendant has presented no evidence that all of its employees are subject to binding arbitration; it "mischaracterizes the standards for conditional certification" (*id.*); and the Complaint "more than adequately plead[s] the nationwide FLSA collective action" (*id.* at 4).

The defendant has filed a Reply arguing generally that the plaintiff misconstrues the applicable law. (Doc. No. 35.)

## II.    MOTION TO COMPEL ARBITRATION

### A.    Legal Standard

The Federal Arbitration Act ("FAA") allows parties to a "contract evidencing a transaction involving commerce" to agree that certain disputes between them arising from such "contract or transaction" will be decided by an arbitrator rather than by a court. 9 U.S.C. § 2. Described by the Supreme Court as the "primary substantive provision" of the FAA, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), Section 2 further provides that any such agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section embodies "a liberal federal policy favoring arbitration." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone*, 460 U.S. at 24). The principal purpose of the FAA is to ensure

---

[2] References to specific pages of documents filed by the parties will be to the court's electronic filing system's pagination, which is not necessarily consistent with the parties' pagination.

the enforcement of private arbitration agreements according to their terms; the broader purpose of allowing parties to submit grievances to arbitration is to facilitate "efficient, streamlined procedures tailored to the type of dispute" at issue. *Id.* at 344 (citations omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) ("The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation."). Despite this liberal federal policy favoring arbitration agreements, arbitration is a "matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *see also GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) ("An agreement to arbitrate is fundamentally a matter of consent.").

When considering a motion to compel arbitration, a district court must determine, as a threshold matter, if the parties agreed to arbitrate. *McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019); *Stout*, 228 F.3d at 714. The court must "use state law to assess the existence of an agreement." *GGNSC Louisville*, 932 F.3d at 485 (citations omitted).

### B.     Analysis

As the party moving to compel arbitration, F&D bears the ultimate burden of establishing the existence of a valid agreement to arbitrate and must, as an initial step, come forward with some evidence showing that the plaintiff agreed to arbitrate. *See Foust v. Comcast Corp.*, No. 3:19-CV-173-HSM-DCP, 2020 WL 1891755, at *4 (E.D. Tenn. Jan. 28, 2020) (citations omitted); *see also Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 803 (W.D. Tenn. 2011) ("Under Tennessee law, a plaintiff alleging breach of contract must prove (1) the existence of a contract . . . ." (citation omitted)). "[O]nce *prima facie* evidence of the agreement

has been presented, the burden shifts to the party opposing arbitration." *Foust*, 2020 WL 1891755, at *4 (citation omitted).

The Sixth Circuit has applied the summary judgment standard under Federal Rule of Civil Procedure 56 when ruling on a motion to compel arbitration. *See, e.g.*, *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). The plaintiff, as the party opposing arbitration, "must show a genuine issue of material fact as to the validity of the agreement to arbitrate. The required showing mirrors that required to withstand summary judgment in a civil suit." *Id.* Applying this "summary-judgment-like standard," the court will ultimately "conclude as a matter of law that the parties did or did not enter into a contract containing an arbitration clause . . . only if 'there is no genuine dispute as to any material fact' concerning the agreement's formation." *Ford v. Midland Funding, LLC*, 264 F. Supp. 3d 849, 854 (E.D. Mich. 2017) (quoting *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016), and Fed. R. Civ. P. 56(a)).

### 1. Evidence Concerning the Existence of an Agreement to Arbitrate

The defendant here has presented *prima facie* evidence of the existence of an agreement to arbitrate. It has introduced the Declaration of Joel Fox, who attests that he is currently F&D's Human Resources Director. (Doc. No. 30 ¶ 1.) From 2014 through 2018, the relevant time frame, Fox was a Human Resources Manager for F&D charged with "human resources responsibilities" for the Antioch store at which Hammond worked. (*Id.* ¶¶ 1, 4.) In that role, Fox "made sure that managers responsible for hiring and onboarding at the [Antioch] store were properly versed in Floor & Decor's hiring and onboarding processes." (*Id.* ¶ 4.) According to Fox, when Hammond was hired in 2016, an Arbitration Agreement was "included . . . as part of" F&D's employee handbook. (*Id.* ¶ 5.) Fox avers that "[t]he Arbitration Agreement and employee handbook were provided to all new employees at the start of their employment." (*Id.*)

In support of that assertion, Fox claims that, "[a]s part of the onboarding process at the time of Mr. Hammond's hiring," the Antioch store employed a "New Hire Forms Checklist" to record the documents that a new employee received upon being hired. (*Id.* ¶ 6.) Hammond's personnel file maintained by the company includes a New Hire Forms Checklist, which, says Fox, shows that Hammond received a copy of the employee handbook. (*Id.*; *see also* Doc. No. 30-2.)

The New Hire Forms Checklist attached as an exhibit to Fox's Declaration lists a large number of documents that were "Provided to" "Gemma Hammond," whose name is handwritten in the space provided for "Employee's Name." (Doc. No. 30-2.) The list of documents includes "Acknowledgment of Receipt of Handbook and Code of Business Conduct & Ethics," "Employee Handbook," and "Code of Business Conduct & Ethics." (Doc. No. 30-2.) There are handwritten checkmarks in the boxes next to each of these documents, purportedly to indicate that these documents were "provided to" Hammond. In addition, the form includes a second list of documents that were "Returned/Completed" by the employee. This list includes, among others, "Acknowledgement of Receipt of Employee Handbook & Code of Business Conduct & Ethics (completed, signed, dated)." (*Id.*) The box next to this form is also checked, which, in theory at least, should mean that Hammond completed that form and returned it to the employer.

According to Fox, a copy of the employee handbook and Arbitration Agreement in effect at the time Hammond was hired are also attached as an exhibit to his Declaration. In fact, a copy of the employee handbook is not attached to the Declaration. Instead, only that portion of it that constitutes the Arbitration Agreement is attached. (Doc. No. 30-1.) The page numbers on this document reflect that it makes up pages 33 through 39 of a longer document.

The Arbitration Agreement itself provides that it is binding on any employee who agrees to it, but it is not a condition of employment. It applies, on its face, to FLSA claims. (Doc. No. 30-

1, Arbitration Agreement ¶ A.) It states that it is to be governed by the FAA "to the maximum extent permitted by applicable law." (*Id.*) It is mutual, insofar as it requires the company, as well as the employee, to arbitrate covered claims. (*Id.*)

The Arbitration Agreement includes a "Class/Collective Action Waiver" expressly providing that claims brought under the agreement "must be brought on an individual basis only." (*Id.* ¶ B.) The agreement outlines the process for pursuing arbitration and states that an authorized arbitrator's award will be "final and binding upon the parties." (*Id.* ¶ D.)

A paragraph titled "The Consideration for the Agreement and Agreement" [sic] provides that, in addition to the mutuality of the agreement, the company agrees, "as further consideration," to pay the travel, lodging, and meal costs of the arbitrator and not to seek allowable costs from the employee even if F&D prevails in the arbitration. (*Id.*) The Arbitration Agreement also expressly states that continued employment shall constitute acceptance of the agreement:

> Your continued employment and/or your accepting employment with the Company subsequent to this Agreement's implementation on February 17, 2014 also shall constitute consideration and acceptance by you of the terms and conditions set forth in this Agreement. The parties agree that the consideration set forth in this paragraph is wholly adequate to support this Agreement.

(*Id.*)

The next full page of the document reflects the heading "Acknowledgment of the Arbitration Agreement." (*Id.* at 6.) It states

> BY SIGNING BELOW OR ELECTRONICALLY, I, THE ASSOCIATE, KNOWINGLY AND FREELY AGREE TO THIS MUTUAL AGREEMENT TO ARBITRATE ANY CLAIMS BETWEEN ME AND THE COMPANY THAT OTHERWISE COULD HAVE BEEN BROUGHT IN COURT AND/OR BEFORE A JURY. I AFFIRM THAT I HAVE HAD SUFFICIENT TIME TO READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND THAT I HAVE BEEN ADVISED OF MY RIGHT TO SEEK LEGAL COUNSEL REGARDING THE MEANING AND EFFECT OF THIS AGREEMENT PRIOR TO SIGNING.

(*Id.*) Below this paragraph is space for the associate's signature and the date of signing.

The same page also informs the associate that he has the prerogative to opt out of the Arbitration Agreement within 30 days after signing it, by signing the "opt-out form," which appears on the next page of the form. (*Id.* at 8.) The "Arbitration Opt-Out Form" states that it is to be filled out by any associate who does not want to be "covered by the benefits of the Arbitration Agreement" and that the associate must complete and return the form to the Human Resources Department within 30 days after signing the Arbitration Agreement. (*Id.*)

Fox does not contend that Hammond's personnel file contains a signed and dated Acknowledgment of the Arbitration Agreement. He maintains, instead, that the Arbitration Agreement itself reflects two methods by which an employee could signal acceptance of the agreement—"either by continuing employment" with F&D or "by signing an acknowledgment form." (Doc. No. 30 ¶ 7.) Fox states that Hammond continued his employment after receiving the Arbitration Agreement. (*Id.*) Fox also confirms that Hammond's personnel file does not contain an opt-out form. He asserts that, if Hammond had chosen to reject the arbitration agreement, "his completed opt-out form would have been kept in his personnel file." (*Id.* ¶ 8.)

In response to F&D's Motion to Compel Arbitration and Fox's Declaration, Hammond submitted his own Declaration. As relevant here, Hammond avers under oath as follows:

> 14.     When I began working for F&D, I did not receive any orientation about company policies. I showed up for my first day of what I thought would be orientation, and Defendant did not give an orientation; instead, I was immediately put to work in the warehouse.
>
> 15.     No one in management at F&D ever gave me a hard copy of the employee handbook. I do not believe a manager at F&D emailed me a copy of the handbook, either. I searched my emails from around the time I started working for F&D and did not find a copy of the handbook.
>
> 16.     No one in management at F&D ever mentioned an arbitration clause to me, explained about an arbitration agreement, or asked me to sign an arbitration agreement as part of my employment. No one ever told me that the Company

wanted me to waive my right to pursue legal claims in court or discussed arbitration at all.

17.     I do not remember signing an arbitration agreement while I worked for F&D.

(Doc. No. 33 ¶¶ 14–17.)

2.     *The Parties' Arguments*

F&D argues that Tennessee law "recognizes the validity of unilateral contracts, in which acceptance is indicated by action under the contract." (Doc. No. 29-1, at 8 (quoting *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 895 (M.D. Tenn. 2003) (Trauger, J.)).) The defendant points to the well established principal that valid assent may be proved by a showing that "[t]he written materials accompanying the arbitration agreement clearly state[] that continued employment after the effective date of the [arbitration agreement] would constitute the employee's acceptance of the agreement to arbitrate." (*Id.* at 9 (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007)).) In this case, F&D argues, Hammond continued working after his receipt of the Arbitration Agreement, which clearly stated that continued employment would constitute consent to the agreement, and his doing so constitutes his consent to be bound by the Arbitration Agreement.

In response, Hammond does not dispute F&D's characterization of the law. He insists, instead, that F&D's evidence does not establish his consent and that F&D, as the proponent of the Arbitration Agreement, has the burden of proving by a preponderance of the evidence that he had "awareness of the existence and nature of" the agreement, such that his continued employment "constitutes sufficient acceptance of the agreement as to make it a valid contract." (Doc. No. 34, at 7 (quoting *Fisher*, 276 F. Supp. 2d at 895)).) He contends that the defendant's evidence does not make the requisite showing and that his Declaration, at a minimum, creates a material factual

dispute as to whether a contract to arbitrate was formed. He points out that the defendant's motion relies on only three facts to form the basis of its assumption that Hammond agreed to arbitrate:

> (1) the existence of an arbitration provision appended to Defendant's Handbook; (2) a declaration from Joel Fox stating that Hammond, "like all Floor and Decor employees, received the handbook;" and (3) a checklist purporting to show that Hammond received the Handbook.

(*Id.* at 9–10.)

Regarding these facts, the plaintiff argues that the mere existence of an agreement is insufficient to establish Hammond's assent to it; Fox has no personal knowledge of whether Hammond actually received the employee handbook or any other documents, and his assertion that "all" F&D employees received the handbook is conclusory and lacking foundation; and the checklist is unreliable hearsay that is "unsigned, undated, and contains no mention whatsoever of the [Arbitration] Agreement." (*Id.* at 10.) He also points out that, although the checklist purports to show that Hammond "completed, signed, and dated" the Acknowledgement of Arbitration form, the defendant has not produced any such form in support of its motion. (*Id.* at 11.) The plaintiff also argues that the cases cited by F&D in support of its motion are factually distinguishable, because in those cases other incontrovertible proof established the plaintiff's receipt of the arbitration agreement.

In its Reply, F&D insists that it too has presented "concrete, contemporaneous evidence" of Hammond's receipt of the Arbitration Agreement and that Hammond's Declaration consists of nothing more than "self-serving statements" that are not sufficient to create a genuine issue of material fact or defeat a motion to compel. (Doc. No. 35, at 3–4.) And it maintains that the caselaw to which the plaintiff cites is inapposite or distinguishable, in particular because the New Hire Forms Checklist, a contemporaneous business record, "establishes receipt of the Agreement." (*Id.* at 4.) It claims, in short, that Hammond's "statements that he did not receive a handbook and does

not remember an arbitration agreement are [not] sufficient to defeat the motion to compel." (*Id.* at 4–5.)

### 3. Whether the Plaintiff Has Established a Material Factual Dispute

The court finds that the plaintiff's Declaration creates a material factual dispute, and the cases cited by the defendant, reaching a contrary conclusion in seemingly similar circumstances, are distinguishable.

First, although the plaintiff in *Fisher v. GE Medical Systems* "did not recall" ever receiving a copy of the employer's dispute resolution program, a witness for the defendant, its former Human Resources Manager for GE, testified based on personal knowledge that copies of the policy "were mailed to all existing GE employees the first week of July 1998." 276 F. Supp. 2d at 892. In addition, the plaintiff "acknowledge[d] that he was aware of the [dispute resolution] Program and had discussed it with other employees and supervisors at GE." *Id.* This court, in ruling on the defendant's motion to compel arbitration, observed that it was "well settled in Tennessee that the terms of an employee handbook may become part of the employee's contract of employment, provided the plan demonstrates that both parties are bound by the rules and regulations therein," as was true under the plan at issue there. *Id.* at 894. In addition, it was also clear that Tennessee recognizes "the validity of unilateral contracts, in which acceptance is indicated by action under the contract." *Id.* (citing *Cent. Adjustment Bureau v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984)). Despite the plaintiff's contention that no agreement had been formed, the undersigned found that the plaintiff, by continuing to work at GE, had manifested his assent to the dispute resolution program, which specifically provided that continuing to work after the program went into effect would constitute agreement to its terms. In that case, the fact that "Mr. Fisher 'does not recall' receiving a copy of [the dispute resolution program did] not invalidate the agreement," in light of the fact that he admitted in his affidavit that he was aware of the program and had discussed it with

other employees, documenting his concern about it. *Id.* at 895. In addition, his lack of recollection was insufficient to refute Fish's testimony that a copy of it was mailed to all existing GE employees the first week of July 1998. *Id.* The court concluded: "In light of his awareness of the existence and nature of [the program], therefore, Mr. Fisher's continued employment at GE constitutes sufficient acceptance of the agreement as to make it a valid contract." *Id.*

The Sixth Circuit cited *Fisher* extensively in *Seawright* and likewise held that the plaintiff employee's "knowing continuation of employment after the effective date of the arbitration program constituted acceptance of a valid and enforceable contract to arbitrate." 507 F.3d at 970. There, however, the employer produced substantial evidence of the efforts it had made to ensure that its employees were aware that it was implementing a mandatory Employee Dispute Resolution ("EDR") program, which included arbitration. Beginning in April 1999, it "introduced the program through a series of announcements and informational meetings." *Id.* It mailed letters to all employees, enclosing an information brochure describing the program in detail and providing notice that "continuing employment with AGF" would mean that the employee agreed to resolve disputes with the employer through the EDR program. *Id.* at 971. The company then held informational meetings explaining the program, during which another pamphlet was distributed, again describing the program and repeating that continued employment would signal agreement to abide by the program. The plaintiff "signed an attendance sheet acknowledging that she had attended an informational session and received a copy of the AGF [EDR] pamphlet." *Id.* The program went into effect on June 1, 1999. Two years later, the company mailed employees a letter reminding them that the EDR program was still in effect, explaining how to access additional information about it, enclosing yet another brochure describing the program, and reiterating that

continued employment with the company would be deemed to manifest agreement to resolve employment disputes through the program.

The plaintiff filed suit in federal court in 2005, alleging discrimination. In response to the defendant's motion to compel arbitration, the plaintiff "acknowledged the above facts" but argued, among other things, that she had not agreed to the program and there was no bargained-for exchange, because merely receiving information and acknowledging the program did not constitute assent. The Sixth Circuit disagreed. The issue, as framed by that court, was simply "whether [the plaintiff's] continued employment with AGF constituted assent." *Id.* at 972. The court found as a matter of Tennessee law that continued employment *can* constitute such assent. *Id.* Further, under the facts there, particularly the uncontroverted evidence that the plaintiff was aware of the program and had received ample notice that continued employment would be deemed to demonstrate her agreement to be bound by the EDR program, the court found that the plaintiff's conduct in that case *did* manifest assent.

Neither of these cases has particular relevance here, because, in both, there was no dispute that the plaintiff was aware of the arbitration agreement. In the other cases cited by the defendant in support of its position, the undisputed facts similarly show that the plaintiff had, at the very least, been made aware of the existence of the arbitration agreement.[3]

---

[3] In *Sellers v. Macy's Retail Holdings, Inc.*, No. 2:12-cv-02496-SHL-tmp, 2014 WL 2826119 (W.D. Tenn. June 23, 2014), for example, the plaintiff claimed that she did not recall signing an agreement to arbitrate. However, the record contained "uncontroverted evidence that [the plaintiff] electronically signed the New Hire Acknowledgment form on November 18, 2009, the date of her hire" and that she did not return the opt-out form within thirty days of her hire. *Id.* at *5. In addition, the employer had informed her of the arbitration agreement through "the SIS Program brochure, Plan Document, opt-out Election Form, New Hire Acknowledgment form, and new hire informational video." *Id.* at *7. By signing the acknowledgment form, the plaintiff acknowledged receipt of the brochure, Plan Document, and opt-out Election Form. *Id.* The court found that the plaintiff's unsupported and conclusory statement that she did not remember signing the form did not create a material factual dispute, in light of the defendant's documentation that

Here, conversely, there is no incontrovertible evidence that the plaintiff received the employee handbook containing the Arbitration Agreement. Joel Fox has testified that his job was to "make sure" that managers responsible for hiring were "well versed" in F&D's hiring and orientation procedures (Doc. No. 30 ¶ 4), but he does not purport to have personal knowledge of what happened when Hammond was hired, and he does not even explain what those procedures were. According to Fox, the employee handbook in effect at the time Hammond was hired contained an Arbitration Agreement, which, he claims, was "provided to all new employees at the start of their employment." (*Id.* ¶ 5.) However, he provides no foundation for such a broad assertion: the fact that he trained managers to provide the handbook does not establish that they did so in every instance, and, again, he does not claim to have personal knowledge of what happened when Hammond was hired. Finally, he claims that the New Hire Forms Checklist "establishes" that Hammond received the employee handbook, which contained the Arbitration Agreement, but the same form also purports to show that Hammond signed and returned the Acknowledgment of Receipt of Employee Handbook. His personnel file apparently does not contain any such Acknowledgment. This inconsistency could lead a reasonable juror to believe that Hammond did not actually receive the employee handbook either, despite the checkmark on the form, particularly in light of Hammond's testimony that he did not receive any kind of orientation and was put straight to work instead.

Moreover, Hammond does not simply state that he "does not recall" receiving the employee handbook; rather, he affirmatively avers that he did not receive any type of orientation,

---

she had signed the acknowledgement form and had received the various documents describing the agreement. *Id.* at *9. *Accord Manigault v. Macy's East, LLC*, 318 F. App'x 6, 8 (2d Cir. 2009); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002); *Mecherle v. Trugreen, Inc.*, No. 12 C 1617, 2012 WL 4097221, at *2 (N.D. Ill. Sept. 14, 2012).

did not receive a hard copy of the employee handbook, and can find no evidence that an employee handbook was emailed to him. (Doc. No. 33 ¶¶ 14, 15.) Just as critically, he asserts that no one with the company ever mentioned the arbitration provision, explained the arbitration agreement, asked him to sign such an agreement, or "discussed arbitration at all" with him. (*Id.* ¶ 16.) Further, he does not recall signing an arbitration agreement. (*Id.* ¶ 17.)

Hammond's statements in his Declaration are no more "self-serving" than Joel Fox's.[4] More importantly, they are not conclusory or unsupported. They are affirmative statements based upon Hammond's personal knowledge, and they are not effectively controverted by the evidence offered by the defendant. Because Hammond very specifically denies undergoing any form of orientation or receiving the employee handbook, and because there is no concrete evidence that he signed, dated, and returned the "Acknowledgment of Receipt of Employee Handbook," despite the checkmark next to that entry on the New Hires Form Checklist, the checkmark on the same checklist next to "Employee Handbook," at most, establishes a material factual dispute as to whether Hammond received a copy of the employee handbook and, thus, as to whether he received the Arbitration Agreement. Hammond does not have the obligation to "prove a negative. Rather, he needed only to offer evidence sufficient to create a genuine dispute about whether he agreed to

---

[4] As the Circuit Court for the District of Columbia noted recently, an affidavit is "self-serving" if it supports an affiant's position, *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374 (D.C. Cir. 2020). That is, "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." *Id.* (quoting *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013)). As a result, "the term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.* (quoting *Hill*, 724 F.3d at 967). The issue is not whether an affidavit or declaration is "self-serving," but whether it is "made upon personal knowledge" and "sets out facts that would be admissible in evidence." *Id.* at 374–75 (quoting Fed. R. Civ. P. 56(c)(4)). "It may be that an affidavit lacking specific facts or support from the record is, by itself, insufficient to create a genuine factual issue. But it is the 'conclusory allegations of [such] an affidavit,' not its self-serving nature, that render it inadequate." *Id.* at 375 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, (1990)).

be bound by the company's arbitration policy." *Camara*, 952 F.3d at 375. He has done that. *Accord id.* at 374–75 (denying motion to compel arbitration based on a material factual dispute as to the existence of an agreement to arbitrate); *Amos v. Lincoln Prop. Co.*, No. 3:17-CV-37, 2017 WL 2628820, at *5–6 (M.D. Tenn. June 19, 2017) (Trauger, J.) (same).[5]

Having concluded that there is a material factual dispute as to whether the plaintiff received the Arbitration Agreement at all, the court need not consider the matter further. The court nonetheless notes that, even assuming F&D were able to establish that Hammond had received a copy of the employee handbook, it is not at all clear that the employer's obligation to provide notice of the Arbitration Agreement would have been satisfied by simply handing over to a new employee a lengthy handbook that happened to contain, buried at least 33 pages into it, such an agreement. In that regard, the defendant has made no effort to show that anyone actually told Hammond that the employee handbook contained an Arbitration Agreement or that his failure to affirmatively opt out of it would be construed as agreeing to it.

Because there is a material factual dispute as to whether Hammond had notice of the Arbitration Agreement and voluntarily agreed to submit employment-related disputes to arbitration, the defendant's Motion to Compel Arbitration must be denied.

## III.   ALTERNATIVE MOTION TO DISMISS OR STRIKE

In the alternative to its Motion to Compel Arbitration, F&D also moves to dismiss or strike the Complaint, or portions thereof, under Rule 12(b)(2), 12(b)(6), or 12(f), on the grounds that (1) the court lacks personal jurisdiction over F&D with respect to the claims asserted against it by opt-in plaintiffs who do not reside in Tennessee and whose claims have no connection to Tennessee;

---

[5] *Camara* and *Ames*, though not directly on point, have distinct factual similarities with this case. In both, the declarations offered by the defendants were conclusory and lacking foundation.

(2) the court cannot adjudicate any claims asserted by opt-in plaintiffs who are subject to binding agreements to arbitrate FLSA claims; and (3) the Complaint fails to allege sufficient facts to state colorable claims on behalf of any individual opt-in plaintiffs other than Hammond.

### A. Motion to Dismiss or Strike All Claims on Behalf of a Collective

Regarding the latter argument, the allegations in the Complaint in support of Hammond's individual claim clearly satisfy Rule 8 as construed by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The defendant does not argue otherwise. Regarding the allegations in support of claims on behalf of a collective class of similarly situated F&D employees, this court has previously recognized that "the level of detail necessary to plead a[n] FLSA overtime claim is unsettled among different courts around the country." *Roberts v. Corr. Corp. of Am.*, No. 3:14-cv-2009, 2015 WL 3905088, at *5 (M.D. Tenn. June 25, 2015) (Trauger, J.) (collecting cases). However, this court also concluded that the "Sixth Circuit has never directed its district courts to apply the [heightened] pleading requirements that have recently been read into FLSA claims by several other circuits" and, further, that district courts within the Sixth Circuit have largely rejected calls to apply that standard. *Id.* at *7.

In *Roberts*, the court first determined that the named plaintiffs in an FLSA case adequately pleaded their individual claims. It also rejected the defendant's argument that a plaintiff bringing collective action claims on behalf of himself and other similarly situated employees "must indicate who those other employees are and allege facts that would entitle those other employees to relief." *Id.* at *8. The court held that "the FLSA's text itself defeated the defendant's argument, because Section 216(b) authorizes a single employee to bring an action on his or her own behalf and on behalf of "other employees similarly situated." *Id.* (citing *Ambrose v. Northstar Mem'l Grp., LLC*, No. 12-2278-STA-dkv, 2012 WL 3727156, at *3 (W.D. Tenn. Aug.27, 2012)). "Therefore, the

FLSA's text expressly provides for complaints with allegations lacking additional factual detail as to the identity of other similarly situated employees at the pleading stage." *Id.*; *accord Hutchins v. Great Lakes Home Health Servs., Inc.*, No. 17-CV-10210, 2017 WL 3278209, at *2 (E.D. Mich. Aug. 2, 2017) ("Courts within the Sixth Circuit have consistently held that 'detailed factual pleading is not required in the context of a FLSA claim, so long as a defendant is given sufficient notice of the *prima facie* claim that it is being asked to defend.'" (quoting *Roberts*, 2015 WL 3905088, at *7)); *Hellenberg v. Integrated Deicing Servs., LLC*, No. 10-CV-11364, 2011 WL 317733, at *2 (E.D. Mich. Feb. 1, 2011) ("[E]xtensive pleading is not required in the context of an FLSA claim.").

In this case, besides alleging facts to support his own FLSA claim with sufficient detail, the plaintiff asserts that other similarly situated F&C Hourly Workers were scheduled to and did work hours similar to his—that is, more than forty per week—and that the defendant did not compensate them at the statutorily required rate. (Doc. No. 1 ¶¶ 47, 50.) He alleges that F&D managers regularly "shaved time" off of Hourly Workers' recorded hours in order to avoid paying the amount of overtime due. (*Id.* ¶¶ 51, 52.) At this juncture, these allegations are sufficient, and the motion to dismiss (or strike) in their entirety the claims on behalf of a collective will be denied.

### B. Motion to Dismiss Claims by Individuals Subject to Arbitration Agreement

While the law is clear that any individual employee who has agreed to binding arbitration will be required to comply with that agreement, *see Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) ("[C]onsistent with [the FAA], courts must rigorously enforce arbitration agreements according to their terms." (internal quotation marks omitted)), the defendant, as the party seeking to enforce it, has the burden of making a *prima facie* showing of the existence of a valid agreement to arbitrate. *See, e.g.*, *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010); *Arnold v. Owensboro Health Facilities, L.P.*, No. 4:15-CV-00104-JHM, 2016 WL 502061,

at *3 (W.D. Ky. Feb. 8, 2016). The defendant has not yet made this showing with respect to the named plaintiff, much less any opt-in or putative opt-in plaintiff. It is therefore premature for it to seek dismissal of any claims on that basis. The defendant's motion will be denied to the extent it is premised on this argument.

### C. Motion to Dismiss or Strike Claims of Out-of-State Opt-in Plaintiffs for Lack of Personal Jurisdiction

F&D's argument that the court lacks personal jurisdiction over it with respect to claims brought by opt-in plaintiffs and potential opt-in plaintiffs who do not reside in Tennessee and whose claims do not arise from contacts with this forum bears more extensive analysis. Because opt-in notices by at least two non-residents have already been filed, this argument is not premature, and the court will consider it on the merits.[6]

#### 1. Rule 12(b)(2) Standard of Review

Personal jurisdiction "is an essential element of the jurisdiction of a district court without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (alterations and internal citations and quotation omitted). In the context of a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing the existence of jurisdiction. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). Where neither party requests a hearing and the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, the burden on the plaintiff is "relatively slight." *Id.* (citation

---

[6] The Circuit Court in *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293 (D.C. Cir. 2020), held that a motion to dismiss all nonresident putative class members for lack of personal jurisdiction, filed prior to Rule 23 class certification, was premature, because, "[a]bsent class certification, putative class members are not parties before a court." *Id.* at 295. In an FLSA collective action, however, "an opt-in plaintiff's action is deemed 'commenced' from the date her opt-in form is filed with the district court." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018) (citing 29 U.S.C. § 256).

omitted). "[T]he plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Id.* (citation omitted). The pleadings and affidavits submitted must be viewed in the light most favorable to the plaintiff.

2.     *The Parties' Arguments*

F&D does not contend that the court lacks personal jurisdiction over it with respect to the claim brought by Tennessee resident Hammond, the sole named plaintiff. It asserts, instead, that the court lacks personal jurisdiction over it with respect to any claims brought by opt-in or putative opt-in plaintiffs who reside outside Tennessee and whose claims do not arise from the defendant's activities in Tennessee.

Its argument largely hinges upon an assumption that the exercise of personal jurisdiction depends upon F&D's amenability to service of process and to the reach of the state's long-arm statute:

> "Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists if [1] the defendant is amenable to service of process under the [forum] state's long-arm statute and [2] if the exercise of personal jurisdiction would not deny the defendant due process."

(Doc. No. 29-1, at 13 (quoting *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)).) Similarly, it asserts, that, "[a]bsent consent, a basis for service of a summons on the defendant is prerequisite to the exercise of personal jurisdiction." (*Id.* (quoting *BNSF Ry. Co. v. Tyrell*, 137 S. Ct. 1549, 1556 (2017)); *see id.* ("[W]hen a federal question case is based upon a federal statute that [like the FLSA] is silent as to service of process . . . a state long-arm statute is therefore utilized to serve an out-of-state defendant." (quoting *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 101 (1987))).)

It then asserts that it is not subject to the exercise of *general* jurisdiction by Tennessee courts, a proposition the plaintiff does not seriously dispute,[7] and that, with respect to claims brought by non-resident plaintiffs, it is not subject to specific personal jurisdiction under Tennessee's long-arm statute. The defendant's argument arises from the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California* ("*BMS*"), 137 S. Ct. 1773, 1787 (2017), which, the defendant insists, applies to this case as well and requires dismissal of the claims brought by out-of-state opt-in plaintiffs for lack of personal jurisdiction.

In *BMS*, nearly 700 plaintiffs had filed a mass tort action—not a collective or class action—against the defendant pharmaceutical company in California state court, for injuries allegedly caused by a drug manufactured by the defendant. *Id.* at 1778. Nearly 600 of the plaintiffs were residents of states other than California; they had not bought the drug in California, suffered injury in California, or been treated in California. *Id.* The defendant was incorporated in Delaware and headquartered in New York, with substantial operations in New York and New Jersey. *Id.* at 1777–78. *BMS* addressed the due process protections of the Fourteenth Amendment as they apply to a state court's exercise of specific jurisdiction over mass tort claims asserted by out-of-state plaintiffs against an out-of-state defendant. The Supreme Court ultimately held that the California state courts could not exercise personal jurisdiction over the claims of the out-of-state plaintiffs and had erred in finding specific jurisdiction "without identifying any adequate link between [California] and the nonresidents' claims." *Id.* 1781.

---

[7] In the text of his Response, the plaintiff only asks the court to find that it has specific jurisdiction over the defendant. In a footnote, he states, "[r]egarding general jurisdiction, Defendant has continuous and systematic contacts with the state, and Defendant should be 'fairly regarded as at home' in Tennessee.'" (Doc. No. 34, at 12 n.4 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).) To the extent the plaintiff is attempting to assert that the Tennessee courts would have general jurisdiction over F&D based on its operating three stores in this state, such a conclusion was firmly foreclosed by *Daimler*, the very case the plaintiff cites.

No circuit court of appeals has addressed the question of whether *BMS* applies to FLSA collective actions, and the district courts nationwide are split. *See Pettenato v. Beacon Health Options, Inc.*, No. 19-CV-1646 (JPO) (BCM), 2019 WL 5587335, at \*6–8 (S.D.N.Y. Oct. 25, 2019) (collecting cases). One line of cases, holding that it does not, stems from *Swamy v. Title Source, Inc.*, No. C 17-cv-01175 WHA, 2017 WL 5196780, (N.D. Cal. Nov. 10, 2017). *Swamy* held that *BMS* "does not apply to divest courts of personal jurisdiction in FLSA collective actions." *Id.* at \*2. The court reasoned that an FLSA claim is "a federal claim created by Congress specifically to address employment practices nationwide," that "Congress created a mechanism for employees to bring their claims on behalf of other employees who are 'similarly situated,'" and that Congress "in no way limited those claims to in-state plaintiffs." *Id.* (citing 29 U.S.C. §§ 202, 207(a), 216(b)). That court also believed that applying *BMS* to collective actions "would splinter most nationwide collective actions, trespass on the expressed intent of Congress, and greatly diminish the efficacy of FLSA collective actions as a means to vindicate employees' rights." *Id.* The court concluded that, to satisfy personal jurisdiction in an FLSA collective action, the defendant must simply be "subject to personal jurisdiction in [the forum] to claims brought by . . . the sole named plaintiff." *Id.*; *accord Warren v. MBI Energy Servs., Inc.*, No. 19-CV-00800-RM-STV, 2020 WL 937420, at \*6 (D. Colo. Feb. 25, 2020) (finding "*Swamy* line of cases more persuasive"); *Seiffert v. Qwest Corp.*, No. 18-cv-00070, 2018 WL 6590836, at \*2–3 (D. Mont. Dec. 14, 2018) ("This Court agrees with the reasoning in *Swamy*. . . . Nothing in the plain language of the FLSA limits its application to in-state plaintiffs' claims.").

"The other line of cases derives from *Maclin v. Reliable Reports of Texas, Inc.,* 314 F. Supp. 3d 845 (N.D. Ohio 2018), which held that '[*BMS*] applies to FLSA claims, in that it divests courts of specific jurisdiction over the FLSA claims of [out-of-state] plaintiffs' against out-of-state

defendants." *Pettenato*, 425 F. Supp. 3d at 276 (quoting *Maclin*, 314 F. Supp. 3d at 850; other internal quotation marks and citations omitted); *see also Chavira v. OS Rest. Servs., LLC*, No. 18-CV-10029-ADB, 2019 WL 4769101, at *6 (D. Mass. Sept. 30, 2019); *Turner v. Utiliquest, LLC*, No. 3:18-cv-00294, 2019 WL 7461197, at *3 (M.D. Tenn. July 16, 2019) (Richardson, J.) (agreeing with the "rationale of *Maclin*"); *Rafferty v. Denny's, Inc.*, No. 5:18-cv-02409, 2019 WL 2924998, at *3–7 (N.D. Ohio July 8, 2019) (adopting *Maclin*); *Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 3d 43 (D. Mass. 2018) (same).

The defendant urges the court to adopt the reasoning of those cases applying *BMS* to claims brought by out-of-state opt-in plaintiffs in FLSA collective actions against non-resident defendants, noting that "every district court in the Sixth Circuit to consider the issue," including another judge of this court, has done so. For his part, the plaintiff insists that the court should find that it has specific jurisdiction over the claims brought against the defendant by the out-of-state opt-in plaintiffs based on *Swamy* and the line of cases following it.

### 3. Analysis

In *BMS*, the defendant moved to quash service of summons on the nonresidents' claims for lack of personal jurisdiction. *BMS*, 137 S. Ct. at 1778. The trial court denied the motion, finding that it had general jurisdiction over the defendant based on its extensive contacts with the state. *Id.* The California Court of Appeal affirmed, based on a finding that the California court had specific jurisdiction over the nonresidents' claims against the defendant, and the California Supreme Court affirmed. *Id.* The Supreme Court reversed, applying long-standing principles of specific jurisdiction under the Due Process Clause of the Fourteenth Amendment. "In order for a state court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Id.* at 1780 (quoting *Daimler*, 571 U.S. 117, 118 (2014); citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985); *Helicopteros Nacionales de Colombia, S.A. v.*

*Hall*, 466 U.S. 408, 414 (1984)); *see also id.* at 1781 ("Our settled principles regarding specific jurisdiction control this case.").

In reaching its holding, the *BMS* Court specifically noted that, "[b]ecause '[a] state court's assertion of jurisdiction exposes defendants to the State's coercive power,' it is 'subject to review for compatibility with the Fourteenth Amendment's Due Process Clause.'" *BMS*, 137 S. Ct. at 1779 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)). The holding was very specifically limited to the exercise of specific jurisdiction by *state* courts over nonresident defendants. *See id.* at 1780. And in conducting its analysis of the "variety of interests" relevant to the question of whether specific personal jurisdiction exists, the Court noted that the "primary concern," among the various interests, is the "burden on the defendant." *Id.* (citations omitted). And the assessment of this burden requires the consideration, not only of "the practical problems resulting from litigating in the forum," but also of "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.*

None of these concerns, deemed central to the personal jurisdiction analysis in *BMS*, comes into play in a collective action initiated in federal court raising issues governed by federal law. In the end, the *BMS* Court, while expressly limiting its decision to "the due process limits on the exercise of specific jurisdiction by a State," left "open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84. It also, as Justice Sotomayor noted in her dissent, did not address the question of whether its holding would "apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." *Id.* at 1789 n.4 (Sotomayor, J., dissenting). Likewise, it left unanswered the question of whether, in an FLSA

collective action, each individual opt-in plaintiff must establish personal jurisdiction over the defendant in the forum state.

*BMS* involved mass tort actions, not a collective or class action. As other courts have recognized, this distinction is important, because *BMS* "framed the specific jurisdiction analysis at the level of the suit: "'the *suit*" must "aris[e] out of or relat[e] to the defendant's contacts with the forum."'" *Morgan v. U.S. Xpress, Inc.*, No. 3:17-CV-00085, 2018 WL 3580775, at \*5 (W.D. Va. July 25, 2018) (quoting *BMS*, 137 S. Ct. at 1780). Prior to *BMS* and since, courts have recognized that the relevant inquiry for purposes of personal jurisdiction is whether the named plaintiff or plaintiffs in "the suit" can exercise personal jurisdiction over the defendant. *See, e.g.*, *Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1022 (N.D. Cal. 2015) (stating, in the context of a hybrid FLSA collective action and state law class action, "specific jurisdiction must be demonstrated by the named Plaintiffs"); *Seiffert v. Qwest Corp.*, No. CV-18-70-GF-BMM, 2019 WL 859045, at \*4 (D. Mont. Feb. 22, 2019) ("It is well settled that the original plaintiff in a collective action under the FLSA dictates a district court's analysis of specific jurisdiction."). "[I]n a mass tort action [like *BMS*], each plaintiff is a real party in interest to the complaints; by contrast, in a putative class action [or collective action], one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint." *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018) (denying motion to dismiss).

In other words, here, unlike in *BMS*, the only "suit" at issue is that between F&D and Hammond, a Tennessee resident who worked for F&D in Tennessee. While the named plaintiff may end up representing other members of the collective action, this is different from a mass action where independent suits with independent parties in interest are joined for trial. *See Devlin v.*

*Scardelletti*, 536 U.S. 1, 2 (2002) ("[N]onnamed class members . . . may be parties for some purposes and not for others."). The only suit before the court, that brought by Hammond, arises out of and relates to F&D's contacts with this forum, for purposes of personal jurisdiction.

Relatedly, F&D's arguments for the application of *BMS* to this case are primarily premised upon the necessity of effecting service of process as a prerequisite to the exercise of personal jurisdiction over a defendant. In an FLSA collective action, however, as in a class action (and unlike in a mass tort action such as the one at issue in *BMS*), there has never been a requirement that each individual opt-in plaintiff (or class member) achieve individual service of process upon the defendant. Rather, service is deemed effective or not based upon whether the named plaintiff complies with Rule 4 and can assert a legitimate basis for the exercise of personal jurisdiction over the defendant. There is no dispute here that Hammond has complied with Rule 4 and achieved effective service of process upon F&D, and that personal jurisdiction over the defendant exists with respect to Hammond's claim.

Moreover, the court is persuaded by the reasoning of *Swamy* and the other cases following its lead: an FLSA collective action presents circumstances that "are far different from those contemplated by the Supreme Court in Bristol-Myers." *Swamy*, 2017 WL 5196780, at *2. An FLSA claim is "a federal claim created by Congress specifically to address employment practices nationwide." *Id.* By enacting the statute, "Congress created a mechanism for employees to bring their claims on behalf of other employees who are 'similarly situated,'" and Congress "in no way limited those claims to in-state plaintiffs." *Id.* (citing 29 U.S.C. § 216(b)). As the plaintiff argues, extending *BMS* to collective actions "would splinter most nationwide collective actions, trespass on the expressed intent of Congress, and greatly diminish the efficacy of FLSA collective actions as a means to vindicate employees' rights." *Id.*

In sum, for all these reasons, this court agrees with *Swamy*: "all that is needed to satisfy the requirement of personal jurisdiction in an FLSA collective action" is a finding that the "defendant is subject to personal jurisdiction in [the forum] to claims brought by the sole named plaintiff." *Id.* There is no question in this case that personal jurisdiction over the defendant exists with respect to the named plaintiff's claims—the defendant does not argue otherwise.

The court concludes that the holding in *BMS* does not extend to cases such as this one, involving an FLSA collective action filed in federal court, asserting only federal claims. The defendant's motion to dismiss the claims brought by out-of-state opt-in plaintiffs, or putative opt-in plaintiffs, for lack of personal jurisdiction, will be denied.

## IV.    CONCLUSION

For the reasons forth herein, the defendant's Motion to Compel Arbitration and Alternative Motion to Dismiss or Strike will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge