**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GERMMA HAMMOND, on behalf of himself and others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:19-cv-01099** **Judge Aleta A. Trauger** |
| **FLOOR AND DECOR OUTLETS OF AMERICA, INC.,** | ) ) ) | |
| **Defendant.** | ) ) | |

## MEMORANDUM AND ORDER

Having previously denied without prejudice the defendant's Motion to Compel Arbitration on the grounds that a material factual dispute precluded a summary determination as to whether an agreement to arbitrate was formed between the parties, the court held an evidentiary hearing to resolve this dispute, in accordance with 9 U.S.C. § 4. *See id.* ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."). Having heard testimony and received other evidence from both parties at the hearing conducted on July 15, 2020, followed by telephonic closing arguments on July 16, 2020, the court now definitively resolves this factual dispute in favor of the plaintiff. Finding that no contract to arbitrate was made, the defendant's motion to compel plaintiff Germma Hammond to arbitrate his claims against the defendant is **DENIED**, for the reasons set out more fully herein.

## I. THE EVIDENCE PRESENTED

The defendant called two witnesses: the plaintiff and James Jonathan ("JJ") Donalson. The plaintiff called only one witness: the plaintiff himself.

JJ Donalson worked for defendant Floor and Decor Outlets of America, Inc. ("F&D")

beginning approximately twelve or thirteen years ago until January 2020. He now lives and works in Texas. He testified by live video link. Donalson was formerly employed at F&D's Nashville, Tennessee store as its Chief Executive Merchant, effectively its general manager. Jeremy Glass was the Nashville store's Operations Manager at the relevant time. Glass normally conducted new hire orientations, unless they took place on a weekend or holiday or if, for some other reason, Glass was not available. In that event, Donalson would do them.[1] Donalson never witnessed Glass's orientations.

Donalson has no specific recollection of conducting the plaintiff's new-hire orientation. He believes that he did the orientation based on the fact that his signature appears on two forms in the plaintiff's personnel file: an Occupational Safety Hazard Administration (OSHA) Required Safety Programs Acknowledgement Form at Time of Hire (Pl.'s Ex. 1, Bates No. 243) and Return to Work Program Acknowledgment Form (Pl.'s Ex. 1, Bates No. 242). Both of these documents reflect the signatures of both the plaintiff and JJ Donalson, and the signatures of both are dated 11/18/16. Donalson acknowledged that both of the handwritten dates on the OSHA form are in his handwriting.

Donalson testified that, when he performs a new hire orientation, the process generally takes five to six hours and sometimes as long as eight hours. The process, as he conducted it, included having the new employee watch a short welcome video, take a tour of the facility, and go through a packet of written materials requiring the employee's signature, while Donalson himself would follow a checklist, marking which documents the plaintiff received and which he signed and returned. Donalson testified that it is F&D's policy to maintain all of these forms in an employee's personnel form.

---

[1] The court takes judicial notice that November 18, 2016 fell on a Friday.

Among the documents he provided to new hires was the F&D Associate Handbook[2] which, in 2016, also contained the company's Arbitration Agreement. Donalson stated that he would allow the new employee as much time as he needed—forty-five minutes to an hour—to read the entire forty-eight page Associate Handbook cover to cover. Donalson would then go through each individual policy covered by the Associate Handbook with the employee and entertain any questions the employee might have. He specifically made sure to go over every policy included on the New Hire Forms Checklist. He also stated that it was his practice to go over the Arbitration Agreement and to ensure that the new employee was aware that he either needed to sign it or opt out of it, but that, even if he did not sign it, continued employment would constitute acceptance of the agreement to arbitrate unless he affirmatively opted out. Donalson later clarified that he told new hires that they had to sign the form acknowledging that they had *received* the arbitration agreement and that, regardless of whether they actually signed the acknowledgment form, they would be deemed to have agreed to arbitrate unless they signed and returned the opt-out form.

On cross examination, Donalson stated that, although it was company policy to maintain the documents signed during the new hire orientation in an employee's personnel file, mistakes sometimes happened, files and documents got shuffled around, and such forms were not always maintained. He acknowledged that, although he worked for the company for twelve or thirteen years, his own personnel file included only one document.

The defendant called Hammond to testify as well. Its purpose in calling the plaintiff was to impeach his memory and credibility. For example, the defendant elicited testimony from the plaintiff establishing that, although his Declaration (in the court's record at Doc. No. 33) states

---

[2] The parties refer to this document as the Employee Handbook, and the New Hire Forms Checklist also references it as the Employee Handbook. Because the document itself is titled Floor & Decor Associate Handbook, the court refers to it as the Associate Handbook.

that he began working for F&D in October 2016, his personnel file and other documentary evidence now establish that he began working for F&D in November 2016. The plaintiff testified that, at the time he made the Declaration, he honestly believed, to the best of his recollection, that he had begun working for the defendant in October. It was not until documents became available establishing the actual date that he realized his recollection of the date was in error.

Otherwise, the plaintiff testified, both during his examination by the defendant and when recalled for his own case in chief, as to his recollection of his hiring and orientation process. He stated that he had an initial interview in early November 2016 at F&D's Nashville store with an F&D employee named Britt. He had a second on-premises interview, which the record suggests took place on or around November 11, 2016, with Jeremy Glass and JJ Donalson in Glass's office. Donalson left almost immediately, however. Glass offered the plaintiff a job at the end of that interview, contingent upon his clearing a background check. Because the plaintiff was still working at a different job and needed to leave to start his shift there, rather than filling out new-hire paperwork during that interview, Glass gave him a stack of documents, totaling approximately 18 pages and about a third of an inch thick, for him to take home with him and bring back when he started working. Glass also asked him if he wanted to watch any safety videos at that time. Again because Hammond was concerned about getting to his other job that day, he declined. The plaintiff was quite definite that he did not receive an Associate Handbook among the documents Glass gave him that day and that the matter of resolving employee disputes through arbitration was not discussed.

The plaintiff began work on November 18, 2016. When he arrived, he spoke first with the cashier, who walked him back to the employee breakroom to meet with Glass again. He had filled out the paperwork Glass had previously given him that morning before reporting to work. He met

with Glass for about five minutes, and then Glass took him on a tour of the facility. The last stop was the warehouse, which was to be his station. Glass left him there to "shadow" Brian Dawlen for a period of time. The plaintiff was taught how to pick up orders and stack and wrap them. On that first day, the only time Hammond saw Donalson was when Donalson stopped by to shake his hand and welcome him to F&D.

Toward the end of the day, the plaintiff was called back into the office to sign additional forms. The plaintiff did not precisely remember what documents he had taken home with him after his second interview and what forms he signed that day. He watched some of the company's required OSHA safety videos that day but watched the others over a period of time. The plaintiff was asked specifically about several documents in his personnel file, including the Occupational Safety Hazard Administration (OSHA) Required Safety Programs Acknowledgement Form at time of Hire and the Return to Work Program Acknowledgment Form. As indicated above, both of these documents reflect the signatures of both the plaintiff and Donalson, and the signatures on both are dated 11/18/16. The plaintiff testified unequivocally, however, that Donalson did not sign these forms in his presence.

The plaintiff was also adamant that he had never received a copy of the Associate Handbook on the day of his hire, or at any later date, and that no one ever discussed arbitration with him. At no point during his employment with F&D did anyone discuss arbitration with him or convey to him that his continued employment at F&D constituted his acceptance of an agreement to arbitrate. The plaintiff further testified that he had never even heard the term "arbitration" until after his employment at F&D had been terminated and he was working for a new employer, Avis. He worked for Avis from January through April 2019, and he had a clear recollection of his orientation with Avis, at which time his new employer's arbitration policy was

clearly explained to him. The conversation stuck with him, in particular, because he had never heard the term before or had it explained to him.[3]

The defendant re-called Donalson in rebuttal. Donalson testified that a new hire would never have been given documents to take home with him after a second interview, even if he had received a job offer. Instead, he would receive that paperwork during his first actual day on the job. Donalson also stated that he would not have signed off on the plaintiff's OSHA form if he had not actually been the person explaining the various safety policies listed on the form; he would not have been the person explaining the OSHA policies if he had not done the orientation; and, if he had done the orientation, he would have provided and explained the Associate Handbook and the Arbitration Agreement.

The parties introduced various exhibits into evidence. The defendant's Exhibit 3 is a complete copy of the F&D Associate Handbook, dated April 2016, the version that was in effect when the plaintiff was hired. This document is 48 pages long and covers a number of topics, including, among others, employee benefits and company policy regarding discrimination, harassment, leave, meal period, breaks, vacation and leave, and safety. Page 31 is the Acknowledgment of Receipt of the F&D Associate Handbook. Buried at the end of the Associate Handbook, beginning on page 33, is the company's Arbitration Agreement. Page 37 is the Acknowledgment of the Arbitration Agreement. By signing this page, an employee confirms that he "knowingly and freely agree[s] to this mutual agreement to arbitrate" and, further,

---

[3] The plaintiff also testified that he is originally from Ghana, in West Africa, that he came to the United States as a teenager, and that English is not his first language. This created a slight barrier both to the court's ability to understand the plaintiff's testimony, due to his heavy accent, and, at times, to the plaintiff's ability to understand questions posed by defense counsel, who spoke very quickly. The fact that everyone in court was wearing face-coverings during the hearing somewhat compounded the problem. The plaintiff wore a clear plastic face shield, rather than a mask, while testifying.

acknowledges that he has the option to revoke such acceptance by signing and returning an "opt-out" form to the employer within thirty days of signing the Arbitration Agreement. (Def.'s Ex. 3, at 37, Bates No. 369.) The Arbitration Opt-Out Form follows. (*Id.* at 39, Bates No. 371.)

The plaintiff's personnel file and those of six other individuals hired by F&D at its Nashville store within thirty days of the plaintiff's hire date were introduced by the parties. Several of these, including the plaintiff's, include a New Hire Forms Checklist.[4] The plaintiff's New Hire Forms Checklist reflects the plaintiff's handwritten name on the top of the form.[5] The form contains two lists: one of documents "Provided To" the new employee and another of documents that were "Returned/Completed" by the employee and which, as a result, should be in the employee's personnel file. As the court discussed in the Memorandum accompanying the Order denying without prejudice the defendant's Motion to Compel Arbitration, one of the forms on the "Returned/Completed" list is the Acknowledgment of Receipt of Employee Handbook & Code of Business Conduct & Ethics (completed, signed, dated). (*See* Pl.'s Ex. 1, Bates No. 184.) An indefinite mark that may or may not be a checkmark appears next to this entry on the plaintiff's New Hire Forms Checklist. The defendant insists that it is a checkmark documenting that the plaintiff signed this form acknowledging receipt of the Associate Handbook. Even assuming that it is, Hammond's personnel file does not include any such form. A number of the other items that reflect checkmarks next to them, which should mean that the plaintiff signed and returned them to the defendant, are also not in the plaintiff's personnel file, including a Resume, InfoMart Disclosure & Consent Release of Information Form, background screen results, and Receipt of

---

[4] Importantly, neither the Arbitration Agreement nor the Acknowledgment of the Arbitration Agreement is included on the New Hire Forms Checklist.

[5] The plaintiff and Donalson both testified that the plaintiff's name appeared to be in Donalson's handwriting.

Substance Abuse Policy.

Terrance Quarles' personnel file was introduced by the defendant. Quarles was hired effective December 5, 2016, less than three weeks after the plaintiff. His New Hire Forms Checklist does not contain checkmarks next to any of the items on the list of items "Returned/Completed," but his actual file contains a substantial number of those documents, including several not included in the plaintiff's personnel file, as well as others that are not on the list at all. These include a Receipt of Substance Abuse Policy, a Disclosure of Intent to Obtain Consumer Reports of Investigation of Consumer Reports (dated 11/22/16, or two weeks prior to this individual's actual hire date), Disclosure & Authorization for Background Screening (also dated 11/22/16), as well as Interview Worksheets completed by Jeremy Glass and an entire "New Hire Safety Training Packet" dated 2/20/2017, more than two months after Quarles' hire date. Notably, this personnel file, like Hammond's, does not include an Acknowledgment of Receipt of Employee Handbook or an Acknowledgment of the Arbitration Agreement. The Return to Work Acknowledgment Form and OSHA forms in Quarles' file were signed by Jeremy Glass. (Def.'s Ex. 1.)

Defendant's Exhibit 2 consists of Jamison McKnight's personnel file. On McKnight's New Hire Forms Checklist, there is no checkmark next to "Acknowledgment of Receipt of Employee Handbook" on the "Returned/Completed" list. His personnel file does not include any such Acknowledgment, nor does it contain an Acknowledgment of the Arbitration Agreement. The Return to Work Acknowledgment Form and OSHA forms in McKnight's file were signed by Donalson. McKnight's hire date was the same as the plaintiff's, which initially led Donalson to testify that, consistent with his practice, he would have oriented the two new hires together, until it was pointed out, based on their timesheets, that their work hours overlapped by only one hour.

The plaintiff introduced the personnel files of four other individuals. Only one, that of Jasmine Correa-Molina, hired on 11/28/16, contains both a signed Acknowledgment of Receipt of the F&D Associate Handbook (Pl.'s Ex. 5, Bates No. 398) and a signed Acknowledgment of the Arbitration Agreement (*id.*, Bates No. 399). Nothing in Correa-Molina's personnel file indicates who might have conducted her orientation. Kenneth Hobbs's personnel file includes an Acknowledgment of Receipt of the F&D Associate Handbook dated 11/30/16. (Pl.'s Ex. 6, Bates No. 416.) Although Hobbs's hire date appears to be 11/30/16, his timesheet indicates that he was at work that first day for only a little over two hours. (*Id.*, Bates No. 402.) Nicholas Kendall's hire date was 12/8/16. His New Hire Forms Checklist contains a checkmark next to Acknowledgment of Receipt of Employee Handbook, but his file does not contain that form or an Acknowledgment of the Arbitration Agreement. (Pl.'s Ex. 7.) Finally, Kelvin Owusu's hire date, like the plaintiff's, was 11/18/16. (Pl.'s Ex. 9.) His New Hire Forms Checklist does not have a checkmark next to Acknowledgment of Receipt of Employee Handbook, nor does his file contain such a form. The OSHA forms in his file are from several months after his hire date, and nothing in his file indicates who might have conducted his orientation. Although numerous manual timesheets are included in his file, there is not one for November 18, 2016, so it is unclear to what extent the hours he worked on his first day overlapped with the plaintiff's.

## II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, only when a litigant establishes the existence of a valid agreement to arbitrate must the district court grant the litigant's motion to compel arbitration and stay proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3, 4). "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago,*

*Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted). Under Tennessee law, "acceptance of a written agreement can be performed by action under the contract." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 973 (6th Cir. 2007). Thus, whether an employee actually signed an arbitration agreement is not dispositive of the question of contract formation. But, signed or not, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)); *see also Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 383 (6th Cir. 2005) ("It is well-settled under Tennessee law that a contract must result from a meeting of the minds of the parties in mutual assent to the terms.").

"Although the question of mutual assent involves largely an objective analysis, the parties' intent remains relevant, in particular the circumstances surrounding the formation of the contract." *Walker*, 400 F.3d at 483 (citation omitted). Thus, in a case where a party seeks to bind another to an unsigned arbitration agreement based on continued employment as evidence of assent, the evidence must establish that the employee had notice, whether actual or constructive, that accepting or continuing employment constituted acceptance of an arbitration agreement. *See, e.g.*, *Seawright*, 507 F.3d at 970–71 (detailing the steps the employer took to notify employees of the implementation of the alternative dispute resolution program); *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 892 (M.D. Tenn. 2003) (Trauger, J.) (holding that an employee who "did not recall" ever receiving a copy of the employer's dispute resolution program was nonetheless bound by it where the evidence showed that copies of the policy "were mailed to all existing GE employees" on a specific date, and it was undisputed that the employee was aware of the program and thus, by

continuing to work at GE, had manifested his assent to the dispute resolution program, which specifically provided that continuing to work after the program went into effect would constitute agreement to its terms).

With all of that in mind, the court finds, as a factual matter, that no contract to arbitrate was formed in this case. Specifically, the court finds that the plaintiff was not provided a copy of the Associate Handbook upon being hired by F&D and that no one ever explained to him that his continued employment with F&D constituted his assent to settle any employment disputes with F&D through arbitration, unless he signed and returned an "opt-out" form within thirty days. Consequently, in his case, his continuing to work at F&D did not manifest his assent to the Arbitration Agreement.

Several factors lead the court to this conclusion. First, the plaintiff clearly, unequivocally, and credibly testified that he never received a copy of the Associate Handbook and was never told about the Arbitration Agreement. The court also credits Hammond's testimony that his orientation, such as it was, was conducted by Jeremy Glass, not by JJ Donalson. The court finds it particularly telling that the plaintiff had a clear recollection of the first time an arbitration agreement was explained to him, when he went to work for Avis after his employment at F&D was terminated. He was quite certain that, prior to that time, he had never even heard the word "arbitration."

In addition, the fact that his employee personnel file does not contain either a signed Acknowledgment of Receipt of the F&D Associate Handbook or a signed Acknowledgment of the Arbitration Agreement tends to substantiate his testimony that he did not receive a copy of the Handbook. Further, that only two of the personnel files of the other employees hired around the same time as the plaintiff actually contain an Acknowledgment of Receipt of the F&D Associate Handbook, and only one contains an Acknowledgment of the Arbitration Agreement, suggests

both that F&D's recordkeeping practices at the time of Hammond's hire were sloppy and that there was little consistency in the orientation process itself.

Donalson was able to testify only about his standard orientation practices and had no memory whatsoever of orienting Hammond. He testified that he must have conducted Hammond's orientation because he signed two of the forms found in Hammond's personnel file. In contrast, Hammond had a clear recollection of his first day of work at a new job and that Glass was the person he met with on that first day. Donalson also conceded that Glass was the person who ordinarily conducted orientations, and the documentary evidence in the record shows that three new employees, including the plaintiff, began working at F&D's Nashville store on November 18, 2016. No testimony was adduced regarding what type of stress it may have put on Donalson or Jeremy Glass to "onboard" three new employees in one day, but the evidence in the record— including the differences in the documentation in each of those three employees' files—does not suggest that Donalson's standard orientation process was followed for any of them. Jeremy Glass did not testify, so there is no evidence regarding his standard orientation practices—and Donalson does not claim to have knowledge of Glass's practices.[6]

Regardless, it is evident that Donalson's (and F&D's) purported policy of having new hires sign and return both the Acknowledgment of Receipt of the F&D Associate Handbook and the Acknowledgment of the Arbitration Agreement was aspirational at best, which also casts doubt on Donalson's testimony regarding the thoroughness with which he went over the Handbook and the Arbitration Agreement with each new hire.[7] Without returned forms documenting receipt of the

---

[6] If the defendant's position is that it did not call Glass as a witness because it did not anticipate that the plaintiff would claim that Glass conducted his orientation, the defendant could have, but did not, request to keep the evidence open in order to produce Glass as a witness.

[7] Donalson's claim that he allowed new hires forty-five minutes to an hour to sit and read the Associate Handbook from start to finish strains credulity.

Handbook and Arbitration Agreement, there is no extrinsic evidence that any employees received an adequate explanation of the Arbitration Agreement buried at the back of the Handbook.

And finally, although Donalson testified that the plaintiff would not have received any paperwork during his second interview, before F&D had obtained the results from his background check, other employees' personnel files contain documents that predate their hire date—including that of Kelvin Owusu, who began work on November 18, 2016. His file contains documents that appear to have been signed and completed on November 11, 2016. (Pl.'s Ex. 9.)

The defendant argues that Donalson's testimony was more plausible than the plaintiff's, as a matter of common sense. Common sense, however, would dictate that a company serious about enforcing an Arbitration Agreement would consistently document, at the very least, that the its employees received a copy of the Arbitration Agreement and understood what rights they were waiving if they agreed to it by continuing to work. The defendant insists that documents from personnel files occasionally go missing when files are moved around, such that the absence of certain documents does not necessarily mean they were never there. The court finds, however, that the disorganization, randomness, and inconsistency of the documents contained in each of the personnel files introduced into evidence constitutes circumstantial evidence of the likely disorganization, randomness, and inconsistency in the new-hire orientation process itself. The fact that only one of the seven employee personnel files presented to the courts includes a signed Acknowledgment of the Arbitration Agreement strongly suggests that most of the seven did not sign it and may not have been made aware of it.

The court is not called upon to resolve that larger question, however. Regarding Hammond, the court finds, based on all of the evidence presented at the hearing, that the defendant failed to carry its burden of proving, by a preponderance of the evidence, that the plaintiff ever received a

copy of the Associate Handbook or was ever told that, by accepting employment with F&D, he was agreeing to arbitrate and waiving his right to pursue any future employment disputes in court. No agreement to arbitrate was formed, and the defendant's Motion to Compel Arbitration will be denied with prejudice.

In addition, to be clear, the court also rejects the defendant's argument that simply providing an employee a copy of the Associate Handbook would be sufficient to bind the employee to the Arbitration Agreement contained therein. It is true under Tennessee law both that an individual who signs an agreement without reading it may be bound by its terms, *see, e.g.*, *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 651 (E.D. Tenn. 2011) (when a person signs a contract in Tennessee, that person is presumed to have read its contents (citations omitted)), and that a provision incorporated into an employee handbook may form a contract, *see, e.g.*, *Mannix v. Cty. of Monroe*, 348 F.3d 526, 536 (6th Cir. 2003) (interpreting Michigan law). However, in the absence of a signed agreement or even a signed acknowledgment of receipt of a copy of the arbitration agreement, for an employee handbook incorporating an arbitration agreement to form a contract, there must be adequate notice to the employees that they are required to read the handbook and that it contains a binding arbitration agreement.

Thus, in *Mannix*, the Sixth Circuit found that "[d]istribution of a new employee handbook constitutes *reasonable notice*, regardless of whether the affected employee actually reads it" and, thus, may effect binding employment policy changes—in that case, elimination of the employer's termination-for-cause policy and adoption of employment at will. *Id.* (emphasis added). The actual holding in *Mannix* emphasized the importance of the notice provided to employees about the new policies embodied in the new handbook, including that the defendant had "posted the revised [employment policies] at least four months before the [plaintiff's] termination . . . on an internal

database available to employees" and had "spread the word of the revised policies" by "[holding] meetings between department heads and employees and put[ting] the policies on the [defendant's] email system." *Id.* (citing *Highstone v. Westin Eng'g*, 187 F.3d 548, 552–53 (6th Cir. 1999) (finding that the defendant had "satisfied its burden by reasonably notifying affected employees of the changes to the manual" by publishing the revisions to the employee handbook online, making the entire manual available online, sending two email messages to all employees notifying them of changes, and providing notice of the changes during staff meetings)); *see also Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 418–19 (6th Cir. 2011) (finding that the distribution of the employee handbook in that case did not create an agreement to arbitrate where notice of the arbitration agreement was lacking).

In this case, the first page of F&D's 2016 Associate Handbook states that its purpose is to be "a guide [the employee] may use to familiarize [himself] with Floor and Decor." (Def.'s Ex. 3, Bates No. 334.) The Handbook states:

> This handbook is not, nor should it be considered to be, a bargain or agreement or a contract of employment, express or implied, or a promise of treatment in any particular manner in any given situation. This handbook states general Company guidelines. . . .
>
> The Company may, at any time, in its sole discretion, modify anything stated in this handbook —except as required by law, and except for the rights of the parties to terminate employment at will, which may be modified by an express written agreement signed by an executive officer of the Company.

(*Id.*) In other words, nothing in the introduction to the 2016 Handbook notified employees that they were required to read it or were bound by its terms. As a result, simply providing the Handbook to an employee, without providing some additional form of notice of the Arbitration Agreement incorporated in its final pages, would not have been sufficient notice to the employee that continued employment would constitute acceptance of the Arbitration Agreement. Thus, even if the defendant had established the plaintiff's receipt of the Associate Handbook, that fact, without

more, would not have been sufficient to prove the plaintiff's assent to the Arbitration Agreement.

## III.  CONCLUSION AND ORDER

The court finds, as a factual matter, that the plaintiff did not receive a copy of the Associate Handbook and was not apprised of the existence of the Arbitration Agreement or that his continued employment constituted consent to arbitrate any employment-related disputes. Because there was no meeting of the minds, no contract to arbitrate was formed in this case. The defendant's Motion to Compel Arbitration is **DENIED WITH PREJUDICE**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge