# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**GERMMA HAMMOND**, on behalf of
himself and all other similarly situated
employees,

                Plaintiffs,

    v.

**FLOOR AND DECOR OUTLETS OF
AMERICA, INC.**,

                Defendant.

Civil Action No. 3:19-cv-01099

Honorable Aleta A. Trauger

---

## **DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

Dated: August 28, 2020

Lincoln O. Bisbee, admitted pro hac vice
Russell R. Bruch, admitted pro hac vice
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC 20001
Tel: (202) 739-3000
Fax: (202) 739-3001
lincoln.bisbee@morganlewis.com
russell.bruch@morganlewis.com

Keane A. Barger, TN Bar No. 33196
Katharine R. Cloud, TN Bar No. 019336
**RILEY WARNOCK & JACOBSON PLC**
1906 West End Avenue
Nashville, TN 37203
Tel: (615) 320-3700
Fax: (615) 320-3737
kbarger@rwjplc.com
kcloud@rwjplc.com

*Attorneys for Defendant Floor and Decor
Outlets of America, Inc.*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF RELEVANT FACTS ............................................................. 3

    A.     Hammond's Proposed Class Includes 12,000 Employees In 129 Stores, Four Distribution Centers, Two Support Centers, And F&D's Corporate Offices—But He Offers No Evidence About 126 Stores Or Any Other F&D Facility. ...................................................................................... 3

    B.     Over 1,000 Individual Managers—The Majority Of Whom Are Putative Class Members—Were Responsible For Managing Overtime And Timekeeping. .......................................................................................... 4

    C.     Hourly Employees' Experiences Working Overtime Vary Dramatically Depending On The Individual Store, Employee, And Manager. .......................... 5

    D.     Contrary To Hammond's Allegation Of An Illegal Companywide Practice, Numerous Hourly Employees Did Not Have Their Kronos Time Adjusted Or Had It Adjusted Solely For Lawful Reasons. ...................................................... 7

    E.     Hammond And His Declarants' Allegations Do Not Match Either Their Own Documented Experiences Or The Experiences Of Other Putative Class Members. .......................................................................................... 8

        1.     Contemporaneous Records Contradict Hammond And His Declarants' Individual Allegations. ........................................................... 8

        2.     Hammond And His Declarants Are Not Similarly Situated To One Another Or To Other Hourly Employees Across The Country. ................. 9

    F.     The Overwhelming Number Of Employees In The Putative Class Are Bound By Different Arbitration Agreements. ...................................................... 11

III. ARGUMENT ................................................................................................... 12

    A.     The Conflict Of Interest Between Hammond, His Counsel, And Over 1,000 Class Members Is An Absolute Bar To Conditional Certification. ........... 12

    B.     The Court Should Deny Conditional Certification Because Hammond Is Not Similarly Situated To Each Putative Class Member. ................................... 13

        1.     Legal Standard: Hammond Bears The Burden Of Showing He Is Similarly Situated To Every Putative Class Member. ............................. 13

        2.     Hammond Is Not Similarly Situated To Thousands Of Putative Class Members Bound By Arbitration Agreements. .............................. 13

        3.     Hammond Has Failed To Establish That He And The 12,000 Putative Class Members Are Similarly Situated. ...................................... 16

            a.     Hammond Has Failed To Offer Any Evidence As To 99.9994% Of The Putative Class. ................................................ 16

b. Hammond Has Failed To Show A Common Policy Affecting All 12,000 Hourly Employees—Instead, His Claims Involve Numerous Individualized Inquiries. .................. 16

4. Hammond Has Failed To Demonstrate A Common Theory Unifying Alleged Claims On Behalf Of All 12,000 Putative Class Members. ............................................................................... 20

C. If Any Class Is Conditionally Certified, Notice Should Be Limited. .................. 24

1. Any Notice Should Be Limited To The Nashville, Bridgeton, And Carmel Mountain Stores. ........................................................ 24

2. Notice Should Not Be Sent To Individuals Who Are Bound By Arbitration Agreements. ....................................................... 26

D. If Any Notice Is Permitted, It Should Be Fair And Accurate And Facilitated By A Third-Party Administrator. .................................... 30

IV. CONCLUSION ............................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adami v. Cardo Windows, Inc.*,
    299 F.R.D. 68 (D.N.J. 2014) ................................................................14

*Amos v. Lincoln Prop. Co.*,
    2017 WL 2935834 (M.D. Tenn. July 7, 2017) (Trauger, J.) ...................25

*Banks v. Radioshack Corp.*,
    2014 WL 1724856 (E.D. Pa. Apr. 25, 2014) ........................17, 18, 19, 20

*Bearden v. AAA Auto Club S., Inc.*,
    2013 WL 1181474 (W.D. Tenn. Mar. 18, 2013) ...............................16, 24

*Bigger v. Facebook, Inc.*,
    947 F.3d 1043 (7th Cir. 2020) ............................................26, 27, 28, 29

*Binkley v. Cumberland Corral, LLC*,
    2010 WL 11591196 (M.D. Tenn. Sept. 20, 2010) (Trauger, J.) .............28

*Bowman v. Crossmark, Inc.*,
    2010 WL 2837519 (E.D. Tenn. July 19, 2010) ...............................16, 18

*Bradford v. Team Pizza, Inc.*,
    2020 WL 3496150 (S.D. Ohio June 29, 2020) .................................28, 29

*Brickey v. Dolgencorp., Inc.*,
    272 F.R.D. 344 (W.D.N.Y. 2011) ........................................18, 19, 20

*Clark v. Dollar Gen. Corp.*,
    2001 WL 878887 (M.D. Tenn. May 23, 2001) .....................................13

*Comer v. Wal-Mart Stores, Inc.*,
    454 F.3d 544 (6th Cir. 2006) ........................................................13, 25

*Daoust v. Maru Rest., LLC*,
    2018 WL 7506167 (E.D. Mich. Apr. 13, 2018) ...................................30

*Delano v. MasTec, Inc.*,
    2011 WL 2173864 (M.D. Fla. June 2, 2011) .......................................14

*Diaz v. Elecs. Boutique of Am., Inc.*,
    2005 WL 2654270 (W.D.N.Y., Oct. 17, 2005) ...................................18

*Ellerd v. Cty. of L.A.*,
    2009 WL 982077 (C.D. Cal. Apr. 9, 2009) ...........................................................12

*Erman v. Wethington*,
    2006 WL 8458053 (M.D. Tenn. Mar. 21, 2006) ....................................................12

*Errickson v. Paychex, Inc.*,
    2020 WL 1307682 (W.D.N.Y. Mar. 19, 2020).........................................................15

*Fischer v. Kmart Corp.*,
    2014 WL 3817368 (D.N.J. Aug. 4, 2014) ...............................................................27

*Gaffers v. Sitel Worldwide Corp.*,
    2016 WL 3137726 (M.D. Tenn. June 6, 2016).........................................................21

*Geiger v. Charter Commc'ns, Inc.*,
    2019 WL 8105374 (C.D. Cal. Sept. 9, 2019) ..........................................................26

*Gonzalez v. Gonzalez v. Diamond Resorts International Marketing*,
    2020 WL 2114353 (D. Nev. May 1, 2020)...............................................................29

*Graham v. Word Enterprises Perry, LLC*,
    2019 WL 2959169 (E.D. Mich. June 18, 2019).......................................................26

*Harrison v. McDonald's Corp.*,
    411 F. Supp. 2d 862 (S.D. Ohio 2005) ...................................................................16

*Hart v. JPMorgan Chase Bank, N.A.*,
    2012 WL 6196035 (M.D. Fla. Dec. 12, 2012)................................................. *passim*

*Hoffmann-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989).......................................................................................... *passim*

*Jancich v. Stonegate Mortg. Corp.*,
    2012 WL 380287 (D. Kan. Feb. 6, 2012) ................................................................30

*In re JPMorgan Chase & Co.*,
    916 F.3d 494 (5th Cir. 2019) ...........................................................26, 27, 28, 29

*Kidd v. Mathis Tire & Auto Serv. Inc.*,
    2014 WL 4923004 (W.D. Tenn. Sept. 18, 2014).....................................................30

*Kilmer v. Burntwood Tavern Holdings LLC*,
    2020 WL 2043335 (N.D. Ohio Apr. 28, 2020).........................................................30

*Knispel v. Chrysler Grp. LLC*,
    2012 WL 553722 (E.D. Mich. Feb. 21, 2012)........................................................30

-iv-

*Langlands v. JK & T Wings, Inc.*,
2016 WL 4073548 (E.D. Mich. Aug. 1, 2016) .......................................................24

*Malicki v. Leman U.S.A., Inc.*,
2019 WL 699963 (E.D. Wis. Feb. 20, 2019) .........................................................18

*McGuire v. Intelident Sols., LLC*,
385 F. Supp. 3d 1261, 1265 (M.D. Fla. 2019) .......................................................26

*Medley v. S. Health Partners, Inc.*,
2017 WL 3485641 (M.D. Tenn. Aug. 15, 2017) (Trauger, J.) ...................13, 16, 21

*Merit Ins. Co. v. Leatherby Ins. Co.*,
581 F.2d 137 (7th Cir. 1978) ................................................................................28

*Miller v. Lebanon Golf & Country Club*,
2014 WL 7359003 (M.D. Tenn. Dec. 23, 2014) (Trauger, J.)................................26

*Morangelli v. Chemed Corp.*,
2010 WL 11622886 (E.D.N.Y. June 17, 2010) ........................................14, 15, 27

*Myers v. TRG Customer Sols., Inc.*,
2017 WL 3642295 (M.D. Tenn. Aug. 24, 2017) (Trauger, J.) ...............................26

*Roberts v. Corrections Corp. of America*,
2015 WL 3905088 (M.D Tenn. June 25, 2015).....................................................25

*Shabazz v. Asurion Ins. Serv.*,
2008 WL 1730318 (M.D. Tenn. Apr. 10, 2008) ....................................................26

*Simpson v. Caresouth HHA Holdings, LLC*,
2016 WL 3349637 (M.D. Tenn. June 16, 2016) (Trauger, J.)................................25

*Smith v. Maco Management. Co.*,
2019 WL 1437927 (M.D. Tenn. Apr. 1, 2019)......................................................21

*Stewart v. CUS Nashville, LLC*,
2013 WL 504165 (M.D. Tenn. Feb. 8, 2013) ..................................................18, 28

*Strickland v. Wyndham Vacation Resorts, Inc.*,
2014 WL 12873396 (M.D. Fla. May 28, 2014).....................................................18

*Sutka v. Yazaki N. Am. Inc.*,
2018 WL 1255767 (E.D. Mich. Mar. 12, 2018) ...................................................13

*Tassy v. Lindsay Entm't Enters., Inc.*,
2018 WL 1582226 (6th Cir. Feb. 22, 2018) .........................................................28

Case 3:19-cv-01099   Document 118   Filed 08/28/20   Page 6 of 39 PageID #: 1051

*Taylor v. Pilot Corp.*,
2016 WL 4524310 (W.D. Tenn. Mar. 3, 2016), *aff'd,* 697 F. App'x 854 (6th
Cir. 2017) ...................................................................................................................30

*Taylor v. Pilot Corp.*,
697 F. App'x 854 (6th Cir. 2017) .................................................................................29

*Thedford v. Drive In of Evansville, Inc.*,
2014 WL 5520954 (N.D. Ala. Oct. 31, 2014) ...........................................17, 18, 24

*Tyler v. Taco Bell Corp.*,
2016 WL 2344229 (W.D. Tenn. May 3, 2016) ............................................................16

*Ware v. T-Mobile USA*,
828 F. Supp. 2d 948 (M.D. Tenn. 2011) (Trauger, J.)...................................21, 25

*Watson v. Advanced Distrib. Servs., LLC*,
298 F.R.D. 558 (M.D. Tenn. 2014) (Trauger, J.).......................................................21

*West v. Border Foods, Inc.*,
2006 WL 1892527 (D. Minn. July 10, 2006) .......................................................16, 24

*Williams v. King Bee Delivery, LLC*,
2017 WL 987452 (E.D. Ky. Mar. 14, 2017).................................................................30

*Yates v. Applied Performance Techs., Inc.*,
209 F.R.D. 143 (S.D. Ohio 2002) ..................................................................................12

**Statutes**

Fair Labor Standards Act ("FLSA") ................................................................... *passim*

Federal Arbitration Act ("FAA")..........................................................................2, 28, 29

## I.    <u>INTRODUCTION</u>

Gemma Hammond seeks to represent a nationwide class of 12,000 current and former full-time hourly employees of Floor and Decor Outlets of America, Inc. ("F&D" or the "Company"). Hammond worked in one F&D store: Nashville. From this limited experience—and the limited alleged experiences of six other declarants raising allegations about Nashville and just two other stores—Hammond speculates that over 1,000 managers in 129 stores, four distribution centers, two ancillary support centers, and F&D's corporate offices took steps to minimize overtime pay to all full-time hourly employees nationwide by allegedly "shaving" time or requiring "off-the-clock" work. F&D recognizes the relatively lower bar for conditional certification, but a lower bar is not a rubber stamp. For several reasons, the unique circumstances of this case push it past the boundaries of conditional certification.

***First***, this case presents a fundamental conflict of interest for Hammond, his counsel, and the putative class. Hourly paid managers who fall squarely within the putative class are responsible for managing other hourly employees, including managing overtime and adjusting time records when appropriate to do so. Declarations from current opt-in plaintiffs already allege that managers *who are also putative class members* are responsible for the very conduct challenged in this case. This textbook conflict of interest is grounds alone to deny Hammond's motion.

***Second***, the Court's recent decision that Hammond did not agree to arbitration in light of the unique facts of his employment shows that he is not similarly situated to the thousands of employees who are unquestionably bound by signed arbitration agreements. Moreover, as Hammond's recent evidentiary hearing confirms, the Court would need to hold highly individualized proceedings for any opt-in who challenges his or her arbitration agreement. This is anathema to conditional certification.

***Third***, Hammond has not identified any unlawful, nationwide policy that could tie together

1

the fractured experiences of over 10,000 employees managed by over 1,000 managers. He has also failed to demonstrate that he and every other hourly employee across the country share claims that are unified by a common theory of an alleged violation of the Fair Labor Standards Act ("FLSA"). Hammond and the six declarants supporting his motion—collectively representing less than .0006 percent of the putative class—offer no facts to support sending notice to employees across the country. Hammond's motion presents no evidence of any alleged FLSA violation in 126 of F&D's 129 stores. Nor does it even allege an FLSA violation at any of F&D's non-store facilities in which putative class members worked. Accordingly, the Court should deny Hammond's motion in full. If the Court orders any notice, it should be limited to the three stores addressed in Hammond's motion.

The record confirms that putative class members had materially different experiences. For one, both the declarations submitted by Hammond and declarations from other employees across the country show that putative class members are not similarly situated for numerous reasons. In addition, Hammond's documented experience with F&D—being paid for many more hours than he was scheduled to work, including for 212 overtime hours—directly contradicts his theory that the Company engaged in a uniform, nationwide effort to eliminate overtime pay. His declarants' contemporaneous records reaffirm Hammond's failure to present a common policy or theory.

*Fourth*, even if the Court were to conclude that Hammond was similarly situated to some members of the putative class, it still should not authorize notice to any individuals with arbitration agreements. As the Fifth and Seventh Circuits held recently, sending notice to thousands of current and former employees who by contract may not join this case is contrary to the Supreme Court's controlling decision in *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989), and the preemptive force of the Federal Arbitration Act ("FAA").

## II.    STATEMENT OF RELEVANT FACTS

### A.    Hammond's Proposed Class Includes 12,000 Employees In 129 Stores, Four Distribution Centers, Two Support Centers, And F&D's Corporate Offices—But He Offers No Evidence About 126 Stores Or Any Other F&D Facility.

F&D is a nationwide retailer of hard surface flooring. The Company operates 129 locally run stores, four distribution centers, two ancillary support centers, and its corporate headquarters, which is referred to as its Store Support Center ("SSC"). (Fox Decl. ¶¶ 4-5.) The Company's distribution centers (which stockpile product and distribute it to stores), ancillary support centers (which help with customer service and sample fulfilment), and SSC (which houses personnel for various corporate departments, including legal, human resources, accounting, etc.) are independent from each of the 129 stores, which themselves roll-up to different leadership. (*Id.* ¶¶ 5-6; Coates Decl. ¶¶ 3-4.) The distribution centers, support centers, and SSC have entirely different operations from stores and are run by entirely different individuals. (Fox Decl. ¶ 6.)

Hammond's proposed class includes approximately 12,000 current and former employees in stores, distribution centers, support centers, and the SSC across the country. (Fox Decl. ¶ 10.) Yet Hammond offers declarations from himself and just six other individuals, only two of whom (Ed Cardona and Fierce Taylor) have opted into the case.[1] Based on these declarations, Hammond's motion alleges FLSA violations in three stores: Nashville, TN; Bridgeton, MO; and Carmel Mountain, CA. (Br. 4-9.) The declarations are notable for what they do *not* include. Neither Hammond nor any of his declarants claim to have any personal knowledge outside of the stores in which they worked. They have *zero* personal knowledge—and do not claim to have personal knowledge—about: (1) any of the distribution centers; (2) either of the ancillary support centers;

---

[1] Although Hammond's motion states that this case includes five opt-ins (Br. 4), that is incorrect. The Court dismissed one opt-in (Mark Turner) who never worked for F&D (Dkt. 94) and another opt-in (Amy Hayes) dismissed her claims (Dkt. 99). Three opt-ins now remain. And one of the three (Craig Cheuvront) did not submit a declaration.

(3) the SSC; or (4) 126 of F&D's 129 stores.

**B.    Over 1,000 Individual Managers—The Majority Of Whom Are Putative Class Members—Were Responsible For Managing Overtime And Timekeeping.**

Each F&D store is run independently by a salaried employee called a Chief Executive Merchant ("CEM"). (Coates Decl. ¶ 3.) During the relevant period, over 150 CEMs ran F&D's 129 stores. (Fox Decl. ¶ 13.) Each CEM has broad discretion to autonomously manage his or her own store's operations. (Coates Decl. ¶ 5.) This includes, among other things, making individualized decisions about what product mix to stock and sell, how to allocate the store's payroll budget (including overtime), and how to manage overtime hours. (*Id.*).[2]

While the CEM is a store's only salaried employee, each store has several other managers who are paid on an hourly basis and classified as non-exempt. (Coates Decl. ¶ 6.) Depending on the store, there are one to two hourly "operations managers," who help run overall store operations, as well as four to eight hourly "department managers" and "pro services" managers who are each responsible for a specific store department (*e.g.*, wood, tile, etc.) or consumer segment (*e.g.*, professional contractors). (Coates Decl. ¶ 6.) Each of these hourly managers has his or her own direct reports. (*Id.* ¶ 7.) These direct reports include supervisors and assistant department managers, as well as non-supervisory hourly employees. (*Id.* ¶ 7.)

Although specific duties vary by store, hourly managers are responsible for disciplining and counseling hourly employees, managing work for hourly employees, and, when appropriate, adjusting hourly employees' Kronos time records to correct missed punches and other timekeeping inaccuracies. (Coates Decl. ¶ 8.) Depending on the store, some hourly managers are also responsible for determining and managing the overtime worked by other hourly employees. (*Id.*;

---

[2] Similarly, each distribution center is independently run, each ancillary support center is independently run, and each department in the SSC is independently run. (Fox Decl. ¶ 7.)

4

Wilkins Decl. ¶ 4.) There are over 1,000 of these hourly managers in Hammond's proposed class. (Fox Decl. ¶ 11.)[3] In other words, nearly one-tenth of the proposed class is composed of the same group of managers who Hammond alleges violated the FLSA.

F&D began using the Kronos timekeeping system in late December 2017 and early 2018. (Fox Decl. ¶ 8.) Both before and after that time, the Company: (1) strictly prohibited CEMs and hourly store managers from permitting hourly employees to work off-the-clock; and (2) required managers to ensure that all employees are paid for all hours worked. (Coates Decl. ¶ 17; Pickens Decl. ¶ 8; Wilkins Decl. ¶ 14; Untiedt Decl. ¶ 10; Voss Decl. ¶ 8; Martin Decl. ¶ 10; Ex. 35.)

## C. Hourly Employees' Experiences Working Overtime Vary Dramatically Depending On The Individual Store, Employee, And Manager.

Hammond suggests, in conclusory fashion, that F&D has adopted a nationwide policy disfavoring overtime, but his suggestion is misplaced. In reality, hourly employees work and are paid for a tremendous amount of overtime. The precise extent to which employees work overtime is highly individualized depending on the individual store, employee, and manager. Some stores (*e.g.*, busier stores with higher sales volume) are more likely to have employees who regularly work substantial overtime hours. (Coates Decl. ¶ 16.) The hard data supports this. For example, the Orlando, FL store had 23,005 overtime hours—an average of over 166 overtime hours *per week*—between January 1, 2018 and August 27, 2020. (*Id.* ¶ 15; Ex. 1.)[4] During that same period, the Reno, NV store had 3,154 total overtime hours (13.7% of the total overtime hours in Orlando).

---

[3] This number solely includes operations managers, department managers, and pro services managers. It does not include assistant department managers, supervisors, etc.

[4] The Orlando store is not an outlier with respect to huge overtime hours. As a few other non-exhaustive examples: (1) the Alexandria, VA store has averaged 110.94 overtime hours per week; (2) the Houston N Freeway store has averaged 118.10 overtime hours per week; (3) the Farmingdale, NY store has averaged 119.35 overtime hours per week; and (4) the Avon, MA store has averaged 242.39 overtime hours per week. (Coates Decl. ¶ 15; Ex. 1.)

(*Id.*) Falling in between these two stores are more than 100 other individual stores with a wide array of different overtime hours. (*Id.*)

This data is supported by declarations from individual managers, whose stores frequently had substantial overtime hours and who never felt any corporate pressure to reduce overtime. (*See* Martin Decl. ¶ 4 ("In my experience, there is no corporate pressure at Floor & Decor regarding payroll generally and overtime in particular. More specifically, there is no corporate pressure to minimize overtime hours. We are so busy that, if anything, there is pressure to add hours worked. . . . I have had employees work truly ridiculous amounts of overtime in the Dallas store."); Untiedt Decl. ¶ 11 ("Based on my individual experience at several different stores, there is no corporate pressure at Floor & Decor to minimize overtime. In Hilliard, for example, it is very common for hourly employees to work overtime . . . . No one has ever suggested to me that these overtime hours were a problem, and I have never experienced any pressure to lower the overtime hours for any store."); Wilkins Decl. ¶ 5 (similar); Pickens Decl. ¶¶ 9-10 (similar); Voss Decl. ¶ 14 (similar).)

Overtime hours also differ significantly by individual employee, even within the same store. The Nashville store provides a prime example, as shown by Hammond and his declarants' own records. Hammond's records confirm that he worked—and was paid for—212 overtime hours between January and October 2018 (when he left F&D). (Ex. 2.)[5] Opt-ins Dowlen and Cardona also had a substantial number of overtime hours (184 and 149 hours, respectively) in 2018. (Exs. 3 & 4.)[6] Opt-in Owusu, by contrast, worked only 29 overtime hours in five months in 2018. (Ex. 5.) This same pattern exists across the country. Some hourly employees work significant overtime,

---

[5] Hammond defines the relevant period as when F&D used Kronos (Br. 2), and F&D relies on records from that period (late December 2017/January 2018–present) in this opposition.

[6] Cardona and Dowlen had different individual experiences in 2019. Cardona worked 50 overtime hours the entire year while Dowlen worked 179 hours in just 9 months. (Exs. 3 & 4.)

6

and others work less due to a myriad of individual factors. (*Compare* Voss Decl. ¶ 12 ("I almost always worked at least five hours of overtime") and Kiarii Decl. ¶ 6 ("I frequently work overtime") *with* Brody Decl. ¶ 5 (rarely works overtime).) This is true even in Nashville and the other stores where Hammond's declarants worked. (Estreen Decl. ¶ 6; Pickens Decl. ¶ 9; Mills Decl. ¶ 3; Walker Decl. ¶ 4; Canning Decl. ¶ 4; Davis Decl. ¶ 9; Bailey Decl. ¶3; Marcha Decl. ¶ 4.)

Finally, the amount of overtime worked by hourly employees can differ substantially based on an individual manager's preferences and practices. Some managers have their employees work significant overtime. (Martin Decl. ¶ 4; Voss Decl. ¶ 11; Untiedt Decl. ¶ 11.) Other managers will manage their employees' schedules to limit the overtime hours actually worked, particularly when a store is slow. (Hurst Decl. ¶ 11; Molina Decl. ¶ 3.) As one example, a manager may ask an employee to report to work an hour later than scheduled—*i.e.*, work an hour less—if the employee worked an extra hour the prior day. (Hurst Decl. ¶ 11; Untiedt Decl. ¶ 12; Thomas Decl. ¶ 4.) Far from shaving-time or asking employees to work off-the-clock, this approach permissibly limits overtime by simply reducing hours worked in the workweek.

### D. Contrary To Hammond's Allegation Of An Illegal Companywide Practice, Numerous Hourly Employees Did Not Have Their Kronos Time Adjusted Or Had It Adjusted Solely For Lawful Reasons.

Although Hammond and a few others allege that their individual managers reduced their overtime hours in Kronos for unlawful reasons, far more putative class members—including those in the same stores and different stores as Hammond and his declarants—report the opposite experience. To start, directly contrary to Hammond's allegation that store managers were pressured to shave time, some hourly employees had their managers *add* time to Kronos, which resulted in the employees receiving *more* pay. (*See, e.g.*, Molina Decl. ¶ 6; Wilkins Decl. ¶ 11.) Other hourly employees requested that their managers adjust their time for different *lawful* reasons: adding a lunch break where one was taken but not recorded, or adjusting time where an employee

forgot to punch out at the end of a shift. (Pickens Decl. ¶ 7; Martin Decl. ¶ 9; Wilkens Decl. ¶¶ 8-10; Hunton Decl. ¶ 12.) Still other hourly employees' time was lawfully adjusted for instances of time theft. That is, when employees report more time than they actually worked. (Fox Decl. ¶¶ 25-27.) For example, F&D terminated opt-in Cardona for sleeping on-the-clock for 2.5 hours. (Fox Decl. ¶ 26; Ex. 6.)[7] There are also documented examples of employees recording time while literally performing work for other companies. (Fox Decl. ¶ 25; Ex. 7.)

Finally, Hammond's alleged experience differed markedly from many other F&D employees on the core issue of whether they were paid for all overtime hours worked. Numerous hourly employees working across the country have submitted sworn declarations confirming that they were paid for all of their hours worked. These include other employees who worked in the same stores as Hammond and his declarants. (*See* bullet points *infra* at p. 10.)

E. **Hammond And His Declarants' Allegations Do Not Match Either Their Own Documented Experiences Or The Experiences Of Other Putative Class Members.**

1. **Contemporaneous Records Contradict Hammond And His Declarants' Individual Allegations.**

Hammond's personal theory for conditional certification—that he was regularly scheduled to work 54 hours a week but had overtime hours "shaved" as a cost-cutting measure—is incongruent with his actual experience with F&D. To start, Hammond's sworn statement that he and other Nashville employees were "regularly scheduled" to work 54 hours per week is demonstrably false. Hammond's own Kronos records show that he was *never once* scheduled to work 54 hours in a week—or anything close to it—during the relevant period. (Fox Decl. ¶ 19; Ex.

---

[7] Contrary to his termination paperwork, Cardona falsely claims that F&D terminated his employment "as part of a reduction in force." (Dkt. 54 ¶ 4.) This follows Hammond and his declarants' pattern of misstating crucial facts about their employment. (*See infra* at pp. 8-9.) It also provides an independent reason why the Court should be skeptical of their statements and reluctant to conditionally certify a class based on demonstrably false allegations.

8

8.) Hammond was scheduled to work between 30 and 42.5 hours every week during that period. (Fox Decl. ¶ 19; Ex. 8.) The records for the other Nashville declarants tell the same story. Although each declarant stated that he or she was regularly scheduled to work 54 hours, *none* was *ever* scheduled to work that many hours. (Fox Decl. ¶¶ 20 -22; Exs. 9, 10, & 11.)[8]

Similarly, although Hammond alleges that one CEM in the Nashville store "shaved" his overtime hours, that allegation cannot be reconciled with his payroll records showing that he was consistently paid significant overtime—212 hours in ten months, an average of over 5 hours per week—during the relevant period. (Fox Decl. ¶ 15; Ex. 2.) The same is true for many declarants, whose records also show substantial overtime. (Fox Decl. ¶¶ 16-17; Exs. 3 & 4.)

Finally, a week-by-week comparison of Hammond's schedule and payroll documents reveals that *F&D frequently paid him for significantly more hours—including overtime hours—than he was scheduled to work*. (*Compare* Ex. 8 *with* Ex. 2.)[9] This practice is the precise opposite of the time "shaving" Hammond alleges, and it eviscerates his theory for conditional certification.

### 2. Hammond And His Declarants Are Not Similarly Situated To One Another Or To Other Hourly Employees Across The Country.

Hammond and his declarants' individual allegations are markedly different from the experiences of both one another and other employees nationwide. The factual record before the Court reveals a series of fractured, individualized experiences and allegations—not a cohesive

---

[8] Hammond's non-Nashville declarants similarly misrepresent their scheduled hours. For example, although Taylor swore that he was "regularly scheduled" to work 52.5 hours per week, he was never scheduled to work those hours. (Fox Decl. ¶ 23; Ex. 12.)

[9] As just one example, Hammond was scheduled to work 40 hours the week of 3/2/2018 and 36 hours the week of 3/9/2018, for a total of 76 scheduled hours in those two weeks. (Ex. 8.) But F&D paid him for 91.82 hours—including 13.15 overtime hours—for that two-week pay period. (Ex. 2.) In other words, F&D paid Hammond for over <u>15 hours more</u> than he was scheduled to work. This is not an isolated example. *Far from "shaving" Hammond's time, F&D paid him for more hours than he was scheduled to work in the vast majority of pay periods*. (*Compare* Ex. 8 *with* Ex. 2.)

9

theory that could sustain conditional certification. The declarations submitted by Hammond, his declarants, and other hourly employees nationwide reveal the deeply individualized nature of Hammond's core allegations. Specifically:

- Hammond alleges that individual F&D managers "shaved" time in Kronos, resulting in employees not being paid for all time worked. (*See* Hammond Decl. ¶¶ 3, 10.)

  o In contrast, although opt-in Cardona alleges that his manager shaved his time in Kronos when he worked in the Nashville store, he does *not* allege that time shaving when he worked in the Pompano, FL store. (*See* Cardona Decl.)

  o Furthermore, numerous employees—including those who worked in the same stores as Hammond and his declarants—expressly deny having their time shaved, and attest that they were always paid for all their hours worked. (*See* Marcha Decl. ¶ 11 ("At the end of each week, or sometimes at the end of a day, I check the Kronos time-keeping system located at the back of the store to ensure that my time is being recorded accurately. Nobody has never adjusted my time in the Kronos system without my knowledge. As a result, I have always been paid for all of the time that I worked, including overtime."); *see also* Brody Decl. ¶¶ 9, 10; Canning Decl. ¶ 7; Casas Decl. ¶ 8; Collins Decl. ¶ 11; Davis Decl. ¶ 10; Estreen Decl. ¶ 9; Harry Decl. ¶ 10; Hunton Decl. ¶ 11; Hurst Decl. ¶ 14; Kegley Decl. ¶ 10; Kiarii ¶ 9; Mills Decl. ¶ 9; Molina Decl. ¶ 6; Pimentel-Bonano Decl. ¶ 7; Thomas Decl. ¶¶ 6, 7, 9; Walker Decl. ¶ 14.)

- Some (but not all) of Hammond's declarants allege that they worked off-the-clock—*i.e.*, when attending quarterly Sunday meetings or by signing a paper through which they falsely underreported their hours worked. (*See* Preiss Decl. ¶¶ 10, 14, Taylor Decl. ¶ 17.)

  o Contrary to that allegation, Hammond and several other declarants unambiguously admit that they recorded all the time they worked in Kronos and did not work off-the-clock. (*See* Hammond Decl. ¶¶ 6, 7 ("I, along with other Hourly Workers, regularly clocked in on Kronos when I began working and regularly clocked out of Kronos when I stopped working. Kronos captured all the time that I and other Hourly Workers spent working for F&D at their worksites."); *see also* Davies Decl. ¶¶ 7-8; Dowlen Decl. ¶¶ 7-8; Cardona Decl. ¶¶ 8-9.)

  o Many other employees expressly deny ever working "off-the-clock." (*See* Canning Decl. ¶ 6 ("I have never had any issues being paid for all the time I have spent working at Floor & Decor. I have never been told by my manager (or anyone else at Floor & Decor) that I should work off-the-clock in any way."); Molina Decl. ¶¶ 8-10 ("I was always paid for all of the time I spent in [Sunday] meetings, including any overtime. More generally, I have always been on-the-clock for any store meeting, and I have always been paid for all time spent in meetings"); *see also see also* Brody Decl. ¶¶ 6, 12; Casas Decl. ¶¶ 6, 9; Estreen Decl. ¶¶ 8, 10; Hunton Decl. ¶¶ 5, 8; Hurst Decl. ¶ 13, 14; Kegley Decl. ¶¶ 5-7; Marcha Decl. ¶¶ 5, 10; Mills Decl. ¶¶ 5,6; Pimentel-Bonano Decl. ¶¶ 5, 9; Rovda Decl. ¶ 9, 10; Thomas Decl. ¶¶ 10, 11; Voss Decl. ¶ 8.)

10

**F.** **The Overwhelming Number Of Employees In The Putative Class Are Bound By Different Arbitration Agreements.**

Almost all putative class members are subject to arbitration agreements in which they definitively waived any right to pursue claims in court or to participate in a collective action.

While these agreements are equally binding, different hourly employees are subject to different arbitration agreements and consented to those agreements in different ways. Unlike Hammond, at least 9,800 employees (including opt-ins Cardona and Taylor, and now dismissed opt-in Hayes) *signed* an arbitration agreement or acknowledgment form confirming their agreement to arbitrate. (Fox Decl. ¶¶ 31-32; Dkt. 88-1 & 88-3, Ex. 13.) In addition, almost all remaining putative class members (including opt-in Cheuvront) agreed to arbitration by continuing their employment after receiving an arbitration agreement. (Fox Decl. ¶ 28; Dkt. 91.)[10]

F&D has reviewed the putative class's records and collected the vast majority of signed agreements and arbitration consent forms. The Company is prepared to provide the almost 10,000 individually signed agreements and acknowledgment forms for the Court's *in camera* review at any time, but it did not want to send these voluminous materials without a request from the Court. For now, F&D has attached the different versions of the Company's arbitration agreement in effect during the relevant period. (Fox Decl. ¶¶ 28-29; Exs. 14-34.)[11] These documents will allow both the Court and Hammond to assess the terms of the different arbitration agreements. Any claimed need for the 10,000 individual agreements—or other individual documents—only further demonstrates that conditional certification is inappropriate. (*See infra* at pp. 13-15.)

---

[10] Thirty-one hourly employees signed arbitration opt-out forms. (Fox Decl. ¶ 31.) F&D does not dispute that these employees are able to participate in non-arbitration proceedings.

[11] There are six versions of the F&D employee handbook containing an arbitration agreement, and sixteen versions of standalone arbitration agreements. The number of different versions is due to very minor changes from one version to another (*e.g.*, changing the company signatory, adding a cover page, changing a date notation from "January 1, 2018" to "January 2018," etc.).

11

III.     <u>**ARGUMENT**</u>

      A.     <u>**The Conflict Of Interest Between Hammond, His Counsel, And Over 1,000 Class Members Is An Absolute Bar To Conditional Certification.**</u>

As an initial matter, the Court should deny conditional certification due to a critical conflict of interest. The conflict arises out of Hammond and his counsel's assertion of claims on behalf of—and attempt to represent—both non-managerial hourly employees asserting FLSA violations and the hourly managers purportedly responsible for at least some of the alleged violations.[12]

Under the decisions of this Court and others, Hammond's counsel cannot represent both sets of employees, and the Court should deny Hammond's motion for conditional certification. *See, e.g.*, *Erman v. Wethington*, 2006 WL 8458053, at *3 (M.D. Tenn. Mar. 21, 2006), *report and recommendation adopted*, 2006 WL 8458052 (M.D. Tenn. Mar. 31, 2006) (Trauger, J.) (denying motion for conditional certification where plaintiff's counsel previously represented former executives who could be potentially liable for FLSA violations); *Ellerd v. Cty. of L.A.*, 2009 WL 982077, at *5 (C.D. Cal. Apr. 9, 2009) (denying conditional certification due to conflict between social workers and supervisors covered in class definition because "the social workers will have to show that their supervisors violated federal law and defendant's official policies by telling the social workers not to record their overtime"); *accord Yates v. Applied Performance Techs., Inc.*, 209 F.R.D. 143, 152 (S.D. Ohio 2002) (disqualifying counsel where dual representation of putative class members and former executive in FLSA action impaired duty of loyalty to each client and placed counsel in position of having to cross-examine their own client).

The dispositive point of the above cases is that counsel cannot seek to represent hourly managers while simultaneously accusing them of FLSA violations. The same principles foreclose certification in this case. These are not hypothetical concerns. As but one example, opt-in Taylor

---

[12] F&D informed Hammond of this conflict long ago, but he declined to change course. (Ex. 36.)

specifically alleges that hourly manager Michael Graszer—whose name Taylor incorrectly spells as "Grazer"—is responsible for FLSA violations. (Taylor Decl. ¶¶ 11-12.) But Graszer also falls within the class definition. (Fox Decl. ¶ 12.) Hammond's counsel are seeking to represent an individual whose alleged activities provide a cause of action to a current party plaintiff (and their client). This same concern would play-out repeatedly were a class to be certified. In keeping with its prior decisions, the Court should end its analysis here and deny Hammond's motion.

**B.** **The Court Should Deny Conditional Certification Because Hammond Is Not Similarly Situated To Each Putative Class Member.**

  **1.** **Legal Standard: Hammond Bears The Burden Of Showing He Is Similarly Situated To Every Putative Class Member.**

  "Although the standard for granting conditional certification is lenient, it is not non-existent." *Sutka v. Yazaki N. Am. Inc.*, 2018 WL 1255767, at *8 (E.D. Mich. Mar. 12, 2018) (citation omitted). A court's discretion under section 216(b) of the FLSA to conditionally certify a collective action and facilitate notice is limited to cases in which the plaintiff "[has] shown that the employees to be notified are, in fact, 'similarly situated.'" *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). Although Hammond's "required factual showing is 'modest,' it cannot be satisfied simply by unsupported assertions" or through conclusory declarations. *Medley v. S. Health Partners, Inc.*, 2017 WL 3485641, at *5 (M.D. Tenn. Aug. 15, 2017) (Trauger, J.). The law does not presume that employees are similarly situated, and "[i]t is [Hammond's] responsibility to prove to the Court the scope of the alleged violations of the FLSA." *Clark v. Dollar Gen. Corp.*, 2001 WL 878887, at *5 (M.D. Tenn. May 23, 2001) (citation omitted).

  **2.** **Hammond Is Not Similarly Situated To Thousands Of Putative Class Members Bound By Arbitration Agreements.**

  After full briefing on the question of Hammond's arbitration agreement, followed by partial discovery, an in-person evidentiary hearing, and telephonic closing arguments, the Court issued a 16-page decision finding that Hammond did not agree to arbitration. (Dkt. 97.) The Court's

13

decision turned on its finding that Hammond credibly testified that he did not personally receive a copy of the arbitration agreement. (*Id.* at 11.) This procedural history—and Hammond's individual experience concerning arbitration—confirms two grounds for denying his motion.

*First*, Hammond is not similarly situated to the nearly 10,000 putative class members—including two current opt-ins—with signed arbitration agreements or acknowledgment forms. *See, e.g.*, *Morangelli v. Chemed Corp.*, 2010 WL 11622886, at *3 (E.D.N.Y. June 17, 2010) ("Opt-in plaintiffs who cannot bring suit in federal court are simply not similarly situated with those who can."). For this reason alone, the Court should deny Hammond's motion. *See, e.g.*, *id.; Delano v. MasTec, Inc*., 2011 WL 2173864, at *6 (M.D. Fla. June 2, 2011) (denying conditional certification where opt-ins were subject to arbitration agreement that did not apply to named plaintiff); *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 81 (D.N.J. 2014) (similar).

*Second*, Plaintiffs' on-the-record positions already make clear that individual mini-trials will be necessary for any class members who challenge their arbitration agreement. For example, analyzing Hammond's arbitration defense (*i.e.*, that he did not receive a copy of the arbitration agreement) required a full evidentiary proceeding devoted to a number of highly individualized issues. (Dkt. 97 at 11.) Opt-in Cheuvront raises a similar defense to Hammond. His opposition to arbitration also involves highly individualized issues; for example, whether the hourly manager who indisputably provided and explained the F&D arbitration agreement to him specifically "explained that continued employment constitutes acceptance." (Dkt. 114 at 5; *id.* at 4 (similar).)[13]

The arbitration defenses raised by Opt-ins Taylor and Cardona are also individualized. They oppose arbitration by identifying several "unique circumstances" that supposedly undermine

---

[13] The fact that hourly managers are also involved in individual arbitrability disputes further deepens the conflict of interest discussed above.

14

their signed agreements, including: (1) their educational backgrounds; and (2) whether their individual "managers did not want them to know they were signing arbitration agreements." (Dkt. 115 at 3-9). These defenses, by definition, require highly individualized analyses and proceedings.

Given the sheer number of putative class members with arbitration agreements, the ancillary arbitration litigation would swallow the merits of this action. This provides an independent reason to deny Hammond's motion at this stage. *See, e.g.*, *Errickson v. Paychex, Inc.*, 2020 WL 1307682, at *9 (W.D.N.Y. Mar. 19, 2020) (declining to include arbitration-eligible individuals in class where plaintiffs "made clear that opt-in plaintiffs may have individualized defenses to the execution of [arbitration agreements]"); *Morangelli*, 2010 WL 11622886, at *3 (finding it would be a "disservice to judicial efficiency" to send notice to employees who signed arbitration agreements when they would be "subject to additional, prolonging motion practice"); *Hart v. JPMorgan Chase Bank, N.A.*, 2012 WL 6196035, at *5 (M.D. Fla. Dec. 12, 2012) (similar).

Hammond will likely argue that this issue cannot be addressed at conditional certification, either because it is purportedly a "merits" issue or for some other reason. This is wrong. As discussed below, the question of arbitration is a threshold inquiry, not a merits question. (*See infra* at pp. 27-28.) Even if the Court concluded that arbitration was somehow a merits question, that is irrelevant. The Court is not required to ignore the existing record, including Hammond's evidentiary hearing and Plaintiffs' on-the-record positions about arbitration at this time. The existing record already demonstrates that: (1) Hammond is not similarly situated to individuals with signed arbitration agreements; and (2) the Court will be required to evaluate the highly individualized "unique circumstances" of each person challenging arbitration. Disregarding that record and conditionally certifying a class—as Hammond asks the Court to do—would fatally undermine both fairness and judicial efficiency.

15

### 3. Hammond Has Failed To Establish That He And The 12,000 Putative Class Members Are Similarly Situated.

Separate and apart from the question of arbitration, there is nothing common about the experiences of 12,000 employees working under 1,000-plus different managers across the country.

#### a. Hammond Has Failed To Offer Any Evidence As To 99.9994% Of The Putative Class.

Hammond has produced seven declarations, including his own, alleging FLSA violations in three of F&D's 129 stores. *This represents .0006% of all putative class members, and includes no evidence about 126 stores or any of F&D's distribution centers, support centers, and corporate offices*. "Such a limited sampling of employees does not support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan." *West v. Border Foods, Inc.*, 2006 WL 1892527, at *6 (D. Minn. July 10, 2006) (denying conditional certification where plaintiffs' declarations showed at most 2.5% of the potential class "were allegedly required by their store managers to work off-the-clock"); *see also, e.g.*, *Tyler v. Taco Bell Corp.*, 2016 WL 2344229, at *5 (W.D. Tenn. May 3, 2016) (denying motion to certify nationwide class where plaintiff offered evidence of alleged FLSA violations in only two stores); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 870-71 (S.D. Ohio 2005) (finding that declarations from two employees out of potential class of 300 were insufficient for conditional certification); *Bowman v. Crossmark, Inc.*, 2010 WL 2837519, at *6 (E.D. Tenn. July 19, 2010) (similar).

#### b. Hammond Has Failed To Show A Common Policy Affecting All 12,000 Hourly Employees—Instead, His Claims Involve Numerous Individualized Inquiries.

For a "class-wide policy or practice" to bind together a collective of purportedly similarly situated individuals, "proof of that policy or [practice]" must "prove[] a violation as to all" members of the putative class. *Medley*, 2017 WL 3485641, at *4 (Trauger, J.); *see also Bearden v. AAA Auto Club S., Inc.*, 2013 WL 1181474, at *6 (W.D. Tenn. Mar. 18, 2013) (plaintiffs must

16

prove they "are 'similarly situated' to the potential opt-in plaintiffs 'with respect to whether a[n] FLSA violation has occurred'") (citation omitted). Despite a few conclusory and unsupported claims in the declarations he submitted, Hammond has not identified any nationwide policy regarding time recording or labor costs. But even if he had, there is nothing facially unlawful about either correcting employee timesheets or seeking to control labor costs. *See, e.g.*, *Banks v. Radioshack Corp.*, 2014 WL 1724856, at *1 (E.D. Pa. Apr. 25, 2014) (recognizing employer's lawful reasons for adjusting time recorded on timesheets, such as "adjust[ing] employee time records to reflect breaks taken when employees neglected to do so themselves"); *Thedford v. Drive In of Evansville, Inc.*, 2014 WL 5520954, at *11 (N.D. Ala. Oct. 31, 2014) ("Even assuming defendant maintains a policy requiring labor costs not to exceed 22% of revenue, such a policy does not violate the FLSA.").

Putative class members' experiences further demonstrate the absence of a common policy. Some hourly employees had time *added* via Kronos. Other hourly employees had their time corrected for lawful reasons such as failing to record a lunch. (*See supra* at pp. 7-8, 10.) Similarly, although some of Hammond's declarants claim that they were required to work "off-the-clock," many other employees (including Hammond and other of his declarants) confirm that they recorded all of their work time in Kronos. (*See supra* at p. 10.) In sum, the experience of numerous putative class members was that their Kronos time was never shaved, they never worked off-the-clock, and they were always paid for all of the hours they worked. (*See supra* at p. 10 and declarations cited in same.) Merely being an hourly employee who used Kronos tells the Court (or a jury) nothing about whether that employee was subject to a violation of the FLSA.

Hammond's claims would—for *every employee* in *every workweek*—"require an examination by the Court of when he was scheduled to work, when he actually worked, whether

he was paid for such and whether management altered his timesheets and, then, the Court would to have conduct the same inquiry as to each other class member." *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 WL 2654270 at *5 (W.D.N.Y., Oct. 17, 2005) (denying conditional certification). This is the antithesis of the type of efficient proceeding mandated by *Hoffmann-La Roche.* As a result, courts nationwide routinely refuse to certify claims similar to Hammond's. *See, e.g.*, *Bowman*, 2010 WL 2837519, at *5 (denying conditional certification in off-the-clock case involving 12,000 hourly employees where court would be required to examine "[i]ndividual supervisor preferences and requirements" to determine whether any class member worked off-the-clock); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 347-48 (W.D.N.Y. 2011) (denying motion for conditional certification premised on time shaving and off-the-clock theories); *Banks*, 2014 WL 1724856, at *3 (similar).[14]

The decisions in *Brickey* and *Banks* are particularly instructive. Both applied a "lenient" conditional certification standard, and both refused to certify alleged time-shaving and/or off-the-clock claims because the named plaintiffs failed to establish an unlawful, nationwide policy. In *Brickey*, the plaintiffs claimed that Dolgencorp's policy of assigning a fixed labor budget to each Dollar General store encouraged managers to shave time and have employees work off-the-clock.

---

[14] *See also, e.g.*, *Stewart v. CUS Nashville, LLC*, 2013 WL 504165, at *4 (M.D. Tenn. Feb. 8, 2013) (denying conditional certification because, while 14 plaintiffs alleged off-the-clock claims, their evidence was based on "each individual's specific experiences at a particular company-owned saloon" and not a common practice); *Malicki v. Leman U.S.A., Inc.*, 2019 WL 699963, at *5 (E.D. Wis. Feb. 20, 2019) (denying conditional certification of alleged time shaving claims where named plaintiff and putative class members were subject to different timekeeping practices); *Thedford*, 2014 WL 5520954, at *11 (finding that declarations from opt-in plaintiffs stating their managers shaved time from their time records was not sufficient to establish company-wide practice of time shaving: "[T]hat a particular . . . manager may have been motivated to violate the FLSA . . . does not necessarily create a policy or practice of that manager's employer."); *Strickland v. Wyndham Vacation Resorts, Inc.*, 2014 WL 12873396, at *11 (M.D. Fla. May 28, 2014) (denying conditional certification where opt-ins had different experiences with respect to whether their time was shaved).

18

272 F.R.D. at 345-46. While the plaintiffs offered some declarations about practices of individual managers, they offered "no evidence that the Dolgencorp policies about which they complain [*i.e.*, labor budgets], compelled, caused or necessitated" FLSA violations across all stores, particularly given the evidence that not all store managers shaved time. *Id.* at 347-48.

In *Banks*, the plaintiffs alleged that RadioShack managers in 23 stores in the same city—compared to the 129 F&D stores nationwide, plus distribution centers, support centers, and the SSC—improperly altered employees' timesheets. 2014 WL 1724856, at *1. It was undisputed "that store managers made modifications to time records." *Id.* Nonetheless, the court found that even if some store managers improperly deducted time, that conduct "would have affected each member of the putative class only through the discrete actions of individual store managers, and would thus have affected each employee differently." *Id.* at *3. Despite the narrow scope of the proposed collective, the court held that conditional certification was particularly inappropriate because the plaintiffs offered no "method for identifying false [time] entries in a systematic way," and thus each employees' claim "require[d] separate adjudication of each modification." *Id.*

Here, just as in *Banks* and *Brickey*, Hammond speculates that some F&D managers feel pressured to lower labor costs. But Hammond has not offered—and cannot offer—any systematic method to identify: (1) whether a given individual's Kronos entries were modified; (2) whether any modified entries were adjusted for an unlawful purpose (as opposed to one of the lawful reasons discussed above); or (3) whether any individual worked off-the-clock. Hammond also provides no way of establishing that all F&D locations—including the 130-plus stores and other facilities for which he offers zero evidence—faced any sort of labor cost pressure. Indeed, both store data (which show substantial overtime in individual stores) and manager declarations (which confirm their stores faced no labor cost pressure) disprove the existence of any common policy.

19

As in *Brickey* and *Banks*, the Court should deny conditional certification here.[15]

### 4. Hammond Has Failed To Demonstrate A Common Theory Unifying Alleged Claims On Behalf Of All 12,000 Putative Class Members.

Perhaps realizing the inherently individualized nature of his allegations, Hammond contends that his claims and the claims of thousands of others are unified by "a common theory of F&D's statutory violations—namely a top-down corporate policy of reducing overtime labor costs through time shaving and other methods that deprived Hourly Workers of their lawful overtime wages." (Br. 14.) But the only support Hammond offers for this theory is a few conclusory sentences parroted in his declarations: "F&D store managers are required by company policy to keep costs down"; "I believe the Defendant implemented this policy or practice nationwide." (*See, e.g.*, Cardona Decl. ¶¶ 12-13; Osuwu Decl. ¶¶ 11-12; Dowlen Decl. ¶¶ 11-12.)[16]

Neither Hammond nor his declarants: (1) identify this supposed unlawful "company policy" or its source; (2) claim personal knowledge of the policy; or (3) explain the basis for their "belief" as to its existence, let alone its application in every store nationwide (including in 120-plus stores where they never worked). Even under the more lenient conditional certification standard, "affidavits submitted at the notice stage must be based on the personal knowledge of the affiant. If the Court were to conclude otherwise, affidavits submitted would not be any more probative than the bare allegations in the complaint, and the requirement of factual support would

---

[15] Hammond briefly attempts to establish a broader policy by arguing that Samantha Remick's purported failure to investigate his alleged complaints somehow establishes that "someone above her in the company was responsible for the time shaving." (Br. 11-12.) This argument does not track. Remick's supposed inability to determine who, if anyone, was "shaving" Hammond's time in no way suggests that the alleged perpetrator was high-up in F&D. In fact, Hammond specifically alleges that his store-level CEM was the person who shaved his time. (Dkt. 1 ¶ 51; Hammond Decl. ¶ 10.) Hammond's claim is also factually wrong as Remick's role had nothing to do with timekeeping. (Remick Decl. ¶ 6.)

[16] Again, even if true, there is nothing unlawful about the declarants' unremarkable assertion that store managers are responsible for keeping costs down. (*See* supra at p. 17.)

be superfluous." *Watson v. Advanced Distrib. Servs., LLC*, 298 F.R.D. 558, 563 (M.D. Tenn. 2014) (Trauger, J.). Hammond and his declarants' conclusory speculation cannot fill the holes in his theory of a nationwide corporate policy to violate the FLSA. *See, e.g.*, *Medley*, 2017 WL 3485641, at *8 (Trauger, J.) (refusing to consider plaintiff's "bare-bones, conclusory assertion that she 'personally knew' other employees who were forced to work off the clock"); *Gaffers v. Sitel Worldwide Corp.*, 2016 WL 3137726, at *1 (M.D. Tenn. June 6, 2016) (denying conditional certification where plaintiffs lacked personal knowledge of other similarly situated employees).[17]

Not only do Hammond's declarations consist overwhelmingly of generic assertions like the ones quoted above, his declarants' specific allegations confirm there is *no* common theory of FLSA violations unifying their individual claims, let alone the claims of every hourly employee nationwide. This Court has held that to satisfy the "common theory" test, plaintiffs must "demonstrate that the claims of the class would proceed under common, focused theories of statutory liability." *Ware v. T-Mobile USA*, 828 F. Supp. 2d 948 (M.D. Tenn. 2011) (Trauger, J.).[18] The opposite of common and focused, the declarations submitted by Hammond show that putative

---

[17] Hammond relies heavily on *Smith v. Maco Management. Co.*, 2019 WL 1437927 (M.D. Tenn. Apr. 1, 2019), in arguing that the Court should certify a nationwide class. *Smith*, however, is an outlier compared to the authority cited in Section III.B and, moreover, is readily distinguishable. In *Smith*, unlike here, the named plaintiffs submitted detailed, factual declarations setting forth their personal knowledge of the defendant's corporate structure and alleged nationwide corporate policy, including *allegations that the plaintiffs' themselves were instructed by senior management to enforce that policy*. *Id.* at *3, 5. The *Smith* declarations, attached for the Court's reference, stand in stark contrast to the few speculative sentences offered by the declarants in this case. (Ex. 37.)

[18] The showing required by the Court in *Ware* demonstrates what is lacking in this case. In *Ware*, the Court permitted notice to two locations—while denying certification of a nationwide class— because the employer's undisputed written policies provided that "all potential plaintiffs at the [two locations] were effectively required to perform uncompensated tasks before clocking in to work." 828 F. Supp. 2d at 953-54. Here, in contrast, Hammond's own declarations (buttressed by undisputed evidence submitted by F&D) confirm that Hammond cannot show that "all potential plaintiffs" nationwide, or even in a single store, share a common or even *potential* claim against F&D.

21

class members were subject to different alleged practices by different managers in different stores.

For example, although declarants Barrett and Preiss allege that they were required to work off-the-clock, Hammond and others confirm that they always recorded all of their work hours in Kronos. (*See supra* at p. 10.) Similarly, Barrett concedes that one of his Hourly Managers *correctly inputted his time into Kronos*, but contends that another Hourly Manager, *in the same store*, did not. (Barret Decl. ¶¶ 14-15.) And opt-in Cardona—the only declarant who worked in the Pompano Beach store—confirms that he was *not* subject to any alleged off-the-clock or time-shaving policy when he was employed there. (Cardona Decl. ¶ 4.) Cardona alleges only that on "several occasions" an hourly manager "entered an incorrect number of hours" on paper timesheets. (*Id.* ¶ 20.)[19] Even then, he was paid for those wages through a rapid! PayCard. (*Id.* ¶ 21.)[20]

Alleging, as Barret and Cardona do, that one manager "incorrectly" entered time is not evidence of a "top down" corporate policy. This is especially so since Barret admits that a store operations manager contacted payroll on his behalf to ensure that he "receive[d] compensation for all hours worked." (Barrett Decl. ¶ 14.) In fact, a close reading of Barrett's declaration reveals that he does not allege a single occasion when F&D failed to either correct his time or compensate him for alleged "unpaid hours." (*Id.* ¶¶ 14-15.) His declaration confirms that *he was paid for all alleged overtime as soon as he raised the meetings with corporate-level F&D managers*. (*Id.* ¶¶ 25-27.)

---

[19] Although Cardona alleges that a Pompano Beach manager entered incorrect hours when using paper timesheets, other employees in the same store report the opposite experience. (Bailey Decl. ¶ 12 (explaining that his time was entered correctly when using a paper timesheet in the Pompano Beach store).) This is yet another reason why Hammond and his declarants are not similarly situated to the putative class, and why Hammond's motion should be denied in full.

[20] Select declarants' alleged experiences with "rapid! PayCards" further demonstrate why conditional certification is inappropriate. Although some of Hammond's declarants allege that they received occasional payments via paycard for a variety of different reasons, other of his declarants never received a paycard. (*See* Preiss Decl.; Taylor Decl.) As such, any allegation concerning paycards is inherently individualized, and cannot form the basis for conditional certification.

He also admits that despite "regularly" clocking-out after the scheduled end to his shift, he was paid for this time, except for a single occasion when he signed an acknowledgment form stating that he had not worked after the end of his shift. (*Id*. ¶¶ 22-23.) And while Barrett claims (without support) that other employees "felt pressured" to sign these forms, he in contrast refused to sign on multiple occasions without discipline or incident. (*Id.*)

There is still more evidence of the lack of cohesion (and substance) in Hammond's theory. Hammond maintains that Kronos is what "unifies" the putative class's claims. (Br. 15.) But the *only* discussion about timekeeping in the Pompano Beach store relates to Cardona's use of paper timesheets, and even then he was later paid for alleged mistakes involving paper timesheets. (*See* Cardona Decl. ¶¶ 19-20.) As just one additional example, Barrett, Preiss, and Taylor allege that they attended two-hour quarterly meetings (*i.e.*, 8 hours annually). (Barrett Decl. ¶ 25; Preiss Decl. ¶ 8; Taylor Decl. ¶ 17.) But none of the Nashville employees allege they attended any meetings "off-the-clock." Even in Carmel Mountain, Preiss's department manager recorded her time at the meetings. (Preiss Decl. ¶¶ 8-10.) Her deliberately-worded declaration suggests that she takes issue with allegedly receiving a lower "training" versus "work" rate of pay, not that she worked off-the-clock. (*Id.* ("F&D did not pay me the correct amount of overtime for these hours.").)

Finally, as noted earlier, Hammond's core allegation—that he and others were "regularly scheduled" to work 54 hours a week but had their overtime hours "shaved"—is demonstrably false. Not only were he and other Nashville employees never scheduled to work 54 hours in a week, *they frequently received substantial overtime*. This is fatal to any class-wide theory. Hammond's theory that his individual manager shaved Kronos entries in order to limit overtime costs is obliterated by the documented fact that *F&D frequently paid him for more hours (including overtime) than he was scheduled to work*. (*See supra* at p. 9, n.9.) The gaping holes in Hammond's class-wide theory

23

are underscored by F&D's evidence. Both declarations from individual employees and data concerning individual stores confirm that putative class members across the country have worked and been paid for significant amounts of overtime. Individual declarants also refute each one of Hammond and his declarants' allegations—further demonstrating that Hammond is not similarly situated to the putative class he seeks to represent. (*See generally* hourly employee declarations.)

Hammond's misstatements and F&D's corroborating evidence confirm that there is no common theory in this case, and that the Court should deny his motion. "[N]either the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if [courts] were to overlook facts which generally suggest that a collective action is improper." *West*, 2006 WL 1892527, at *7.[21] To be clear, F&D is not asking the Court to resolve the merits of Hammond's claims and allegations. But the Court should not ignore undisputed data contradicting Hammond's central theory that stores are not permitted to have high overtime hours due to budgetary pressure. Hammond's demonstrably false claims provide a standalone reason to deny his motion. *See, e.g.*, *Thedford*, 2014 WL 5520954, at *10 (denying conditional certification where weekly labor costs at named plaintiff's store contradicted claim that managers were required to shave overtime hours).

### C.    If Any Class Is Conditionally Certified, Notice Should Be Limited.

#### 1.    Any Notice Should Be Limited To The Nashville, Bridgeton, And Carmel Mountain Stores.

The Court should deny conditional certification altogether. However, if the Court decides that some employees may receive notice of this action, any notice should reflect the absence of evidence concerning the overwhelming majority of F&D facilities. Hammond's motion—and its

---

[21] *See also, e.g.*, *Bearden*, 2013 WL 1181474, at *8 (denying conditional certification based on factual "variances" showing that class members were not similarly situated); *Langlands v. JK & T Wings, Inc.*, 2016 WL 4073548, at *3 (E.D. Mich. Aug. 1, 2016) (denying conditional certification and stating that "[w]hile Plaintiffs are correct that the Court does not determine the legality of the policy in question at this stage, Plaintiffs must still do more than submit conclusory allegations.").

24

supporting declarations—identifies only three locations with alleged FLSA violations. Hammond and his declarants lack personal knowledge concerning over 99.999% of F&D stores. And they do not even superficially allege wrongdoing in *any* distribution center or support center, or the SSC, where the only personal accounts are that no FLSA violation occurred.[22]

Hammond's "lack of testimony regarding" overtime practices in the overwhelming majority of F&D locations is "fatal to [his] request for conditional certification of a companywide class." *Amos v. Lincoln Prop. Co.*, 2017 WL 2935834, at *4 (M.D. Tenn. July 7, 2017) (Trauger, J.). Tellingly, many of the cases relied upon by Hammond directly undercut his motion's attempt at nationwide certification. For example, in *Ware*; *Comer* and *Roberts v. Corrections Corp. of America*, 2015 WL 3905088 (M.D Tenn. June 25, 2015), the courts *denied* conditional certification of a nationwide collective action in favor of far more limited notice corresponding with the factual support offered by the plaintiffs.

In keeping with this Court's prior decisions, any notice should be limited to F&D's Nashville, Bridgeton, and Carmel Mountain stores. *See, e.g.*, *Ware*, 828 F. Supp. 2d at 954 (Trauger, J.) (limiting conditional certification to Nashville and Colorado Springs call centers where plaintiffs worked, and denying certification to 22 other call centers); *Roberts*, 2015 WL 3905088, at *14 (Trauger, J.) (limiting notice notwithstanding plaintiffs' allegation "that CCA's policies and procedures are centrally dictated and implemented through its Nashville, Tennessee corporate offices for all CCA facilities nationwide"); *Amos*, 2017 WL 2935834, at *3 (Trauger, J.) (similar); *Simpson v. Caresouth HHA Holdings, LLC*, 2016 WL 3349637, at *4 (M.D. Tenn. June 16, 2016) (Trauger, J.) (similar); *Shabazz v. Asurion Ins. Serv.*, 2008 WL 1730318, at *5 (M.D.

---

[22] *See* Collins Decl. ¶ 11 (paid for all hours worked in distribution center); Harry Decl. ¶ 10 (same); Kiarii Decl. ¶ 8 (paid for all hours worked in SSC); Rovda Decl. ¶ 4 (same).

25

Tenn. Apr. 10, 2008) (similar); *Miller v. Lebanon Golf & Country Club*, 2014 WL 7359003, at *4 (M.D. Tenn. Dec. 23, 2014) (Trauger, J.) (similar).

## 2. Notice Should Not Be Sent To Individuals Who Are Bound By Arbitration Agreements.

Even if the Court concludes that Hammond is similarly situated to individuals subject to arbitration agreements ("Arbitration Employees"), notice still should not be sent to those individuals. In recent decisions, both the Fifth and Seventh Circuits—the only circuit courts to consider this issue—have rejected Hammond's position that notice can be sent to Arbitration Employees, and held that "*Hoffmann-La Roche* does not give district courts discretion to send or require notice of a pending FLSA collective action to employees who are unable to join the action because of binding arbitration agreements." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 (5th Cir. 2019); *see also Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1047 (7th Cir. 2020).

Courts in the Sixth Circuit and elsewhere have followed *JPMorgan* and *Bigger* in holding that defendants have a right to submit—and courts must respect—evidence that putative class members are bound by arbitration agreements at the conditional certification stage.[23] Even prior to *JPMorgan* and *Bigger*, many courts, including this one, declined to issue notice to employees subject to arbitration agreements. *See, e.g.*, *Myers v. TRG Customer Sols., Inc.*, 2017 WL 3642295, at *6 (M.D. Tenn. Aug. 24, 2017) (Trauger, J.) (deferring ruling on conditional certification after concluding that if putative class members were subject to arbitration, "then certification of a

---

[23] *See, e.g.*, *Graham v. Word Enterprises Perry, LLC*, 2019 WL 2959169, at *5 (E.D. Mich. June 18, 2019) (finding that employees bound by arbitration agreements could not receive notice "[f]or the reasons stated by" *JP Morgan*); *Geiger v. Charter Commc'ns, Inc.*, 2019 WL 8105374, at *2 (C.D. Cal. Sept. 9, 2019) (excluding putative class members subject to arbitration from notice, and finding that question of arbitration "fits naturally into the . . . conditional certification analyses"); *McGuire v. Intelident Sols., LLC*, 385 F. Supp. 3d 1261, 1265 (M.D. Fla. 2019) (excluding employees subject to arbitration from notice after rejecting argument that court "wait until the second stage of collective certification to address arbitration agreements").

26

collective class would be an exercise in futility").[24]

Courts overseeing notice "must be scrupulous to respect judicial neutrality, avoiding even the appearance of endorsing the action's merits." *Bigger*, 947 F.3d at 1049. To maintain this neutrality, "a court may not authorize notice to individuals whom the court has been shown entered mutual arbitration agreements waiving their right to join the action. And the court must give the defendant an opportunity to make that showing." *Id.* at 1050.[25] It is a matter of fairness. Sending notice to individuals shown to be ineligible to join the action is "indistinguishable from the solicitation of claims," and thus "place[s] a judicial thumb on the plaintiff's side of the case." *Id.*

In other filings, Hammond has already "acknowledged the multiplicity of potential proceedings that this case implicates." *JPMorgan*, 916 F.3d at 502. According to Hammond, after notice goes out, the parties would engage in class-wide discovery to try to sort out admittedly individualized arbitration questions for potentially thousands of opt-ins. (Dkt. 101 at 6.) Then, some employees' claims would proceed in this action and others would proceed to arbitration. (*Id.*) The Fifth Circuit rejected an identical proposal in *JPMorgan*, 916 F.3d at 502 n.15. Such an approach is improper because "alerting those who cannot ultimately participate in the collective 'merely stirs up litigation,' which is what *Hoffmann-La Roche* flatly proscribes." *Id.* at 502.

Citing cases decided before *JPMorgan* and *Bigger*, Hammond's motion urges the Court to defer the question of arbitration by suggesting it is a "merits" issue not appropriate for the conditional certification stage. (Br. 19.) Not so. A district court's determination of whether a party

---

[24] *See also, e.g.*, *Fischer v. Kmart Corp.*, 2014 WL 3817368, at *7 (D.N.J. Aug. 4, 2014) (similar); *Morangelli*, 2010 WL 11622886, at *3 (similar).

[25] To the extent the Court has any doubts about the scope of the evidence of arbitration agreements, F&D respectfully requests that it be given an opportunity to supplement the record in a manner determined by the Court. *See Bigger*, 947 F.3d at 1050 ("[I]f a plaintiff contests the defendant's assertions, then—before authorizing notice to the alleged 'arbitration employees'—the court must permit the parties to submit additional evidence on the agreements' existence and validity.").

27

has agreed to arbitration "does not reach the merits of the parties' claims." *Binkley v. Cumberland Corral, LLC*, 2010 WL 11591196, at *2 (M.D. Tenn. Sept. 20, 2010) (Trauger, J.). A motion to "compel arbitration focuses judicial scrutiny upon the arbitrability of the controversy, not upon the controversy itself. Granting the motion affects the court's power to decide the merits of issues raised in the complaint. It has no effect on the merits themselves. Thus the motion is akin to a challenge to jurisdiction or venue." *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 143 (7th Cir. 1978); *accord Tassy v. Lindsay Entm't Enters., Inc.*, 2018 WL 1582226, at *1 (6th Cir. Feb. 22, 2018) (distinguishing arbitration inquiry from separate and distinct merits questions).

More fundamentally, regardless of the artificial distinction between "merits" and "non-merits" issues, "[n]either [the] FLSA's text nor *Hoffmann-La Roche* offers any support whatsoever for [the] notion" that "all putative collective members—including Arbitration Employees—have a right to be given notice of any FLSA claims that they might have, even if they cannot join the current collective action." *JPMorgan*, 916 F.3d at 502-03. By ignoring evidence of valid arbitration agreements at the conditional stage in the name of avoiding "merits" disputes, Hammond asks the Courts to jeopardize the judicial neutrality that *Hoffmann-La Roche* demands.

The cases cited by Hammond in other filings are also not persuasive. For example, Hammond has cited decisions finding that it would be premature to consider potential class members' arbitration agreements when none of the existing opt-ins had agreed to arbitration. *See* Dkt. 101 at 4; Dkt. 111 at 7 (citing *Weisgarber v. N. Am. Dental Grp., LLC*; *Bradford v. Team Pizza, Inc.*; and *Clark v. Pizza Baker, Inc.*). However, as explained in *JPMorgan* and *Bigger*, considering—rather than ignoring—overwhelming evidence that thousands of putative class members are bound by arbitration agreements is not "premature." The FLSA and the FAA *require* it.

Even if the reasoning in *Weisgarber*, *Clark*, and *Bradford* were valid, it would not support

28

Hammond's position. Those courts permitted notice because they found it possible that no class members bound by an arbitration agreement would attempt to join the case. *See, e.g.*, *Bradford v. Team Pizza, Inc*., 2020 WL 3496150, at *5 (S.D. Ohio June 29, 2020). Here, by contrast, multiple existing opt-ins have arbitration agreements, and F&D has moved to dismiss their claims. The only common sense conclusion is that thousands of other individuals who are not eligible to join this case will nonetheless try to do so. Hammond has conceded as much in other filings.[26]

Finally, *Taylor v. Pilot Corp.*, 697 F. App'x 854 (6th Cir. 2017) also does not help Hammond. That case addressed two narrow questions of appellate procedure: (1) whether the Sixth Circuit had jurisdiction to review a grant of conditional certification; and (2) whether the defendant (Pilot) was entitled to a stay under the FAA. The Sixth Circuit answered the first question in the negative, and so declined to consider whether notice could issue to class members bound by arbitration agreements. *Id.* at 858. As to the second question, the Sixth Circuit affirmed the decision to deny a stay because no party had "agreed to arbitrate with Pilot" and "Pilot point[ed] to no one else with a written arbitration agreement who . . . refused to arbitrate." *Id.* at 860. In short, Hammond's reliance on *Taylor* is misplaced. F&D is not seeking a stay, and multiple opt-ins subject to arbitration agreements have refused to arbitrate. More importantly, the Sixth Circuit did not address the issue presented in *JPMorgan* and *Bigger*, and neither the reasoning nor the result in *Taylor* suggests the Sixth Circuit would split from the Fifth and Seventh Circuits.

---

[26] Hammond also cites *Gonzalez v. Gonzalez v. Diamond Resorts International Marketing*, 2020 WL 2114353, at *7 (D. Nev. May 1, 2020), and suggests that the approach adopted by the Fifth and Seven Circuits may present standing or due process issues. (*See* Dkt. 111 at 8.) This argument conflates whether courts can rule on motions to compel non-parties to arbitration (they cannot) with whether courts can consider their arbitration agreements at all (they can). F&D is *not* asking the Court to compel any non-parties to arbitration. And limiting notice to individuals who can actually participate in this case ensures that Court-sanctioned notice will not be used for a purpose that "looks a lot like 'solicitation of claims,'" which *Hoffmann-La Roche* forbids, instead of permissibly facilitating notice 'for case management purposes.'" *JPMorgan*, 916 F.3d at 504 n.19.

29

### D. If Any Notice Is Permitted, It Should Be Fair And Accurate And Facilitated By A Third-Party Administrator.

If the Court permits notice to any hourly employee, F&D respectfully asks that the Court order the Parties to confer regarding a revised joint notice because Hammond's draft notice is improper and should be struck for many reasons, including these few examples:

- The court letterhead, case caption, and "authorized" language should be omitted from the notice because they improperly imply judicial endorsement of the merits of the action. *See, e.g.*, *Knispel v. Chrysler Grp. LLC*, 2012 WL 553722, at *7 (E.D. Mich. Feb. 21, 2012).

- The request for a 90-day notice period is excessive and should be limited to 45 days. *Kidd v. Mathis Tire & Auto Serv. Inc.*, 2014 WL 4923004, at *3 (W.D. Tenn. Sept. 18, 2014).

- The notice fails to advise the recipients of the full extent of their likely role in the case, including the possibility that they may be required to participate in written discovery and/or be deposed and participate in a trial if they opt-in. The notice also fails to advise "potential opt-in plaintiffs that they may be responsible for Defendant['s] costs and attorney's fees if their claims are unsuccessful." *Williams v. King Bee Delivery, LLC*, 2017 WL 987452, at *8 (E.D. Ky. Mar. 14, 2017); *see also, e.g.*, *Jancich v. Stonegate Mortg. Corp.*, 2012 WL 380287, at *3-4 (D. Kan. Feb. 6, 2012).

The Court should also deny Hammond's request that F&D produce the contact information of putative class members to his counsel. Any notice should be facilitated by a third-party administrator to ensure that communications with such individuals are limited to the methods and language approved by the Court. *See, e.g.*, *Kilmer v. Burntwood Tavern Holdings LLC*, 2020 WL 2043335, at *6 (N.D. Ohio Apr. 28, 2020) (ordering notice through third-party administrator); *Daoust v. Maru Rest., LLC*, 2018 WL 7506167, at *2 (E.D. Mich. Apr. 13, 2018) (same). Additionally, notice should be sent by U.S. Mail only, as Hammond's request for email addresses and telephone numbers raises privacy concerns of non-parties. *See, e.g.*, *Taylor v. Pilot Corp.*, 2016 WL 4524310, at *6 (W.D. Tenn. Mar. 3, 2016), *aff'd,* 697 F. App'x 854 (6th Cir. 2017).

### IV. CONCLUSION

For these reasons, F&D respectfully requests that the Court deny Hammond's motion in its entirety or, at a minimum, limit notice to full-time, hourly employees without arbitration agreements who worked in the Nashville, Bridgeton, and Carmel Mountain stores.

30

Dated: August 28, 2020

Respectfully submitted,

/s/ *Lincoln O. Bisbee*

Lincoln O. Bisbee, admitted pro hac vice
Russell R. Bruch, admitted pro hac vice
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, N.W.
Washington, DC  20001
Tel:     (202) 739-3000
Fax:     (202) 739-3001
lincoln.bisbee@morganlewis.com
russell.bruch@morganlewis.com

Keane A. Barger, TN Bar No. 33196
Katharine R. Cloud, TN Bar No. 019336
**RILEY WARNOCK & JACOBSON PLC**
1906 West End Avenue
Nashville, TN  37203
Tel:     (615) 320-3700
Fax:     (615) 320-3737
kbarger@rwjplc.com
kcloud@rwjplc.com
*Attorneys for Defendant Floor and Decor*
*Outlets of America, Inc.*

31

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of DEFENDANT'S MEMORANDUM OF LAW IN

OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION was

served on August 28, 2020 upon the following via the Court's ECF system:

YEZBAK LAW OFFICES PLLC
Charles P. Yezbak, III
N. Chase Teeples
2002 Richard Jones Road, Suite B-200
Nashville, TN 37215
Tel.: (615) 250-2000
Fax: (615) 250-2020
yezbak@yezbaklaw.com
teeples@yezbaklaw.com

McGILLIVARY STEELE ELKIN LLP
Gregory K. McGillivary
Diana J. Nobile
Hillary LeBeau
1101 Vermont Avenue NW, Suite 1000
Washington, D.C. 20005
Tel.: (202) 833-8855
Fax: (202) 452-1090
gkm@mselaborlaw.com
djn@mselaborlaw.com
hdl@mselaborlaw.com

*Attorneys for Plaintiffs*

*/s/ Lincoln O. Bisbee*
Lincoln O. Bisbee

32