**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GERMMA HAMMOND, on behalf of himself and others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:19-cv-01099** |
| | ) | **Judge Aleta A. Trauger** |
| **FLOOR AND DECOR OUTLETS OF AMERICA, INC.,** | ) ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM – MOTION TO CERTIFY**</u>

Before the court is plaintiff Germma Hammond's Motion for Conditional Certification of a Collective Action and Expedited, Nationwide, Court-Supervised Notice to Putative Plaintiffs ("Motion to Certify"). (Doc. No. 51.) For the reasons set forth herein, the motion will be granted in part and denied in part.

**I.       STATEMENT OF THE CASE**

Named plaintiff Germma Hammond filed this collective action against Floor and Decor Outlets of America, Inc. ("F&D") on behalf of himself and others similarly situated nationwide in December 2019, asserting claims under the FLSA for unpaid overtime compensation. Since that time, the parties have been embroiled in contentious ancillary disputes involving whether the plaintiff must pursue his claims through arbitration rather than in court, whether the opt-in plaintiffs must pursue their claims through arbitration, and in what order the various pending motions should be briefed and resolved.

On June 17, 2020, the plaintiff filed his Motion to Certify, along with a Memorandum of Law in support thereof, his Proposed Notice of Lawsuit and six Declarations, in addition to his

own. (Doc. Nos. 52, 52-1, 54–59, and 33.) Rather than responding to the motion, the defendant sought a stay pending an evidentiary hearing and final resolution of F&D's Motion to Compel Arbitration and then, while the motion to stay was pending, filed Motions to Dismiss the claims of three opt-in plaintiffs on the basis that they, too, had entered into arbitration agreements. On the same date that the court issued an order denying with prejudice the motion to compel arbitration of plaintiff Hammond's claims and denying as moot two separate motions to stay, it also set a briefing schedule for the Motion to Certify and the Motions to Dismiss.

On August 28, 2020, F&D filed its Memorandum of Law in Opposition to Plaintiff's Motion to Certify (Doc. No. 118), along with thirty-seven exhibits (Doc. Nos. 118-3 through -39) and the Declarations of twenty-seven current or former F&D hourly employees (Doc. Nos. 119–45). The plaintiff filed a Reply and four more Declarations (Doc. Nos. 150–54), and, with the court's permission, the defendant filed a Surreply (Doc. No. 162).

Contemporaneously with this Memorandum, the court will enter a separate Memorandum addressing the Motions to Dismiss the Opt-In Plaintiffs, granting two of them and denying a third. As referenced there and discussed herein, the court finds that individuals who have signed arbitration agreements are not similarly situated to the named plaintiff in this case. Because the defendant does not actually seek to compel arbitration of the claims brought by the opt-in plaintiffs who it has demonstrated did sign arbitration agreements, the claims of those opt-in plaintiffs will be dismissed without prejudice on the grounds that they are not similarly situated to Hammond.

## II.     FACTUAL ALLEGATIONS

The Collective Action Complaint ("Complaint") asserts that F&D is a Delaware corporation operating "warehouse-format" retail stores in twenty-eight states, including Tennessee. (Doc. No. 1 ¶¶ 17, 3.) It sells "hard-surface flooring and related accessories." (*Id.* ¶ 30.) F&D employs "non-supervisory Hourly Workers . . . in a variety of positions," including those

of Warehouse Associate, Pro Services Associate, Customer Services Sales Associate, and others. (*Id.* ¶ 32.) The Hourly Workers are paid an hourly wage and do not receive commissions or bonuses. (*Id.* ¶¶ 35–36.) According to Hammond, "F&D applies uniform employment policies, practices, and procedures" to "all similarly situated Hourly Workers nationwide," including with respect to its time-keeping system, Kronos. (*Id.* ¶ 34.) F&D operates a retail store in Antioch, Tennessee (the "Antioch store"). (*Id.* ¶ 39.)

Hammond resides in Davidson County, Tennessee. (*Id.* ¶ 15.) He began working at F&D's Antioch store as a Warehouse Associate in October 2016, and he remained in that position until F&D terminated his employment in November 2018. (*Id.* ¶¶ 41–42.) He alleges that, throughout the time he was employed by F&D as an Hourly Worker, he was regularly scheduled to work, and did work, six nine-hour shifts per week, for a total of 54 hours of scheduled working time per week. (*Id.* ¶ 46.) Hammond alleges, "[o]n information and belief," that "all similarly situated Hourly Workers were scheduled to work and did work hours similar to Hammond's." (*Id.* ¶ 47.)

Pursuant to F&D policy, Hammond and all other similarly situated Hourly Workers clocked in using F&D's time-keeping program, Kronos, when they started a shift and clocked out using Kronos when their shifts terminated. (*Id.* ¶ 48.) Kronos captured all the time that Hammond and similarly situated Hourly Workers actually worked. (*Id.* ¶ 49.) Hammond alleges, however, that F&D "did not compensate [him] and all other similarly situated Hourly Workers for all hours worked over 40 hours in a workweek at 1.5 times their regular rates of pay," as required by the FLSA. (*Id.* ¶ 50.) Instead, "F&D managers, including [the General Manager of the Antioch store, James 'JJ' Donelson], would reduce the number of hours worked over 40 in a workweek, and which were recorded in Kronos," engaging in a process referred to by the plaintiff as "time-shaving" or "shaving time." (Id. ¶¶ 9, 10, 51.) Hammond alleges that F&D, by engaging in time-

shaving, "denied Hammond and all other similarly situated Hourly Workers the overtime compensation required by law." (Id. ¶ 52.)

Hammond first noticed in March or April 2018 that F&D was "shaving" his hours. (*Id.* ¶ 54.) He complained to his manager, Donelson, about the time-shaving and his resulting loss of compensation. (*Id.* ¶ 55.) Donelson did not offer an explanation for the error or deny that time had been shaved from Hammond's hours, but he gave Hammond a "rapid! PayCard," loaded with "additional wages," after Hammond complained. (*Id.* ¶¶ 56–57.) Hammond believes that the PayCard did not fully compensate him for all of the overtime hours he had worked. (*Id.* ¶ 58.)

Later in 2018, Hammond again noticed that his hours over 40 had been shaved, and he complained again to Donelson. Donelson, again, did not explain or deny, but F&D subsequently deposited in Hammond's bank account additional wages following his complaint. (*Id.* ¶¶ 59–62.) F&D did not provide any documentation showing that the additional wages fully compensated Hammond for his overtime hours at 1.5 times his regular rate of pay. (*Id.* ¶ 63.)

Hammond noticed for a third time, later the same year, that his hours had again been shaved. (Id. ¶ 64.) When he complained this time to Donelson, Donelson informed him that he could not help and referred him to Samantha Remmick, Regional Operations Manager. (*Id.* ¶¶ 43–44.). Remmick told Hammond that she would investigate. (*Id.* ¶¶ 65–67.) Although Hammond specifically asked her to investigate whether similar time-shaving was happening at other stores, she refused to do so, and she later told Hammond, after investigating, that "she could not determine who was editing Hammond's time in Kronos." (*Id.* ¶¶ 68–70.) She also claimed that "she could not pay Hammond the unpaid-overtime compensation due to him because she allegedly could not determine the source of the time shaving." (*Id.* ¶ 71.)

Based on these allegations, Hammond asserts a claim for unpaid overtime wages under the FLSA, not only on his own behalf, but also on behalf of a "Putative Collective" defined as

> [a]ll current and former Hourly Workers who worked more than 40 hours in a workweek for F&D from December 10, 2016, to the present for whom F&D recorded time using the Kronos timekeeping system.

(*Id.* ¶ 25.) He seeks damages on behalf of himself and the Putative Collective members in the amount of his and their unpaid overtime compensation "at 1.5 times their regular rates of pay for all hours worked over 40 in a workweek" (*id.* ¶ 73), plus an equal amount of liquidated damages, attorney's fees, costs, and pre- and post-judgment interest.

After filing the Complaint, the plaintiff gave notice that five other individuals had consented to become party plaintiffs in this action to recover overtime wages and other relief. (*See* Doc. Nos. 14, 15, 44, 49.) One of the five, Mark A. Turner, was dismissed on summary judgment on the basis that he had never actually worked for F&D, and Amy Collins Hayes was voluntarily dismissed, without prejudice, by joint stipulation. (Doc. Nos. 94, 99.) The remaining three are the subject of the Motions to Dismiss referenced above. Defendants Fierce Taylor and Edgar Cardona are subject to binding arbitration agreements, and their claims will be dismissed without prejudice on the grounds that they are not similarly situated to the named plaintiff. This leaves just one opt-in plaintiff at present, Craig Cheuvront, who, like the plaintiff, did not sign or acknowledge an arbitration agreement and is not bound by any such agreement.

In support of his Motion to Certify, Hammond filed the Declarations of Fierce Taylor, Edgar Cardona, Davies Owusu, Brian Dowlen, Melinda "Mindy" Preiss, and Joshua Barrett. (Doc. Nos. 54–59.) Each of these individuals asserts that F&D employed them and others as "Hourly Workers," meaning that they were paid an hourly wage for each hour of work at F&D, in "positions including, but not limited to, Assistant Department Managers, Warehouse Associates, Pro Services

Associates, Customer Service Sales Associates, Sales Associates, Sales Consultants, and Overnight Stockers." (Doc. Nos. 54–59 ¶ 1.)

Brian Dowlen asserts that he worked at an F&D store in Antioch, Tennessee as a Warehouse Associate from approximately May 2016 until the summer of 2017, that he was paid an hourly wage in that position, and that he was promoted to Command Center Supervisor in the summer of 2017, which position he held until September 2019. (Doc. No. 56 ¶¶ 2–3.) As Warehouse Associate, he regularly worked more than forty hours per week without receiving overtime compensation for all hours worked over forty at 1.5 times his regular rate of pay. (*Id.* ¶ 4.) Like Hammond, Dowlen asserts that he was regularly scheduled to work, and regularly worked, six nine-hour shifts per week, that he used the Kronos timekeeping system to clock in and out, that Kronos captured all his time, and that he was not compensated for all his overtime, because F&D's managers engaged in time-shaving by going into Kronos and reducing the number of hours he had actually worked. (*Id.* ¶¶ 5–9, 11.) He alleges that F&D managers are required by company policy to keep costs down, which resulted in time-shaving, and that managers at F&D's Antioch location knew about time-shaving, because at least one of them, JJ Donelson, was responsible for engaging in it. (*Id.* ¶¶ 12–13.) Dowlen states that he complained to Donelson about time-shaving and the resulting reduction in his pay at least five times. (*Id.* ¶ 14.) On one of these occasions, Donelson gave him a rapid! PayCard with some additional wages on it, but Donelson did not provide proof that the additional wages covered all the pay Dowlen was due. (*Id.* ¶ 15.)

Dowlen knew that Hammond had experienced time-shaving as well, because they discussed it. He was aware of at least two other individuals at the Antioch store who had also had their time shaved. (*Id.* ¶¶ 16–17.) In addition, while he was working as Command Center Supervisor, other Hourly Workers complained to him about time-shaving. (*Id.* ¶ 18.) Regarding

two who complained during the summer of 2019, he checked Kronos, and it showed that Donelson had shaved hours from both Hourly Workers' time. (*Id.* ¶ 19.) When he confronted Donelson, Donelson did not deny engaging in time-shaving and instead simply stated that he would "fix" the Hourly Workers' hours. (*Id.* ¶ 20.)

Ed Cardona worked as a Warehouse Associate at the Antioch store from January 2017 until "late 2017," when he was promoted to Overnight Warehouse Supervisor (Doc. No. 54 ¶¶ 2, 3.) He transferred to the Pompano Beach, Florida store in May 2019 and remained there until his employment was terminated in January 2020 as part of a reduction in force. (*Id.* ¶ 4.) Before being promoted to supervisor, he was an Hourly Worker, and he regularly worked fifty-four hours per week without receiving compensation at 1.5 times his regular payrate for all overtime hours. (*Id.* ¶¶ 5–6.) He, too, was supervised by JJ Donelson, believes Donelson was responsible for shaving his time in accordance with a nationwide policy of keeping costs down, and complained several times to Donelson, who did not deny time-shaving. After Cardona had complained several times, Donelson added some wages to a rapid! PayCard and gave it to him, but without providing proof that the payment covered all overtime pay by which he had been shorted. (*Id.* ¶¶ 12–16.)

Davis Owusu testified that he was a Warehouse Associate and Hourly Worker at F&D's Antioch store from December 2016 until September 2017. (Doc. No. 55 ¶ 2.) He was a Warehouse Supervisor from September 2017 until January 2019. (*Id.* ¶ 3.) While he was a Warehouse Associate, he and other Hourly Workers were regularly scheduled to work, and did work, fifty-four hours per week but were not compensated at 1.5 times his regular rate of pay for all hours worked over forty. He, too, became aware that his hours were being shorted, complained to Donelson about it at least three times, and on one occasion was given a rapid! PayCard, but without proof that it covered all the pay by which he had been shorted. He was aware that other employees

at the store experienced the same thing, including Dowlen and Hammond. In addition, after he was promoted to Warehouse Supervisor, other employees complained to him about not being paid for all hours worked. On one occasion, Owusu checked a complaining employee's time on Kronos and confirmed that Donelson had shaved the employee's hours.

In his Declaration, Fierce Taylor states that he worked as Assistant Department Manager from October 2018 until September 2019 in F&D's Bridgeton, Missouri store. (Doc. No. 59 ¶ 2.) Although he supervised lower-level employees in his department, he was still an Hourly Worker, and he had no control over his hours, schedule, and pay or those of other employees. (*Id.* ¶¶ 2–3.) Taylor claims that he, like other Hourly Workers at his store, regularly worked six shifts per week, each averaging more than eight hours, used the Kronos timekeeping system to record his hours, and did not receive 1.5 times his regular pay rate for all hours worked over forty per work week. (*Id.* ¶¶ 5–9.) The alleged form of time-shaving at the Bridgeton store took a different form than that at the Antioch store. According to Taylor, when he worked a shift that lasted longer than eight hours, he would find when he went to clock out that his manager had already clocked him and his co-workers out "at least 30 minutes prior to the time that [he] stopped working." (*Id.* ¶ 11.) The same manager would "frequently adjust [his] time and schedule in Kronos." (*Id.* ¶ 12.) When he confronted his manager, Michael Graszer, about this form of time-shaving, Graszer did not dispute that he had "shaved" Taylor's hours. (*Id.* ¶ 15.) When he complained up the management chain, he was told that the problem would be "investigate[d]," but the problem was never corrected and he was not paid his lost wages. (*Id.* ¶ 16.) In addition, he was occasionally required to attend two-hour store meetings on Sundays. These meetings were mandatory, but he was not allowed to clock in for them and believes he was not paid for the time (typically overtime) spent at these meetings. (*Id.* ¶ 17.) He believes that F&D implemented a nationwide "time-shaving" policy. (*Id.* ¶ 14.) He

identifies five other individual Hourly Workers at the Bridgeton store who he knows had their time shaved. (*Id.* ¶ 19.)

Mindy Preiss worked at F&D's Carmel Mountain, California store. She worked part-time as a Customer Service Associate from August 2017 to November 2017, full-time as a Customer Service Supervisor from November 2017 to December 2018, and full-time as a Customer Service Associate from January 2019 until November 2019. (Doc. No. 58 ¶ 2.) She worked as an Hourly Worker even when she was a supervisor, and she had no control over her pay and hours or those of other employees. (*Id.* ¶ 3.) She alleges that managers at the Carmel Mountain store engaged in time-shaving as well, but it took yet another form at this store. Preiss states that she was regularly scheduled to work 39.5 hours per week but regularly worked more than that. She believes that she and other Hourly Workers were not compensated for all hours they worked over forty per week. She states specifically that she was told not to clock in for mandatory, two-hour store meetings that occurred quarterly. Instead, she was told she would be paid for that time using "training" hours. (*Id.* ¶¶ 7–10.)

In addition, she and her co-workers frequently had to work past the end of their scheduled shifts to complete necessary work tasks, but F&D would reduce their time. Preiss explains that whenever she or other employees clocked out past the end of their scheduled shift, Kronos would "flag" it and the employee could be subject to discipline. The manager would "have the employee sign a piece of paper stating, in essence, that although the employee clocked out late, the employee intended to clock out at the end of their shift." (*Id.* ¶ 14.) F&D would then change the hours in Kronos to reflect that the employees had clocked out at the time their shifts were scheduled to end, thus ensuring that they would be paid only for their scheduled hours, rather than the time actually worked. (*Id.* ¶ 14.) Preiss states that she and other Hourly Workers felt "pressured to sign these

pieces of paper to avoid discipline." (*Id.* ¶ 15.) She would occasionally complain about this practice, but the managers would nonetheless "insist" that she sign the paper. (*Id.* ¶ 16.) She saw this happening regularly in her department and was aware that other managers in other departments did the same thing. (*Id.* ¶ 18.) She believes that F&D had a policy requiring store managers to keep overtime costs down and that this policy resulted in the manipulation of hours that she witnessed and experienced.

Joshua Barrett also worked at the Carmel Mountain, California store as an Assistant Department Manager and as a Sales Associate from August 2017 until September 2019. (Doc. No. 57 ¶ 2.) Even while he worked as an assistant manager, he was an Hourly Worker with no control over his pay or hours or those of other employees. (*Id.* ¶ 3.) He regularly worked more than forty hours per week and knows that other employees at the same store had the same number of hours. He used Kronos to clock in and out but had numerous difficulties in ensuring that he was being paid correctly for all hours worked. He discovered, on several occasions, that a manager had manually changed his hours and, therefore, believes that F&D managers "would reduce the number of hours I and other Hourly Workers worked over 40 in workweek." (*Id.* ¶ 13.) He frequently complained that his hours were incorrect, but his first manager would not correct them. On two occasions she compensated him for unpaid hours through a rapid! PayCard. A subsequent manager would honor his requests to correct "errors" on Kronos, but on one occasion when the manager could not correct the error, F&D again compensated him for the unpaid hours through a rapid! PayCard. (*Id.* ¶ 15.) Barrett does not claim that he is due any compensation resulting from Kronos timekeeping errors, because he was able to recover the amounts he believes were due "through [his] own diligent efforts." (*Id.* ¶ 16.) However, he is aware that other Hourly Workers at his store with similar issues were not so lucky in having "errors" corrected. (*Id.*)

Barret also witnessed a policy at the Carmel Mountain store of flagging entries of employees who clocked out after the end of their scheduled shifts. He believes that "F&D would also frequently attempt to reduce small amounts of work time every time an employee clocked out late at the end of their shift." (*Id.* ¶ 20.) He and other Hourly Workers frequently had to clock out late to complete necessary work tasks, but the store had a "three strikes policy whereby employees with three instances of Kronos flagging them out late would get written up." (*Id.* ¶ 21.) Barrett and others were asked to sign a piece of paper stating that they had intended to clock out at the end of their scheduled shift. He signed this paper once but refused to do so on subsequent occasions. He believes other employees felt pressured to sign the paper to avoid discipline.

He states that F&D's Carmel Mountain store was aware of these pay practices because he complained about them and ultimately ended up resigning from the store because of them. (*Id.* ¶ 24.) Toward the end of his tenure with the company, he went back through his paystubs and discovered that he was not paid for all hours over forty in a workweek and, in particular, was not paid overtime for attending store meetings, even if those meetings put his time for the week over forty hours. He complained about the problem to the regional HR director, the regional manager, and the store manager. F&D ultimately agreed to pay him for the missing overtime wages due for the Sunday meetings, but he believes, based on his conversations with other employees and with F&D management, that F&D had a policy requiring store managers to keep overtime costs down, which resulted in the managers' engaging in hour- and pay-manipulation of the type that he witnessed.

## III.   LEGAL STANDARDS

The FLSA governs the payment of minimum wages and overtime to employees. 29 U.S.C. §§ 206, 207. In addition to individual actions for violations of its provisions, it authorizes collective actions to "be maintained against any employer . . . by any one or more employees for and in behalf

of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Because the statute only requires that employees be "similarly situated," plaintiffs seeking to certify a collective action under the FLSA face a lower burden than those seeking to certify a class action under Rule 23 of the Federal Rules of Civil Procedure. *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by Campbell–Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Once a collective action is certified, however, employees seeking to join the collective class must affirmatively opt into the litigation by filing a written consent with the court. 29 U.S.C. § 216(b).

The FLSA does not define the term "similarly situated." However, the Sixth Circuit has held that "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien*, 575 F.3d at 585. Employees may also be similarly situated if their claims are merely "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.* Indeed, "[s]howing a 'unified policy' of violations is not required [for certification]." *Id.* at 584; *see also Gunn v. NPC Int'l, Inc.*, 625 F. App'x 261, 267 (6th Cir. 2015) ("[P]laintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.").

Typically, although such a practice is not mandated by statute, courts employ a two-phase inquiry to address whether the named plaintiffs are similarly situated to the proposed opt-in plaintiffs for purposes of certifying a collective action. *Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006); *O'Brien*, 575 F.3d at 583. "The first [phase] takes place at the beginning of discovery. The second occurs after all of the opt-in forms have been received and discovery has

concluded." *Comer*, 454 F.3d at 546 (internal quotation marks and citation omitted).

At the first stage, the plaintiff bears the burden of showing that the employees in the collective are similarly situated. *Shabazz v. Asurion Ins. Serv.*, No. 3:07-0653, 2008 WL 1730318, at *3 (M.D. Tenn. April 10, 2008). At that point, "'the certification is conditional and by no means final.' The plaintiff must show that 'his position is similar, not identical, to the positions held by the putative class members.'" *Comer*, 454 F.3d at 546–47 (quoting *Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 595 (S.D. Ohio 2002)). In *Comer*, the Sixth Circuit approvingly quoted the lower court's decision, which stated that conditional certification "'need only be based on a modest factual showing,'" *Comer*, 454 F.3d at 547 (quoting *Pritchard*, 210 F.R.D. at 596), and that the court should use "'a fairly lenient standard [that] typically results in 'conditional certification' of a representative class.'" *Comer*, 454 F.3d at 547 (quoting *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497 (D.N.J. 2000)).

Although the required factual showing is "modest," it "cannot be satisfied simply by unsupported assertions." *Keenum v. Lott Enters., Inc.*, No. 2:14-cv-02504, 2014 WL 11369832, at *2 (W.D. Tenn. Nov. 25, 2014). The named plaintiff "must present some factual support for the existence of a class-wide policy or practice" that violates the FLSA. *Tyler v. Taco Bell Corp.*, No. 2:15-cv-02084, 2016 WL 2344229, at *3 (W.D. Tenn. May 3, 2016) (citation omitted). *See also Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004) (to meet the "modest factual showing" standard, "Plaintiffs must simply submit evidence establishing at least a colorable basis for their claim that a class of similarly situated plaintiffs exist[s]." (internal quotation marks and citation omitted)). However, "[t]he fact that a defendant submits competing declarations will not as a general rule preclude conditional certification." *Keenum*, 2014 WL 11369832, at *2 (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (explaining that plaintiffs

may meet the lenient standard "by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary")).

In short, "[a]t the notice stage, all that is required is substantial allegations supported by declarations, and once the plaintiff has met that burden, the case may be conditionally certified as a collective action, regardless of what exemptions the defendant wishes to assert at a later time." *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 373 (E.D. Tenn. 2006). If the named plaintiffs show that employees in the proposed class are similarly situated, "[t]he district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit." *Comer*, 454 F.3d at 546.

After discovery, the defendant may move for decertification of the conditional class. *See O'Brien*, 575 F.3d at 583; *Shabazz*, 2008 WL 1730318, at *3 (citing *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007)). At this second stage, the court has access to more information and employs a "stricter standard" in deciding whether class members are, in fact, similarly situated. *Comer*, 454 F.3d at 547.

## IV.    DISCUSSION

The motion here concerns the first of the two phases. The plaintiff argues generally that collective action certification here is proper, because he has demonstrated through his declaration and those of six other F&D employees that

> F&D subjected all members of the Putative Class to its common policy of suffering or permitting Hourly Workers to perform work in excess of 40 hours in a workweek without overtime compensation as a result of the Company's company-wide policy or practice of reducing overtime hours, by among other things eliminating, or shaving, recorded overtime hours, and suffering or permitting employees to work off the clock.

(Doc. No. 52, at 13.) He characterizes the policy as a "top-down corporate policy of reducing overtime labor costs" through various time-shaving methods that, however executed, work to deprive Hourly Workers of their lawful overtime wages. (*Id.* at 14.) He argues that the supporting declarations show that F&D "applies these policies and practices in numerous states throughout a diverse geographic area." (*Id.*)

The plaintiff also argues that his proposed Notice of Lawsuit Against Floor & Decor ("Notice") is fair and adequate, as it advises putative members of the collective of the pendency of the action and their opportunity to join, accurately describes Hammond's legal claims, and explains that F&D denies violating the law and is defending against the claims. (*See* Doc. No. 52-1.) The proposed Notice informs potential members that they are not required to participate and that their rights will not be affected if they do not join, except that their statute of limitations will not be tolled. It provides instructions on how to join the case and how joining impacts their rights. The plaintiff posits that the proposed Notice is easy to read, written in plain English, and "is consistent with notices approved by this court in other cases." (Doc. No. 52, at 17.)

Hammond proposes that the Notice be distributed by counsel via first-class mail, email and text message to "all Putative Class members, defined as all current and former employees who worked for F&D as full time Hourly Workers since December 10, 2016," and that class members be permitted to join by returning a consent via mail, facsimile, email, text, or online submission within ninety days of the mailing, "consistent with established practice under the FLSA." (*Id.*) To that end, Hammond moves for an order requiring F&D to provide, within ten days, each putative collective member's name, current or last known address, email address, telephone number, dates of employment, position(s) held, and location(s) worked, to facilitate distribution of the Notice.

Hammond also requests that the court expedite notice in light of the running of the statute of limitations.

Finally, Hammond "anticipates that F&D will seek to oppose nationwide notice on the ground that some of its Hourly Workers are purportedly subject to binding arbitration agreements" and argues that such an argument will be premature, as the existence of arbitration agreements is "irrelevant to collective action approval because it raises a merits-based determination." (Doc. No. 52, at 19 (quoting *Romero v. La Revise Assocs., LLC*, 968 F. Supp. 2d 639, 647 (S.D.N.Y. 2013)).) He argues that the proper course is to certify the class without considering the possibility of arbitration and then decide who must arbitrate, and, if some potential class members must arbitrate, the court "can always decertify, subclassify, or otherwise alter the class later." (*Id.* (quoting *Weisgarber v. N. Am. Dental Grp., LLC*, No. 4:18CV2860, 2020 U.S. Dist. LEXIS 48398, at *18– 19 (N.D. Ohio Mar. 20, 2020)).)

The defendant strenuously opposes the Motion to Certify. It argues, in a nutshell, that: (1) Hammond's proposed definition of the class presents an inherent conflict of interest for the named plaintiff, his counsel, and the proposed collective—requiring dismissal—insofar as the collective includes managers who were also Hourly Workers, including "managers . . . responsible for managing other hourly employees, including managing overtime and adjusting time records" (Doc. No. 118, at 8[1]); (2) Hammond is not similarly situated to the "thousands of [F&D] employees who are unquestionably bound by signed arbitration agreements" and, with respect to any of whom opts in and challenges his or her arbitration agreement, the court would be required to hold "highly individualized proceedings" to determine the enforceability of the arbitration agreement (*id.*); (3)

---

[1] Because F&D's Memorandum incorporates a cover page, lengthy Table of Contents, and Table of Authorities, the electronic pagination stamped by CM/ECF is not consistent with the defendant's pagination. The court uses the CM/ECF pagination.

even if the court concludes that Hammond is similarly situated to some members of the putative collective, the court should not authorize notice to members with arbitration agreements; (4) Hammond has not identified any unlawful nationwide policy; and (5) Hammond's proposed Notice is improper, and the court should require that any notice be "facilitated by a third-party administrator" (*id.* at 37).

The plaintiff has filed a Reply, arguing that F&D's approach to the "similarly situated" inquiry has been rejected by the Sixth Circuit and is contrary to the requirement, at this stage, that he make only a "modest factual showing" that he and putative members of the collective are similarly situated; there is no conflict of interest; arbitration agreements are not a bar to conditional certification; and his proposed Notice is fair and accurate. (Doc. No. 150.) The defendant's Surreply takes issue with some of the evidence, in the form of online employer reviews, submitted with the plaintiff's Reply. (Doc. No. 162.)

### A.      Whether There Is a Conflict of Interest

Hammond's proposed collective includes all F&D "Hourly Workers," without distinguishing between non-managerial Hourly Workers and Hourly Workers in supervisory positions, including managerial employees who might have been responsible for at least some of the alleged FLSA violations. As a threshold matter, the defendant argues that dismissal of the case in its entirety is required, because counsel for Hammond "cannot represent both sets of employees" due to an inherent conflict of interest. (Doc. No. 118, at 19.)

F&D insists that the concerns about conflicts are not "hypothetical," pointing out that the manager about whom Fierce Taylor complains, Michael Graszer, was an Hourly Worker who also falls within the proposed definition of the collective. (*See id.* at 20 (citing Fox Decl., Doc. No. 127 ¶ 12 ("Michael Graszer was an hourly department manager in the Bridgeton, MO store.")).) F&D

asserts that "Hammond's counsel are seeking to represent an individual whose alleged activities provide a cause of action to a current party plaintiff (and their client)." (*Id.*)

There is no actual or potential conflict of interest that requires the withdrawal of plaintiff's counsel, and several of the cases upon which F&D relies simply confirm that point. In particular, in *Erman v. Wethington*, No. 3:04-1092, 2006 WL 8458053 (M.D. Tenn. Mar. 21, 2006), *report and recommendation adopted*, 2006 WL 8458052 (M.D. Tenn. Mar. 31, 2006) (Trauger, J.), the original plaintiffs included an hourly worker, a salaried worker, and several officers, board members, and shareholders of the entity that formerly employed the workers. The plaintiffs brought twelve causes of action, including one for FLSA violations, against the entities that controlled the employer. All claims and all plaintiffs except the FLSA claim and the hourly worker were dismissed on the grounds that these claims did "not constitute one case or controversy with the federal FLSA claim," and the court declined to exercise supplemental jurisdiction over them. *Id.* at *1 n.1 (citing 28 U.S.C. § 1367). Thereafter, the magistrate judge recommended dismissing the sole remaining FLSA claim without prejudice on the basis of a conflict of interest that barred plaintiff's counsel from continue to represent the hourly worker plaintiff, because several of the original plaintiffs, including the employer's former Chief Executive Officer and former Executive Vice President and Chief Operating Officer, both of whom had also been significant shareholders and board members of the employer, fell within the FLSA's broad definition of "employer." *Id.* at *3. As such, they were "potentially liable as 'employers' under the FLSA." *Id.* at *2. Because they had been represented from the outset of the litigation by the same attorneys who continued to represent the hourly worker plaintiff, this posed an actual conflict, insofar as these individuals could not be named by counsel as defendants to an FLSA claim to be pursued on behalf of a collective of hourly workers. *Id.*; *see also* Tenn. S. Ct. R. 8, § 1.7(b)(3) & cmt. 17 (under the

Tennessee Rules of Professional Conduct, the only non-waivable direct conflict precluding representation is "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal"). The magistrate judge recognized that neither individual would be a necessary party to an FLSA action, because of joint and several liability among any entities who fall within the definition of an FLSA employer, *see id.* at *4 (citing *Yates v. Applied Performance Techs., Inc.*, 209 F.R.D. 143, 148–50 (S.D. Ohio 2002)), but she found that "the class of potential FLSA plaintiffs sought to be certified should not be foreclosed from making the assessment of whether these individuals are potential FLSA defendants and from taking the further step of including them as defendants to the FLSA claim." *Id.* On the basis of this conflict, the case was dismissed without prejudice.

The problem at issue in both *Erman* and *Yates*—also cited by the defendant—does not arise here, however, because the managers who are also Hourly Workers (and who, as such, may have fallen victim to the alleged policy that they were also purportedly directed to implement) would not fall within the FLSA's definition of "employer." *See Diaz v. Longcore*, 751 F. App'x 755, 758 (6th Cir. 2018) (reaffirming a definition of employer that extends to "individuals who are chief corporate officers of the business, have a significant ownership interest in the business, control significant aspects of the business's day-to-day functions, and determine employee salaries and make hiring decisions"). There is no direct, non-waivable conflict of interest of the type addressed in Rule 1.7 of the Tennessee Rules of Professional Conflict.

Moreover, this court and others have rejected similar arguments based, not on an actual conflict of interest that requires the withdrawal of counsel, but on claims that some members of the putative collective may also have been personally involved in the activity alleged to have violated the FLSA. *See, e.g.*, *Smith v. Maco Mgmt. Co.*, No. 2:18-CV-00082, 2019 WL 1437927,

at \*4 (M.D. Tenn. Apr. 1, 2019) (Crenshaw, C.J.) ("Maco's 'conflict of interest' argument, although not without intellectual appeal, does not defeat Named Plaintiff's conditional certification motion. . . . Other courts faced with similar facts have approved motions for conditional certification of proposed classes that include both supervisors and their supervisees." (citing *Garcia v. Moorehead Commc'ns, Inc.*, No. 1:12-CV-208-JD, 2013 WL 4479234, at \*4 (N.D. Ind. Aug. 19, 2013) (finding technicians and their supervisor field service managers were similarly situated); *Aguilar v. Complete Landsculpture, Inc.*, No. 3:04 CV 0776 D, 2004 WL 2293842, at \*4 (N.D. Tex. Oct. 7, 2004) (finding foremen with hiring and firing authority to be similarly situated to laborers, where all employees were compensated under the same pay scheme); *Pacheco v. Aldeeb*, No. 5:14-cv-121-DAE, 2015 WL 1509570, at \*6 (W.D. Tex. Mar. 31, 2015) (finding that plaintiffs who had served in managerial capacity were not precluded, on that basis alone, from representing non-managerial employees)).

In *Maco*, as here, the defendant argued, based on the named plaintiff's class definition, that "potential opt-in plaintiffs could both: (1) qualify to join the suit as an opt-in plaintiff; and (2) be a potential defendant in the action (*i.e.*, an opt-in plaintiff could be a [district manager] who was a former [property manager], and instructed other opt-in plaintiffs, who were [property managers], to engage in time-shaving)." *Id.* The defendant claimed that the plaintiff admitted that district managers had "enforced the alleged unlawful policy at issue, and, therefore could also be potential defendants in the action." *Id.* The court, however, found that this potential "conflict" did not preclude a finding that property managers and district managers were similarly situated, insofar as the plaintiffs alleged that they were all "victims of illegal pay policies that originated from the corporate headquarters and [district managers] were enforcing that corporate policy," but district managers "had no financial incentive to encourage [property managers] to under-report their

hours." *Id.* at *5. Rather, because the defendant was allegedly not paying overtime to either group, both were "equal victims" of the defendant's "overtime pay policies and procedures." *Id.* The court therefore found the case distinguishable from those cited by the defendant. *See id.* (citing *Ellred v. Cty. of Los Angeles*, No. CV 08-4289 CAS (FFMx), 2009 WL 982077, at *5 (C.D. Cal. Apr. 9, 2009) (refusing to certify a proposed class of social workers and their supervisors because of an inherent conflict between the parties, as the social workers would have to prove that their supervisors violated federal law by telling the social workers not to record their overtime); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314–15 (M.D. Ala. 2002) (refusing to certify a proposed class where foremen and crewmen had dissimilar job duties and there was an inherent conflict between them, because foremen were responsible for reporting the correct number of hours worked by crewmen and foremen received bonuses for efficiency); *Bentley v. Cty. of Los Angeles*, No. CV 09-02063-RGK(CWx), 2009 WL 10674394, at *3 (C.D. Cal. Sept. 15, 2009) (refusing to certify class based on the analysis in *Ellred*). Further, the court in *Smith* also noted that the "disparate factual and employment settings of the individual plaintiffs" alleged by the defendant were issues more "'appropriately examined under th[e] second stage of the [certification] analysis' *(i.e.*, in a motion for decertification), rather than at the motion for certification stage." *Id.* (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001); *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 367 (E.D. Tenn. 2006)).

This court agrees with Judge Crenshaw's analysis in *Smith*: to the extent the plaintiff is otherwise able to satisfy his burden at the notice stage of showing substantial similarity between the proposed members of the collective, the defendant cannot defeat that showing simply by "arguing that individual issues may dominate." *Id.* The potential conflict identified by the defendant does not preclude a finding of substantial similarity between managerial and non-

managerial hourly workers, insofar as the named plaintiff alleges that all Hourly Workers were victims of the same time-shaving policy. *Accord O'Brien*, 575 F.3d at 586 ("Defendants note that some of the plaintiffs were managers and therefore could not be 'similarly situated.' This is not a compelling argument, because managers could also have been cheated by defendants.").

**B.    The Plaintiff Is Not Similarly Situated to Individuals Who Have Signed Arbitration Agreements**

Next, F&D argues that individuals who have entered into arbitration agreements are not similarly situated to those who did not. The plaintiff insists that this argument is "premature" and that district courts within this circuit and elsewhere have typically held that "determining whether [an arbitration agreement] precludes a putative class member from joining the action is inappropriate at the class certification stage." *Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 752 (M.D. Tenn. 2018) (citing *Romero v. La Revise Assocs., LLC*, 968 F. Supp. 2d 639, 647 (S.D.N.Y. 2013) ("Courts have consistently held that the existence of arbitration agreements is irrelevant to collective action approval because it raises a merits-based determination.")). The plaintiff insists that this issue should be resolved at a later stage of the litigation, at which point, "[i]f it turns out that some potential class members must arbitrate, the Court can always decertify, subclassify, or otherwise alter the class." (Doc. No. 52, at 19 (quoting *Weisgarber v. N. Am. Dental Grp., LLC*, No. 4:18CV2860, 2020 U.S. Dist. LEXIS 48398, at *18–19 (N.D. Ohio Mar. 20, 2020)).)

F&D asserts that there are approximately 12,000 current and former hourly workers who would otherwise fall within Hammond's definition of the collective. (Doc. No. 118, at 10 (citing Fox Decl., Doc. No. 127 ¶ 10).) Of that number, approximately 9,800 (including opt-in plaintiffs Taylor and Cardona) actually signed arbitration agreements or arbitration acknowledgment forms, and only thirty-one signed arbitration opt-out forms. (Doc. No. 127 ¶ 31.) F&D also claims that

the vast majority of the remainder, more than 2,000,[2] are bound to arbitrate because they "agreed to arbitration by continuing their employment after receiving an arbitration agreement." (Doc. No. 118, at 18 (citing Fox Decl., Doc. No. 127 ¶ 28, and Walker Decl., Doc. No. 91).)

The existence and enforceability of the signed arbitration agreements are not hypothetical concerns. As F&D points out, Hammond has made it clear that "individual mini-trials will be necessary for any class members who challenge their arbitration agreement" (Doc. No. 118, at 21), both by those who actually signed arbitration agreements and those who did not but who, F&D contends, are nonetheless bound to arbitrate. F&D argues that the "sheer number" of putative class members with arbitration agreements means that "ancillary arbitration litigation would swallow the merits of this action" and that this problem, standing alone, provides a basis for denying the Motion to Certify. (*Id.* at 22.)

With respect to those individuals for whom F&D can produce a signed arbitration agreement (whether physically or electronically), the court agrees. In determining whether a plaintiff has met his burden of establishing that the proposed members of a putative collective action are similarly situated, district courts in this circuit generally consider the "factual and employment settings of the individual[] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien*, 575 F.3d at 584 (quotation marks and citation omitted).

For each putative class member who signed an arbitration agreement, the court anticipates that F&D's defense would be similar to that deployed in contesting opt-in plaintiffs Taylor and

---

[2] F&D does not dispute that the thirty-one employees who actually signed and returned arbitration opt-out forms may pursue their FLSA claims in court.

Cardona—moving to dismiss that individual's claims based on the execution of a valid arbitration agreement. And, as indicated by the course this litigation has taken to date, the named plaintiff has made clear his belief that virtually every potential opt-in plaintiff who has signed an arbitration agreement would have individualized defenses to the execution of the arbitration agreement. As at least one other court has found under similar circumstances:

> From a procedural perspective, it is apparent that Defendant will seek to dismiss (or compel arbitration) of each of these claims. . . . The attendant procedural and legal issues unique to those who have signed Arbitration Agreements militate against finding that this group of employees is similarly situated to [the named plaintiff].

*Errickson v. Paychex, Inc.*, 447 F. Supp. 3d 14, 27 (W.D.N.Y. 2020) (citing *Morangelli v. Chemed Corp.*, No. 10 Civ. 0876 (BMC), 2010 WL 11622886, at *3 (E.D.N.Y. June 17, 2010) (holding that it would be a "disservice to judicial efficiency" to include those who signed arbitration agreements in the collective, when they would be "subject to additional, prolonging motion practice which will likely disqualify them from the class"). Indeed, as F&D argues, the "ancillary litigation" attendant upon the need to address the validity and enforceability of up to 9,800 signed arbitration agreements or arbitration acknowledgment forms would overwhelm the court, render it impossible to address the merits of the claims of those individuals who have not signed arbitration agreements and who may proceed in court, and would "fatally undermine both fairness and judicial efficiency." (Doc. No. 118, at 22.) Moreover, as indicated by the court's treatment of the Motions to Dismiss Opt-in Plaintiffs Taylor and Cardona, any opt-in plaintiff who actually signed an arbitration agreement would have a relatively low likelihood of succeeding in invalidating the agreement.

In short, the court finds that current and former F&D employees who, unlike Hammond, have signed arbitration agreements are not similarly situated to Hammond. Any definition of the putative collective must exclude those individuals.

However, a different analysis pertains to those individuals for whom the defendant cannot produce a signed arbitration agreement or arbitration acknowledgment form. As the court's denials of the defendant's motion to compel plaintiff Hammond to arbitrate and the defendant's Motion to Dismiss Opt-In Craig Cheuvront together suggest, the defendant will encounter substantial difficulty in proving, by a preponderance of the evidence, that individuals who did not sign arbitration agreements are actually bound by them anyway. This difficulty arises from several sources.

First, the documentation submitted by F&D establishes that only a few of the many versions of the Arbitration Agreement it has deployed over the years actually contain the language upon which F&D relies as creating a contract, even in the absence of a signed agreement—that is, language stating that an employee's continued employment will constitute acceptance of an agreement to arbitrate. Specifically, F&D has produced six different versions of its Employee Handbook, all of which contain some version of its Arbitration Agreement: (1) February 2014 Employee Handbook For all states except California (Doc. No. 118-16); (2) April 2015 Employee Handbook For California Employees (Doc. No. 118-17); (3) January 2015 Employee Handbook For all states except California (Doc. No. 118-18); (4) October 2015 Employee Handbook for California Employees (Doc. No. 118-19); (5) April 2016 Associate Handbook (Doc. No. 118-20); and (6) May 2016 Associate Handbook (Doc. No. 118-21). Of these versions, only the three earliest (from February 2014, April 2015, and January 2015) contain the language F&D believes creates a contract merely by virtue of the Handbook's having been given to an employee: "Your continued employment and/or your accepting employment with the Company subsequent to this Agreement's implementation on February 17, 2014 also shall constitute consideration and acceptance by you of the terms and conditions set forth in this Agreement." (See Doc. No. 118-

16, at 50; Doc. No. 118-17, at 64; Doc. No. 118-18, at 50.) The remaining Arbitration Agreements that are incorporated either in an Employee Handbook or Associate Handbook and date from October 2015 through 2017 contain no such language.

After 2017, F&D adopted a stand-alone Arbitration Agreement. F&D has produced fourteen different versions of this agreement, dating from December 2017 through May 2018. The variations among these different versions are slight, but not one of them contains language indicating that continued employment will constitute the employee's consent to arbitration or that the employee's continued employment is contingent upon his or her agreeing to arbitrate.[3] Those pertaining specifically to California employees, in fact, contain express language barring oral amendments to the agreement and referring to the employee's act of signing the agreement as signaling assent. (*See, e.g.*, Doc. No. 118-31.)

In other words, although F&D does not indicate how many of its employees it believes are bound by three earliest versions of its arbitration agreement, it is likely a relatively small percentage of the total number of individuals who did not sign arbitration agreements.

But second, insofar as F&D will continue to argue that receipt of one of those three versions of the Arbitration Agreement, standing alone, establishes that the employee had notice that continued employment would be construed by F&D as assent to arbitrate any employment-related claims, that argument will face an uphill evidentiary battle. In light of the fact that the language upon which its claim depends is buried at least fifty pages into an Employee Handbook, unless

---

[3] Instead, the agreements typically indicate only that *part* of the consideration for the agreement is the employee's accepting or continuing employment: "As consideration for accepting or continuing your employment with the Company, the mutual promises contained in this Agreement and other good and valuable consideration, You and the Company hereby agree that any dispute between You and the Company . . . must be submitted for resolution by mandatory, binding arbitration." (*See, e.g.*, Doc. No. 118-22, at 2.)

F&D can produce managers with specific recollection of having *expressly* informed the specific employees who seek to opt into this lawsuit that continuing employment would be deemed their acceptance of the Arbitration Agreement, F&D will be unlikely to meet its burden of proof as to the mutual assent and meeting of the minds required for the formation of a binding contract under applicable state contract laws.

Thus, insofar as the F&D intends to continue to maintain that individuals who did not sign arbitration agreements or acknowledgments of arbitration agreements are nonetheless bound by the arbitration agreements, its ability to raise a good-faith argument in that regard will be extremely limited. The court finds that the likelihood of the need for individualized litigation of whether each of these potential opt-ins assented to arbitration is relatively small and that the risk of this ancillary litigation overwhelming the merits of the case to be commensurately slight.

The parties do not address this issue, but the court also finds that, even assuming the Sixth Circuit ultimately adopts the reasoning of the Fifth and Seventh Circuits in *In re JPMorgan Chase & Co.*, 916 F.3d 494 (5th Cir. 2019), and *Bigger v. Facebook, Inc.*, 947 F.3d 1043 (7th Cir. 2020), the holdings in those cases would not preclude notice to individuals who did not sign an arbitration agreement or acknowledgment form. In those cases, completely aside from the "similarly situated" question, the courts concluded that the district courts lack authority to send notice of a collective action to "an employee with a valid arbitration agreement." *JPMorgan Chase*, 916 F.3d at 501; *see also Bigger*, 947 F.3d at 1050 ("[A] court may not authorize notice to individuals whom the court has been shown entered mutual arbitration agreements waiving their right to join the action."). Here, for those putative employees for whom F&D cannot produce a signed agreement or acknowledgment, it cannot make a *prima facie* showing of the existence of a binding arbitration

agreement, at least for purposes of providing notice of the collective action at this stage of the litigation.

To summarize: those individuals for whom F&D can produce a signed Arbitration Agreement or signed Acknowledgment of Arbitration Agreement—and not merely an acknowledgment of receipt of the Employee Handbook or a checkmark by a manager on a form showing that the employee received a copy of either an Employee Handbook or Arbitration Agreement—are not similarly situated to the plaintiff and will not be entitled to receive notice of this collective action. But this ruling does not preclude notice to individuals for whom F&D cannot produce a signed agreement.

### C.      Whether Proposed Members of the Collective Are Similarly Situated

The plaintiff asserts that he has shown, through his Declaration and the Declarations of six witnesses,[4] that his claims and those of the putative members of the collective are unified by a common theory of F&D's statutory violations—namely, "a top-down corporate policy of reducing overtime labor costs through time shaving and other methods that deprived Hourly Workers of their lawful overtime wages"—and that F&D applies these policies and practices nationwide. (Doc. No. 52, at 14, 15.) As set forth above, in their respective Declarations, the plaintiff and his witnesses all state that (1) they were employed at an F&D store as a Warehouse Associate, Sales Associate, Customer Services Associate, Department Supervisor and/or Assistant Department Manager during the relevant time frame; (2) they were paid on an hourly basis; (3) they were regularly scheduled to work, and did work, more than forty hours per week; and (4) they did not

---

[4] The plaintiff identifies the declarants as two opt-ins and four witnesses, but the claims of the two opt-ins to whom he refers will be dismissed on the grounds that, having signed binding arbitration agreements, they are not similarly situated to Hammond. However, they still qualify as witnesses.

receive all the overtime compensation to which they were due. (*See* Doc. Nos. 33, 54, 55, 56, 57, 58, 59.) They allege two basic methods by which they were deprived of overtime pay to which they were purportedly entitled: (1) being compelled to work off the clock during store meetings; and (2) "time shaving," effected either by managers who pressured employees to sign "pieces of paper" authorizing the manager to manually edit their clock-out times or managers who unilaterally "clocked out" employees while they were actually still working or changed employees' clock-out times within the system, so the number of hours worked as shown on the system would not reflect the overtime or the full amount of overtime actually worked.

The plaintiff maintains that these allegations satisfy the "modest factual showing" required to establish that a putative collective of similarly situated employees exists, for purposes of the initial stage of conditional certification of a nationwide class. In opposing the motion, F&D argues that (1) the evidence offered by Hammond and his six declarants of alleged FLSA violations fails to "support [Hammond's] assertion of widespread violations resulting from a common policy or plan" (Doc. No. 118, at 23 (citation omitted)); (2) Hammond has failed to show a common policy, and his claims instead will involve numerous individualized assessments of every collective member's work schedule and pay for every work week within the limitations period and an individualized inquiry into whether the work schedule as recorded by Kronos was altered, which is the "antithesis of the type of efficient proceeding mandated by [*Hoffmann–La Roche, Inc., v. Sperling*, 493 U.S. 165 (1989)]," (*id.* at 25); and (3) Hammond has not identified a common theory unifying the claims of the putative collective or even unifying the claims of the declarants he has identified.

### 1. Sufficiency of the Evidence

F&D points out that it operates 129 stores in thirty different states,[5] plus an additional four distribution centers, several support centers, and corporate offices. F&D insists that Hammond and his six declarants make up a minute percentage of all putative class members—seven out of approximately 12,000 putative class members—and that their allegations concern only three stores in three states and have no bearing on F&D's distribution centers, support centers, or corporate offices. F&D argues that such limited sampling fails to support the existence of "widespread violations resulting from a common policy or plan." (Doc. No. 118, at 23 (quoting *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *6 (D. Minn. July 10, 2006)).)

The number of Hourly Workers F&D references includes those individuals who, it claims, have signed arbitration agreements. As discussed above, the approximately 9,800 individuals for whom F&D has located signed arbitration agreements or acknowledgments are not similarly situated with Hammond. Their exclusion will substantially reduce the size of the potential collective. Moreover, the cases upon which F&D draws in support of its position are largely outside this jurisdiction and differ substantially on the facts from this one. Although the plaintiff has not produced a substantial amount of evidence, his burden, at this juncture, is relatively slight, and other courts within the Sixth Circuit have permitted nationwide collective actions to proceed based on a similar quantity of evidence. *See, e.g.*, *Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 750 (M.D. Tenn. 2018) (finding declarations from "twelve different employees, working across eight stores, in five states" to be "sufficient evidence of common nationwide practices whereby Hourly Workers are forced to engage in 'off-the-clock' work in violation of the FLSA to

---

[5] The plaintiff alleges that F&D operates in twenty-eight states. (Doc. No. 1 ¶ 3.) The defendant claims to operate in thirty states. (Doc. No. 123 ¶ 3.) The court finds this dispute to be immaterial.

support a nationwide class"); *Gunn v. NPC Int'l, Inc.*, No. 13-1035, 2016 WL 7223466, at *7–8 (W.D. Tenn. Dec. 13, 2016) (finding that thirty declarations from opt-ins in eight different states of the twenty-eight states in which the defendant operated were sufficient to make the requisite "modest factual showing" that defendant had "implemented a common policy or practice that violated the FLSA and that [the plaintiff was] similarly situated to servers at other . . . restaurants [operated by the defendant]"); *Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1078–79 (M.D. Tenn. 2015) (certifying nationwide class and noting that the FLSA's "broad remedial purpose" did not require a showing that employees from every restaurant in each state where defendant operated had opted into the lawsuit at the conditional certification stage); *see also Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2012 WL 1414325, at *6 (D. Colo. Apr. 21, 2012) (rejecting the defendant's request to limit class geographically where only six of forty-two regions were represented at the time of conditional certification, because "[t]he fact that [employees] from every region have not yet opted into [the] action does not mean that a nationwide class cannot exist").

As the plaintiff argues, he has "presented testimony from 2.3% of [F&D's] stores" and "10% of the [approximately 30] states in which it has facilities." (Doc. No. 150, at 7.) The court does not find it appropriate to impose a hard and fast rule regarding representative percentages that will be deemed sufficient. It finds that the evidence offered by the plaintiff, though it falls at the lower end of the acceptable quantum, is nonetheless sufficient to justify a finding that the plaintiff and the proposed collective are similarly situated and to justify conditional certification of a nationwide collective.

The plaintiff's declarations, however, are only from individuals who worked at actual F&D retail stores, rather than at its distribution centers, support centers, or corporate offices. The

allegations in the Complaint concern only F&D's practices at its retail outlets. The plaintiff does not respond to F&D's contention that he has failed to provide evidence sufficient to warrant including employees or former employees from these facilities in the definition of the collective. Moreover, F&D offers evidence that its distribution centers, support centers, and corporate offices are "independent from" its stores, have "entirely different operations, are run by entirely different individuals, and report to entirely different management chains." (Doc. No. 127 ¶ 6.) At this stage, the court "does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Roberts v. Corr. Corp. of Am.*, No. 3:14-CV-2009, 2015 WL 3905088, at *10 (M.D. Tenn. June 25, 2015) (quoting *Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642 (W.D. Tenn. 2009)). Nonetheless, in light of the plaintiff's failure to respond to this argument or to offer testimony from any F&D employees who worked at a distribution center, support center, or in the corporate offices, the court finds that the definition of the collective must be limited to individuals who worked at F&D retail stores.

### 2. *Necessity of Individualized Inquiry*

F&D argues that the plaintiff has not shown that he and the other putative members of the collective are similarly situated, because their allegations "reveal the deeply individualized nature of Hammond's core allegations," and resolution of the claims will require "[n]umerous [i]ndividualized [i]nquiries." (Doc. No. 118, at 17, 23). The Sixth Circuit has already determined that the necessity of individualized inquiries is not a bar to certification.

In *O'Brien*, the district court granted conditional certification at the initial stage but later granted a motion to decertify, on the basis that "each claim presented by each plaintiff would require an extensive individualized analysis to determine whether a FLSA violation had occurred, frustrating the collective consideration of common questions of fact and law." *O'Brien*, 575 F.3d

at 583 (internal quotation marks and record citation omitted). The Sixth Circuit held unequivocally that the district court erred in decertifying on that basis:

> [S]uch a collection of individualized analyses is required of the district court. Under the FLSA, opt-in plaintiffs only need to be "similarly situated." While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA.

*Id.* at 584.

The cases upon which the defendant relies that conclude otherwise are either from outside the Sixth Circuit or predate *O'Brien*. The fact that individualized inquiries may be required is not fatal to the plaintiff's Motion to Certify.

### 3.    Existence of Common, Unifying Theory of FLSA Violations

The *O'Brien* decision also forecloses the defendant's argument that the plaintiff fails to show a "common policy" affecting the putative collective. The defendant contends that Hammond has failed to identify a "nationwide policy regarding time recording or labor costs" or a "common theory" unifying their claims. (Doc. No. 118, at 24, 27.) F&D focuses on the different methods by which the declarants claim that their rights under the FLSA were violated.

In making this argument, the defendant misapplies the holding in *O'Brien* and otherwise relies on cases from outside this jurisdiction. As this court previously stated:

> The FLSA does not define the term "similarly situated." However, the Sixth Circuit has held that "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." Employees may also be similarly situated if their claims are merely "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." Indeed, "[s]howing a 'unified policy' of violations is not required [for certification]."

*Medley v. S. Health Partners, Inc.*, No. 1:17-CV-00003, 2017 WL 3485641, at *4 (M.D. Tenn. Aug. 15, 2017) (quoting *O'Brien*, 575 F.3d at 585, 584).[6]

In *O'Brien*, the plaintiffs, like Hammond and his declarants here, "articulated two common means by which they were allegedly cheated: forcing employees to work off the clock and improperly editing time-sheets." 575 F.3d at 585. Based on these allegations, the Sixth Circuit found that the plaintiffs there were "similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.* The court stressed that it did not "purport to create comprehensive criteria for informing the similarly-situated analysis" and did not mean to imply that all collective actions under § 216(b) were required to be "unified by common theories of defendants' statutory violations." *Id.* It simply found that the plaintiffs in the case before it were thus similarly situated.

In this case, too, the distinct means by which the declarants allege that they were short-changed hours may require individualized inquiry, but they are unified by a common theory, as set forth above. The court will grant the Motion to Certify, but with the noted modifications of the definition of the collective.

**D.     The Issuance of Notice**

Once an FLSA class is conditionally certified, "notice is distributed to the class, putative class members return the opt-in forms sent to them, and the parties conduct discovery." *Hall v. U.S. Cargo & Courier Serv., LLC*, 299 F. Supp. 3d 888, 894–95 (S.D. Ohio 2018) (citations and

---

[6] In *Medley*, the court denied the plaintiff's motion for conditional certification, primarily because the plaintiff failed to offer any evidence in support of her claims other than her own declaration, which addressed only her own experiences, and a print-out from a website offering unsworn reviews of the defendant company by anonymous individuals who claimed to have been employed by the defendant. *See* 2017 WL 3485641, at *7–8.

internal quotation marks omitted). "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative." *Id.* at 897–98 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989)). The court may facilitate notice to the putative collective, but it must "avoid[] communicating to absent class members any encouragement to join the suit or any approval of the suit on its merits." *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 214 (S.D. Ohio 2011) (citing *Hoffman-LaRoche*, 493 U.S. at 168–69). The court has "wide latitude in determining [t]he method or methods of notice that will reach the potential opt-in plaintiffs while maintaining the privacy of the not-as-yet parties to the case and ensuring that the notice does not create an undue burden on Defendants." *Brandenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-CV-516, 2017 WL 3500411, at *5 (S.D. Ohio Aug. 15, 2017).

The plaintiff requests that the court authorize the issuance of notice of the collective action to "[a]ll current and former full-time Hourly Workers who worked for Floor & Decor at any time since December 10, 2016" (three years from the date the plaintiff filed suit). (Doc. No. 52-1, at 1.) The proposed Notice includes the court's name in the heading and the complete case caption; it states that its purpose is to advise such workers of the existence of a lawsuit they may be interested in joining, how their rights may be affected by the lawsuit, and how to join it if they choose to do so. (*Id.*)

It broadly describes the allegations in the Complaint, states that F&D denies the plaintiff's claims, and identifies the collective on whose behalf the plaintiff sues. It explains how individuals can join the suit: by mailing a "Consent to Become Party Plaintiff" form ("Consent form"), attached to the Notice, to counsel for the plaintiff no later than ninety days after the Notice issues, which will be indicated by a specific date on the Notice. It describes the legal effect of joining,

and not joining, the lawsuit, directs individuals to contact plaintiff's counsel if they have additional questions, and clearly identifies plaintiff's counsel. (*Id.* at 2–3.) It states in bold, capitalized letters:

> **THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE FEDERAL DISTRICT COURT, MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION.**
>
> **THE COURT HAS TAKEN NO POSITION IN THIS CASE REGARDING THE MERITS OF THE PLAINTIFF'S CLAIMS OR OF DEFENDANT'S DEFENSES.**

(*Id.* at 3.)

The Consent form, attached to the Notice, is the same form that the plaintiff and opt-ins have been using since the case was filed. (*Id.* at 4.)

The plaintiff submits that the proposed Notice is "fair and adequate" and complies with the standards for notice articulated by the Supreme Court in *Hoffman-LaRoche*. He proposes that counsel for the plaintiff distribute the Notice via first-class mail, email, and text message to all putative members of the collective, as defined in the proposed Notice, and that those individuals choosing to join be permitted to return the Consent form "via mail, facsimile, email, text, or online submission within 90 days of the mailing." (Doc. No. 52, at 17.) In order to facilitate the dissemination of the Notice, the plaintiff moves for an order requiring F&D to provide, within ten days of issuance of the order, the names, current or last known addresses, email addresses, telephone numbers, dates of employment, positions held and locations worked for all putative members of the collective action. (Doc. No. 52, at 19–20.)

In response, F&D contends that the proposed Notice is not fair and accurate because: (1) the court heading, case caption, and "authorized" language must be omitted from the Notice, as they "improperly imply judicial endorsement of the merits of the action" (Doc. No. 118, at 37); (2) the ninety-day notice period is excessive and should be limited to forty-five days; and (3) the proposed Notice is inaccurate insofar as it fails to apprise recipients of "the full extent of their

likely role in the case" if they choose to opt in, "including the possibility that they may be required to participate in written discovery and/or be deposed and participate in a trial" and "that they may be responsible for Defendant['s] costs and attorney's fees if their claims are unsuccessful" (*id.*).

In addition, F&D demands that, if any notice is permitted, its distribution should be facilitated by a third-party administrator. On that basis, it contends that the court should deny the request that F&D relay contact information for putative members of the collective to plaintiff's counsel and instead require that notice go through the third-party administrator, "to ensure that communications with such individuals are limited to the methods and language approved by the Court." (*Id.*)

Finally, it insists that notice be sent through U.S. Mail only, "as Hammond's request for email addresses and telephone numbers raises privacy concerns of non-parties." (*Id.*)

The court finds as follows, regarding each of the defendant's objections:

1.      The defendant proposes removing the case caption and court's name, but it does not propose a replacement or point to any cases in which the inclusion of a case caption on a notice of collective action was deemed inappropriate. Other courts have rejected this argument, and this court does as well. *See, e.g.*, *Bradford v. Team Pizza, Inc.*, No. 1:20-cv-60, 2020 U.S. Dist. LEXIS 113681, at *21 (S.D. Ohio June 29, 2020) (citing *Waters v. Pizza to You, LLC*, No. 3:19-cv-372, 2020 WL 1129357, at *3 (S.D. Ohio Mar. 9, 2020); *Colley v. Scherzinger Corp.*, 176 F. Supp. 3d 730, 735 (S.D. Ohio 2016) ("Including the case caption is not misleading nor a judicial endorsement of the lawsuit.")).

2.      The defendant objects to the statement that the court has authorized the Notice. That statement, however, is accurate, and it is followed by a clear statement that the court has not taken a position on the merits of the case. This objection is unsupported as well.

3. The defendant offers no argument in support of its contention that a ninety-day notice period is too long. On the other hand, the plaintiff offers little in support of it other than noting that a ninety-day notice period is common and that "[m]edia reports about postal service delays . . . underscore the need for a 90 day notice period in this case." (Doc. NO. 150, at 16 n. 14.) The court finds that ninety days is reasonable in this case, given both postal service delays and the indication from the plaintiff's submissions that the employee turn-over rate at F&D is fairly rapid, as a result of which counsel may have difficulty locating and contacting putative members.

4. The defendant is simply incorrect that opt-in plaintiffs may be hit with costs and attorney's fees, and there is no need of notice to that effect. The addition of language pertaining to participation in discovery appears reasonable, however, and the plaintiff will be directed to amend the Notice to acknowledge that possibility.

5. The defendant has provided no reason for requiring notice to be distributed through a neutral third-party administrator. That request is denied.

6. Finally, the court rejects F&D's objection to the provision of email addresses. Distribution through email is a common and widely accepted practice, and F&D's objection to providing email addresses is unreasonable. On the other hand, the court agrees that distribution of the Notice and Consent forms through text messages would be cumbersome and unnecessarily invasive. Accordingly, the court will not require F&D to supply mobile telephone numbers for each putative member of the collective.

The court further observes that, although the plaintiff's Memorandum states that individuals choosing to opt into the lawsuit may signal their consent by returning the Consent form "via mail, facsimile, email, text, or online submission within 90 days of the mailing" (Doc. No.

52, at 17), the actual proposed Notice only instructs recipients that they may join by mailing the Consent form so that it is postmarked no later than ninety days after the Notice is issued. Although the proposed Notice includes plaintiff's counsel's telephone and facsimile numbers and email address, it does not state that Consent forms may be returned by any means other than regular mail. The proposed Notice should be modified to clearly reflect that a signed Consent form may be returned by facsimile, email, or U.S. mail, postmarked or submitted within ninety days of issuance of the Notice. Text or other "online" submission will not be allowed.

Finally, the court notes that neither party references the statute of limitations that will apply to opt-in plaintiffs' claims, and the defendant does not object to the temporal scope of the proposed collective—that is, its inclusion of Hourly Workers employed since December 10, 2016. The proposed Notice indicates only that the statute of limitations will continue to run for those who do not opt-in. The Notice must also indicate that the statute of limitations continues to run for those who do opt in, up until the date they submit their Consent form and such form is filed with the court. 29 U.S.C. § 256.

## V. CONCLUSION

For the reasons set forth herein, the plaintiff's Motion for Conditional Certification of a Collective Action and Expedited, Nationwide, Court-Supervised Notice to Putative Plaintiffs will be granted in part, with the definition of the proposed members of the collective action limited as set forth herein. Specifically, those individuals who have signed an arbitration agreement are not similarly situated with the plaintiff, nor are individuals who were employed by F&D outside of the retail store setting. The plaintiff will be directed to modify the definition of the proposed collective accordingly.

The court will also authorize expedited nationwide notice to the putative members of the collective action, with amendments to the proposed Notice to be effected as set forth herein.

Specifically, the Notice must notify proposed members of the collective that they may be required to participate in discovery and that, absent a court finding that tolling applies, the statute of limitations on their claims continues to run until they submit a Consent form and it is filed with the court. The Notice must clearly indicate by what means the Consent forms may be returned to plaintiff's counsel. The plaintiff will be required to submit a revised version, along with the plaintiff's motion for approval of the revised notice, within five days of entry of this order.

The defendant will be directed to provide counsel for the plaintiff the names, last known addresses, and email addresses (if known) of employees entitled to receive Notice of the collective action.

An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge