# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| GERMMA HAMMOND, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:19-cv-01099 |
| | ) | Judge Aleta A. Trauger |
| FLOOR AND DECOR OUTLETS OF AMERICA, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM – MOTIONS TO DISMISS

Before the court are three separate Motions to Dismiss filed by defendant Floor and Decor Outlets of America, Inc. ("F&D"), seeking, respectively, the dismissal of opt-in plaintiffs Fierce Taylor, Edgar Cardona, and Craig Cheuvront (Doc. Nos. 84, 86, 89), on the basis that they signed arbitration agreements or otherwise consented to arbitration and are required to pursue their claims under the Fair Labor Standards Act ("FLSA"), if at all, through arbitration. For the reasons set forth herein, the court will deny the Motion to Dismiss Opt-In Plaintiff Craig Cheuvront (Doc. No. 89) but grant the other two motions.

## I. STATEMENT OF THE CASE

Named plaintiff Germma Hammond filed this collective action against F&D on behalf of himself and others similarly situated nationwide in December 2019, asserting claims under the FLSA for unpaid overtime compensation. In the ensuing months, several individuals, including Taylor, Cardona, and Cheuvront, filed Notices of Consent to Become Party Plaintiffs. Since then, the case has not progressed substantively, as the parties have been embroiled in litigating the question, first, of whether Hammond must arbitrate his claims. Following an evidentiary hearing,

the court ultimately denied with prejudice F&D's motion to compel Hammond to arbitrate his claims. Meanwhile, however, the plaintiff had filed a Motion for Conditional Certification of a Collective Action and Expedited, Nationwide, Court-Supervised Notice to Putative Plaintiffs ("Motion to Certify") (Doc. No. 51), and the defendant filed the three Motions to Dismiss. The parties then embarked upon litigating the order in which those motions should be briefed and resolved.

On the same date the court issued the order denying the motion to compel arbitration of Hammond's claims, it also issued an order setting a briefing schedule for the Motion to Certify and Motions to Dismiss. (Doc. No. 98.) The plaintiff has now filed a Memorandum of Law in Opposition to the Motion to Dismiss Opt-In Plaintiff Craig Cheuvront (Doc. No. 114) and a separate Memorandum of Law in Opposition to the Motions to Dismiss Opt-In Plaintiffs Taylor and Cardona (Doc. No. 115). F&D filed three separate Reply briefs (Doc. Nos. 155, 156, 158), and both parties have filed various declarations and supporting documents. Very generally, F&D argues that all three opt-in plaintiffs must be dismissed from this litigation because they are bound by written agreements to arbitrate any FLSA claims they may have against F&D. The opt-in plaintiffs contend, in response, that the agreements are unenforceable as a matter of generally applicable state law.

## II.  LEGAL STANDARDS

The Federal Arbitration Act ("FAA") "expresses a strong public policy favoring arbitration in a broad range of disputes." *Cooper v. MRM, Inc.*, 367 F.3d 493, 498 (6th Cir. 2004). It provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a valid arbitration agreement governs a claim, courts must compel arbitration. *Id.* § 3.

Federal law creates "a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Highlands Wellmont*

*Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576–77 (6th Cir. 2003) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). "If parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme circumstances." *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000).

The court reviewing the petition generally must "determine whether the parties agreed to arbitrate the dispute at issue." *Id.* at 714. "[A]ny ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.* In evaluating motions to compel arbitration, "courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party." *Jones v. U-Haul Co. of Mass. & Ohio Inc.*, 16 F. Supp. 3d 922, 930 (S.D. Ohio 2014); *see also Great Earth Cos. v. Simon*, 288 F.3d 878, 889 (6th Cir. 2002) ("In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. The required showing mirrors that required to withstand summary judgment in a civil suit." (internal citation omitted)). If the "validity of the agreement to arbitrate is 'in issue,' the court must proceed to a trial to resolve the question." *Great Earth Cos.*, 288 F.3d at 889.

In evaluating whether the parties agreed to arbitrate, the court applies the applicable state law pertaining to contract formation. *De Angelis v. Icon Entm't Grp. Inc.*, 364 F. Supp. 3d 787, 792 (S.D. Ohio 2019). Whether an arbitration agreement was formed is always a question of law to be resolved by the court. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). Assuming the court finds that a contract was actually formed, the party opposing arbitration may also put forth "generally applicable state-law contract defenses" to the validity or enforceability of

the contract, including, but not limited to, such defenses as "fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004).

## III. DISCUSSION

### A. The Motion to Dismiss Taylor

#### 1. Factual Background

F&D currently uses an electronic human resources information system called Workday to maintain and access F&D's human resources systems and records. (Doc. No. 88, Declaration of Joel Fox ("Fox Decl.") ¶¶ 1, 3.) "Among other functions, Workday provides employees with a human resources portal, which they use to complete human resources-related tasks, including electronically signing documents." (*Id.* ¶ 6.) F&D began using Workday in December 2017. (Doc. No. 157, Declaration of Jonathan Maule ("Maule Decl.") ¶¶ 1, 3.) Beginning at that time, all newly hired and existing employees received Workday credentials, meaning they received a username and temporary password, which the employees had to change to a password of their choosing the first time they logged in. (*Id.* ¶¶ 3, 5–6.) After logging in and changing his or her password, an employee could use Workday to complete and submit employment paperwork such as W-4 and I-9 forms, among others. (*Id.* ¶ 7.)

Opt-in plaintiff Fierce Taylor was employed at F&D's Bridgeton, Missouri store from late October 2018 until early September 2019. (Fox Decl. ¶¶ 1, 9.) Records maintained by F&D in the "usual course of business" show that Taylor accessed F&D's 2018 Non-California Arbitration Agreement ("Arbitration Agreement") through Workday on October 31, 2018. (*Id.* ¶ 10.) F&D's records indicate that Taylor reviewed the Arbitration Agreement and signed it by affixing his electronic signature to the document, using Adobe Sign, on October 31, 2018.

The Arbitration Agreement on which Taylor's electronic signature appears is a six-page document, the first page of which is a cover page clearly labeled "Floor & Decor Arbitration Agreement Non-CA Effective January 2018." (Doc. No. 88-1, at 2.) The document heading on the first page of text is unambiguous as well: "Agreement for Arbitration of Disputes for All States Except California." (*Id.* at 3.) The first paragraph of the agreement states:

> While Floor and Decor Outlets of America, Inc. (the "Company") hopes that employment disputes will not occur, the Company believes that when such disputes do arise, it is in the mutual interest of those involved to handle them through binding arbitration, which seeks to resolve disputes more quickly than court litigation and with a minimum of disturbance to the parties involved. This Agreement represents a contract between the Employee ("You") and the Company. Through this Agreement, You and the Company are both waiving the right to a jury trial for all employment-related disputes and waiving the right to pursue, or participate in, any class or other form of representative action concerning all employment-related disputes.

(*Id.*)

The second paragraph expressly states that the agreement is supported by consideration, including the employee's continued employment and the mutuality of the agreement to arbitrate any disputes between them that "may arise from or in connection" with the employee's employment with F&D. (*Id.*) It also states that the FAA will govern the interpretation and enforcement of the agreement. (*Id.*) The third paragraph incorporates a waiver of the right to bring or participate in a class or collective action, and the fourth paragraph reiterates that waiver in bold, all-capitalized font:

> FOR THE SAKE OF CLARITY, THROUGH THIS AGREEMENT, YOU ARE GIVING UP YOUR RIGHT TO A JURY TRIAL AND YOUR RIGHT TO COMMENCE OR PARTICIPATE IN A CLASS ACTION OR OTHER FORM OF REPRESENTATIVE ACTION; YOU INSTEAD AGREE TO ARBITRATE ANY EMPLOYMENT-RELATED DISPUTE ON AN INDIVIDUAL BASIS ONLY.

(*Id.*)

The next paragraphs of the Arbitration Agreement define the types of claims that are and are not covered by its terms; FLSA claims are explicitly among those covered. The agreement states that, if either party institutes a legal action in connection with a claim that is covered by the Arbitration Agreement and "then upon notice refuse[s] to proceed in arbitration," the opposing party "shall be entitled to recover from the initiating party all costs, expenses, and attorneys' fees incurred as a result of such action, including all costs, expenses, and attorneys' fees incurred in connection with a motion or petition to compel arbitration." (*Id.* at 4.)

Otherwise, the agreement provides that arbitration shall be conducted in accordance with the rules established by the Judicial Arbitration and Mediation Services, Inc. ("JAMS") and that F&D will pay all fees "uniquely attributable to arbitration," including the arbitrator's fees. (*Id.*) Each party is to pay its own costs and attorneys' fees, however, except that the arbitrator has the authority to award fees to the prevailing party if permitted by law. (*Id.* at 5.) The agreement further reserves to F&D alone the ability to "change or terminate this Agreement after providing 90 days written or electronic notice," but any "such change shall not apply to any pending claim." (*Id.*)

The final page of the agreement is the signature or acknowledgment page. The heading at the top of the page reads "Acknowledgment of the Arbitration Agreement." The text of the Acknowledgment states in bold, capitalized letters:

**BY SIGNING BELOW OR ELECTRONICALLY, I, THE EMPLOYEE, KNOWINGLY AND FREELY AGREE TO THIS MUTUAL AGREEMENT TO ARBITRATE ANY CLAIMS BETWEEN ME AND THE COMPANY THAT OTHERWISE COULD HAVE BEEN BROUGHT IN COURT AND/OR BEFORE A JURY. I AFFIRM THAT I HAVE HAD SUFFICIENT TIME TO READ AND UNDERSTAND THE TERMS OF THIS AGREEMENT AND THAT I HAVE BEEN ADVISED OF MY RIGHT TO SEEK LEGAL COUNSEL REGARDING THE MEANING AND EFFECT OF THIS AGREEMENT PRIOR TO SIGNING.**

(*Id.* at 6.)

F&D maintains an electronic copy of the Arbitration Agreement signed by Taylor. (Fox Decl. ¶ 12.) F&D also maintains an Excel document cataloguing the various documents Taylor signed or acknowledged electronically while employed by F&D. This spreadsheet reflects that Taylor accessed and electronically signed the Arbitration Agreement on October 31, 2018. (Doc. No. 88-2, at 2.)

In response to the facts presented by F&D, the plaintiff submits Taylor's Declaration, in which he states, "I do not believe I entered into an arbitration agreement with F&D," denies knowing the meaning of the word "arbitration" prior to opting into this lawsuit, and "do[es] not recall reviewing or signing the arbitration agreement." (Doc. No. 116, Declaration of Fierce Taylor ("Taylor Decl.").) He recalls watching safety-related videos and filling out forms related to those videos around the time he was first employed by F&D, but he does not recall seeing any videos or filling out forms related to arbitration. He states: "No one from F&D ever explained anything about arbitration to me or informed me that I was supposed to sign an arbitration agreement. I feel confident that I would remember these events if they had occurred." (*Id.* ¶ 8.) However, he does recall being pulled from his shift in late October to "finish [his] paperwork." (*Id.* ¶ 9.) His manager did not explain what the paperwork consisted of or explain arbitration to him; the manager simply sent him to a customer service room in the back of the store where there was a computer. As Taylor explains it, the Operations Manager, Ramon Sanchez, was waiting for him at the computer. Sanchez had already logged Taylor in and pulled up documents for him. Taylor remembers that Sanchez told him something like, "Go ahead and click through so you can get back out on the floor," but he did not tell him "anything specific about any of the documents [he] was signing with the exception about one related to payroll." (*Id.* ¶ 12.) Sanchez encouraged Taylor to "complete the documents quickly and return to work." (*Id.*)

Taylor states that he typed his name into the computer once, after which the program, which he recalls being "Workday," "auto-filled my signature on all documents. I simply had to click along to complete the paperwork." (*Id.* ¶ 13.) He points out that, according to F&D's documents, he "allegedly signed the arbitration agreement in the same minute as the payroll deduction authorization and the timekeeping policy," as a result of which he "know[s] that [he] did not read the arbitration agreement." (*Id.* ¶ 14.) In fact, according to the documents' time-stamps, he "signed 13 documents within 3 minutes." (*Id.*) Finally, he denies ever receiving physical or emailed copies of the documents he signed and does not believe he could have accessed them through Workday while employed, even though he concedes that he "eventually received log-in information for Workday." (*Id.* ¶ 16.)

Regarding his background, Taylor states that he came to F&D with seven years of carpentry and tile experience and ten years of warehouse experience. Before that, he obtained a degree in "Business Technology" at the same time that he received his High School Diploma from Normandy Technical High School in Saint Louis, Missouri. (*Id.* ¶ 19.)

Through Jonathan Maule's Declaration, F&D generally refutes Taylor's claim that someone else logged him in, asserting that, prior to accessing Workday, Taylor would have received a unique username and password, and no manager would have had access to his credentials or been able to log in for him. (Doc. No. 157 ¶¶ 5–6.) In addition, Maule asserts that Taylor would only have been able to access the arbitration agreement by logging into the Workday system using his own credentials. (*Id.* ¶ 7.) F&D also disputes that Taylor could have signed the Arbitration Agreement simply by "click[ing] along." Instead, according to Maule, he would have needed to affirmatively click a tab at the bottom of the agreement labeled "apply e-signature." (*Id.* ¶ 8.) Maule avers that the Workday audit trail that identifies Taylor as having signed the agreement

would only have done so if Taylor actually logged into his personal Workday account using his username and password and electronically signed the document using Adobe Sign. (*Id.* ¶¶ 9–10.)

2. *The Parties' Arguments*

In light of the unambiguous nature of the agreement and Missouri law concerning the validity of electronic signatures and the enforceability of mutual agreements to arbitrate employment disputes, F&D submits that the Arbitration Agreement Taylor signed is valid and enforceable. It requests that the court "require" him to bring his claims, if at all, through arbitration and to dismiss him as a plaintiff in this case, but it does not actually request that the court "compel" arbitration. (Doc. No. 85, at 5.)

Taylor argues that (1) under Missouri law, there is at least a question of fact as to whether a valid contract was formed, because there is a factual dispute as to whether Taylor actually signed the agreement; (2) even if Taylor did sign the agreement electronically, the promises it contains are illusory, because F&D retained the unilateral right to modify or terminate the contract; and (3) even assuming that Taylor actually signed the agreement and that it otherwise passes muster under Missouri law, the agreement is unenforceable, because the "manner [in which] F&D obtained the electronic signatures demonstrates that [Taylor] did not knowingly and voluntarily waive [his] right to a jury trial." (Doc. No. 115, at 6.)

3. *Formation of the Contract*

Before compelling arbitration, the court must determine whether . . . a valid agreement to arbitrate exists between the parties." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). The question of contract formation is one of state law, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and the parties agree that the question in this case is governed by Missouri law, as the F&D store for which Taylor worked was located there and he signed the agreement while in Missouri.

Under Missouri law, "[t]he essential elements of any contract, including one for arbitration, are offer, acceptance, and bargained for consideration." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. 2014) (en banc) (internal quotation marks and citation omitted). The party seeking to compel arbitration bears the burden of proving the existence of a valid and enforceable arbitration agreement. *Baier v. Darden Rests.*, 420 S.W.3d 733, 737 (Mo. Ct. App. 2014).

Taylor argues first that F&D has not proved "acceptance" in the form of his assent to the agreement, because it has not shown that Taylor was the person who electronically signed the agreement. (Doc. No. 115, at 10.) He claims that he himself has no recollection of entering into the Arbitration Agreement and that F&D "has not produced enough evidence to show that it was in fact Taylor who affixed his name to the electronic agreement." (*Id.* (citing Taylor Decl. ¶ 3).)

As an initial matter, it is clear that electronic signatures are valid under Missouri law. Mo. Ann. Stat. § 432.230; *see also Franklin v. Cracker Barrel Old Country Store*, No. 4:17 CV 00289 JMB, 2017 WL 7691757, at *4 (E.D. Mo. Apr. 12, 2017) (citing § 432.230). Here, F&D has presented evidence establishing that Taylor electronically signed the Arbitration Agreement. In response to this evidence, Taylor asserts in his declaration only that he "do[es] not believe" that he entered into an arbitration agreement and "do[es] not recall reviewing or signing an arbitration agreement on October 31, 2018." (Doc. No. 116 ¶¶ 3–4.) The court finds that this testimony is not sufficient to refute F&D's electronic records establishing that Taylor did, in fact, affix his electronic signature to the document. *Accord Stephens v. Frisch's Big Boy Rests.*, No. 1:19-CV-954, 2020 WL 4754682, at *3 (S.D. Ohio July 30, 2020) ("Plaintiff's naked assertion that she did not sign the arbitration agreement, without more, is insufficient to raise a dispute of material fact regarding the validity of the arbitration agreement or whether she electronically acknowledged the arbitration agreement."), *report and recommendation adopted*, 2020 WL 4748578 (S.D. Ohio Aug.

17, 2020); *Franklin*, 2017 WL 7691757, at *4 ("[The plaintiff's] testimony that she did not recall reviewing or agreeing to the Arbitration Agreement is not sufficient to refute the [defendant's] [online] system record that she had done so."); *see also Morgan v. United Healthcare Servs., Inc.*, No. 1:12-cv-676–HJW, 2013 WL 1828940, at *3 (S.D. Ohio Apr. 30, 2013) ("In her affidavit, plaintiff . . . indicates she does not 'believe' she submitted an electronic signature 'that agreed to arbitration.' Such conjecture is belied by the record and provides no basis to avoid arbitration. . . . To the extent plaintiff suggests she does not remember, this fails to create any issue as to whether the parties had a valid agreement to arbitrate.").

The court finds that there is no material factual dispute as to whether Taylor electronically signed F&D's Arbitration Agreement.

### 4. Is the Contract Illusory?

Taylor argues in the alternative that, even assuming he did electronically sign the Arbitration Agreement, the agreement is not supported by consideration, because F&D retained the unilateral right to modify it, thus rendering its promise to arbitrate "illusory." (Doc. No. 115, at 10.) The court finds that the agreement is not illusory.

"[B]ilateral contracts are supported by consideration and enforceable when each party promises to undertake some legal duty or liability. These promises, however, must be binding, not illusory." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014). If one party "retains the unilateral right to amend the agreement and avoid its obligations," then its promise to be bound by the agreement is "illusory," and the contract is not binding. *Id.* In *Baker*, the Missouri Supreme Court held that an arbitration agreement in which the employer retained the right to unilaterally and retroactively amend the agreement meant that the employer's promise to arbitrate was illusory and, as such, did not "constitute consideration to create an enforceable contract." *Id.* at 777.

More specifically, the arbitration agreement in *Baker* gave the employer the "right to amend, modify or revoke this agreement upon thirty (30) days' prior written notice to the Employee." *Id.* at 776. The court found that, because the ability to modify or revoke was unlimited, by its plain language it effectively gave the employer the right, upon thirty days' notice, to retroactively revoke or amend the arbitration agreement, even during the course of an ongoing arbitration process and even to disclaim a promise made in the arbitration. In light of this unlimited ability to modify, the employer's promise to arbitrate was illusory. The court expressly distinguished the facts of the case before it from that of a case out of Oklahoma in which the agreement permitted the employer to modify the agreement upon ten days' notice to the employee, but it also expressly provided that any amendment would be prospective only and would not apply to disputes "for which a proceeding ha[d] been initiated pursuant to the Rules." *Id.* at 777 (quoting *Pierce v. Kellogg, Brown & Root, Inc.*, 245 F. Supp. 2d 1212, 1215–16 (E.D. Okla. 2003)).

Following *Baker*, the Missouri Court of Appeals held in *Patrick v. Altria Group Distributing Co.*, 570 S.W.3d 138 (Mo. Ct. App. 2019), that an arbitration agreement was not enforceable where it permitted the employer to amend it unilaterally, with contemporaneous rather than advance notice, and it was not limited to "prospective-only application." *Id.* at 144. That is, under the particular agreement at issue, amendments became effective immediately upon notice. Further, although the agreement prohibited "amendments from affecting 'a Dispute previously submitted to arbitration under the Program,'" they "could apply to claims which have accrued, and of which [the defendant] has notice, but which have not yet been submitted to arbitration." *Id.* Thus, as the court explained, the lack of advance notice combined with application only to claims already submitted to arbitration meant that

> if an employee had complained to the company about alleged employment discrimination, but had not yet commenced arbitration proceedings, [the

> company] would have the ability to modify the dispute resolution agreement to eliminate discrimination claims from the scope of arbitrable disputes, and the employee would have no ability to invoke arbitration before that modification became effective.

*Id.* Because the arbitration agreement before it "failed under either standard," the court expressly did not reach the question of "whether an arbitration agreement is always illusory if a party is given the power to modify the agreement as to accrued claims, or whether advance notice of unilateral modifications is sufficient to avoid a finding that the agreement is unenforceable." *Id.* at 146.

At the other end of the spectrum, a federal district court applying Missouri law found that an arbitration agreement permitting the employer to modify the agreement was enforceable under *Baker*, where it required thirty days of advance notice and expressly provided that any modification or amendment would be "prospective only and shall not apply to any accrued or pending claims or disputes that have been initiated by either party pursuant to this Agreement prior to the expiration of the 30 day period." *Colton v. Hibbett Sporting Goods, Inc.*, No. 2:16-cv-04002-NKL, 2016 WL 3248578, at *1 (W.D. Mo. June 13, 2016).

The agreement in this case is not as obviously permissible as that in *Colton*, but it also is not clearly prohibited under either *Baker* or *Patrick*. It authorizes F&D to "change or terminate" the agreement, but it requires ninety days advance notice and also specifies that any "change" will not affect any "pending" claim. (Doc. No. 88-1, at 5.) Although neither the Missouri Supreme Court nor the Missouri Court of Appeals has expressly addressed the issue presented here, other courts generally have concluded that provisions like that in Taylor's Arbitration Agreement do not render a contract illusory. Specifically, because the agreement requires ninety days' notice and does not pertain to claims that are "pending" as of the date the change goes into effect, even if a claim has merely accrued but is not technically pending as of the date of notice, a claimant would

have time within the notice period to initiate arbitration proceedings.[1] *See, e.g.*, *Nelson v. Watch House Int'l, L.L.C.*, 815 F.3d 190, 194 (5th Cir. 2016) ("[R]etaining termination power does not make an agreement illusory so long as that power (1) extends only to prospective claims, (2) applies equally to both the employer's and employee's claims, and (3) so long as advance notice to the employee is required before termination is effective." (applying Texas law); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 209 n.4 (5th Cir. 2012) (recognizing that "the critical issue" is whether the arbitration agreement "avoid[s] application of . . . amendments to disputes arising before notice" (applying Texas law)); *In re Halliburton Co.*, 80 S.W.3d 566, 569–70 (Tex. 2002) (finding that an employer's ability to modify or terminate an arbitration agreement did not render the agreement illusory, where the agreement specifically required ten days' advance notice before going into effect and provided that neither amendment nor termination would apply to a dispute of which the employer had actual notice as of the effective date of the change); *In re Datamark, Inc.*, 296 S.W.3d 614, 618 (Tex. Ct. App. 2009) (distinguishing the modification provision before it from that in *Halliburton*, which "gave Halliburton employees ample time to file any requests for arbitration and ensured that the company could not avoid the promise to arbitrate").

Because the provision permitting F&D to modify the arbitration agreement states that any change will not apply to pending claims and provides for ample advance notice, thus giving Taylor

---

[1] The agreement does not define the term "pending," but it ordinarily means "[b]egun, but not yet completed; unsettled; undetermined; in process of settlement or adjustment." Black's Law Dictionary (2d Online Edition), thelawdictionary.org/pending/ (last accessed Oct. 15, 2020). The court concludes that a pending claim is one with respect to which some type of process has already been initiated, whether through the filing of a legal complaint in a court or the submission of a demand for arbitration. A claim that has merely accrued, on the other hand, would not necessarily be pending, as the injured party may or may not have given notice of it to the other party or initiated any proceeding related to it.

plenty of time to submit any claim to arbitration before the change would go into effect, the agreement is not illusory.

### 5.     *Is the Waiver of the Right to a Jury Trial Enforceable?*

Next, Taylor argues that the contract is unenforceable, because the "manner [in which] F&D obtained the electronic signature[] demonstrates that [Taylor] did not knowingly and voluntarily waive [his] right to a jury trial." (Doc. No. 115, at 6.) More specifically, he points to Sixth Circuit precedent indicating that a determination of whether a waiver of a constitutional right to a jury trial was knowingly and voluntarily executed requires consideration of such factors as

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Morrison v. Circuit City Stores*, 317 F.3d 646, 668 (6th Cir. 2003) (citation omitted). The waiver was found to be valid in *Morrison*, because the plaintiff was a "highly educated managerial employee who was capable of understanding the terms of the agreement," the waiver at issue was "plain," and the plaintiff did not allege that the agreement was unclear or that she did not understand it. In addition, she had three days in which to withdraw her consent. *Id.*

Conversely, in *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005), the arbitration agreements the plaintiffs challenged were held to be invalid. There, the court found that the waivers of the plaintiffs' constitutional right to a jury trial were not knowing and voluntary, where most of the plaintiffs had not completed high school, were in "dire financial circumstances" at the time they applied for jobs, and obtained jobs that provided pay ranging from $11,000 to $16,000 annually. *Id.* at 381. In addition, the plaintiffs were "typically hired on the spot after a brief interview," were rushed through signing various documents "that they were instructed to sign in order to be considered for the job," and applicants typically were told simply to sign each place

the manager had previously placed an "x" on the paperwork. Most of the managers did not mention the arbitration agreement, and the employees had no opportunity to take the agreement home or confer with an attorney, "even though the agreement purports to afford them that right." *Id.* at 382. The employees had no ability to revoke the agreement, unlike the plaintiff in *Morrison*, and, at least in some instances, the managers provided affirmatively misleading information about the arbitration agreement. *Id.* Finally, in addition to the misleading information provided by managers, the language of the arbitration agreement itself was not entirely clear to individuals with limited education, and the agreement lacked consideration.

Taylor relies heavily on *Walker*, but the court finds, on the facts of this case, that *Walker* does not compel the conclusion that Taylor's waiver was involuntary. Taylor graduated from high school and also received a certificate in "Business Technology" from his high school; he does not claim to have been in dire financial straits at the time he was hired by F&D, nor does he claim to have been working for wages at or near the minimum wage. Although he claims not to have seen the word "arbitration" before joining this lawsuit, the arbitration agreement unambiguously states that, by agreeing to it, the employee agrees to "waiv[e] the right to a jury trial for all employment-related disputes" and the right to participate in any class action. (Doc. No. 88-1, at 3.) It then reiterates, in bold, capitalized font, the point that, by entering into the agreement, the employee is "**GIVING UP [HIS] RIGHT TO A JURY TRIAL AND [HIS] RIGHT TO COMMENCE OR PARTICIPATE IN A CLASS ACTION**" and "**INSTEAD AGREE[S] TO ARBITRATE ANY EMPLOYMENT-RELATED DISPUTES ON AN INDIVIDUAL BASIS ONLY**." (*Id.*) In addition, just above the place for Taylor's signature, also in bold, capitalized font, the agreement expressly provides that the employee, by signing the agreement, "**KNOWINGLY AND FREELY**" enters into it and affirms that he had "**SUFFICIENT TIME TO READ AND**

**UNDERSTAND"** its terms and has been advised of his right to seek legal counsel prior to signing. (*Id.* at 6.) This language is clear and unambiguous.

Moreover, although Taylor claims that he was rushed, he does not indicate that he requested and was denied additional time to consider the documentation he went over online. He claims that he does not remember signing an arbitration agreement and complains that he was not given copies of the documents he signed, but he does not assert that he asked for them. He claims he was not given time to consult an attorney, but he does not indicate that he requested time to do so. Other cases, from Missouri and elsewhere,[2] presented with similar facts have concluded that the plaintiffs failed to show that their waivers were not knowing and voluntary. *See, e.g.*, *Tillman v. Macy's, Inc.*, 735 F.3d 453, 461 (6th Cir. 2013) (rejecting the argument that plaintiff's merely being "a high-school graduate means that she lacks the necessary 'experience, background, and education' to consent knowingly to a waiver of her rights"); *Porter v. MC Equities, LLC*, No. 1:12 CV 1186, 2012 WL 3778973, at *12 (N.D. Ohio Aug. 30, 2012) ("[A]lthough plaintiffs assert that they did not have adequate time to review the Agreements and defendants did not explain the Agreements to them, the plaintiffs have not shown that they sought and were denied desired time to consider the Agreements, that defendants made affirmative misrepresentations to them about what they were signing or otherwise 'tricked' them into signing the Agreements, or that circumstances were made known to the defendants indicating that plaintiffs were confused or

---

[2] *Walker* and *Morrison* apparently applied federal constitutional law, rather than state contract law, to the question of whether a waiver of the right to a jury trial in an arbitration agreement is knowing and voluntary. *Accord Schnaudt v. Johncol, Inc.*, No: 2:15-cv-2619, 2016 WL 5394195, at *3 (S.D. Ohio Sept. 27, 2016) ("The Sixth Circuit has found that 'the constitutional right to jury trial may only be waived if done knowingly, voluntarily and intentionally, and . . . whether this standard was met in a given case is a constitutional question separate and distinct from the operation of rules of substantive contract law. . . .'" (quoting *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755–56 (6th Cir. 1985)).

unclear about what they were signing."); *Gonzalez v. Rent-A-Center, Inc.*, No. 05-cv-005, 2005 WL 1353883, at *4 (N.D. Ohio June 7, 2005) (holding that being "rushed into signing" does not invalidate a contract; plaintiffs must show "fraud, deception or other misconduct by defendant in order to prove the Agreement invalid"); *State ex rel. PaineWebber, Inc. v. Voorhees*, 891 S.W.2d 126, 130 (Mo. 1995) (en banc) (compelling arbitration, stating there is no "obligation to discuss orally with a competent party conspicuous written provisions like the arbitration . . . clause[] here").

The court finds *Schnaudt v. Johncol, Inc.*, No: 2:15-cv-2619, 2016 WL 5394195 (S.D. Ohio Sept. 27, 2016), to be particularly on point here. There, the court found that *Walker* did not require denial of the motion to compel arbitration, first, because the plaintiffs did not show that they were "uneducated or . . . unable to read, to understand English or to comprehend the documents presented to them at the orientation meeting." *Id.* at *4. Instead, they were simply "individuals who needed employment and decided to accept work in a low-wage position." *Id.* Although they "felt rushed to sign paperwork," none of them claimed that they were told not to read the documents or that they requested and were denied additional time to review the documents or to consult with an attorney. *Id.* The court recognized that it was "unrealistic to expect plaintiffs to have quickly digested the contents of the 7-page [dispute resolution procedure] booklet at the orientation meeting." *Id.* However, the agreement was sufficiently clear, with salient points in bold, capitalized font, that "even a cursory review of the Agreement would have impressed on the reader the nature of its contents" *Id.* The court also found it notable that the agreement "advised plaintiffs of their right to discuss the Agreement with their own attorney" and that the location of that notice was in a place likely to be seen, as it appeared just above the signature line. *Id.* Finally, importantly, the plaintiffs did not allege that they were "deceived, under duress or unable to request

more time to review the documents." *Id.* Instead, they "'wanted to start making money as soon as possible,' and they knowingly and voluntarily chose to accept employment, regardless of whether they chose to read the documents." *Id.* (internal citation to the record omitted).

Here, too, Taylor's experience, background, and education level do not suggest an inability to understand the waiver; Taylor did not request additional time to read the documents or consult with an attorney; and the waiver was clear and unambiguous, even for an unsophisticated reader. The mutuality of the agreement constituted sufficient consideration for the waiver, under Missouri law,[3] and nothing about the totality of the circumstances indicates that the waiver was anything other than knowing and voluntary.

### 6. *Conclusion: Motion to Dismiss*

The court finds, for the reasons set forth above, that a binding and enforceable arbitration agreement was formed between Taylor and F&D, and there are no material factual disputes to be resolved by a hearing.

### B. **Motion to Dismiss Cardona**

#### 1. *Factual Background*

F&D moves to dismiss opt-in plaintiff Edgar Cardona as well, on the basis that he, too, electronically executed a valid and binding arbitration agreement. (Doc. Nos. 86 (motion), 87 (memorandum).)

Cardona worked at F&D's Nashville, Tennessee store from January 2017 until April 2019. (Fox Decl., Doc. No. 88 ¶ 14.) He then transferred to F&D's Pompano, Florida store, where he

---

[3] The offer of at-will employment or continued at-will employment is not sufficient consideration for an arbitration agreement, under Missouri law, but the mutuality of the agreement to arbitrate is, so long as the mutuality is not illusory, as discussed above. *Baker*, 450 S.W.3d at 775, 776–77.

worked until December 2019. (*Id.* ¶ 15.)

According to Joel Fox, F&D provided Cardona with an electronic copy of F&D's 2018 Non-California Arbitration Agreement ("Arbitration Agreement") while he was working at the Nashville store, and Cardona signed the agreement electronically, using Adobe Sign, on September 5, 2018. (*Id.* ¶¶ 16–17.) The terms of this agreement are identical to those of the agreement executed by Taylor, discussed above. (*See generally* Doc. No. 88-3.) In addition, Cardona physically signed an earlier version of F&D's arbitration agreement on January 16, 2017. (*See* Doc. No. 159-1.)

According to Fox, F&D maintains a copy of the signed Arbitration Agreement in its electronic records. (Doc. No. 88 ¶ 18.) It also maintains an Excel spreadsheet cataloguing the documents signed or acknowledged electronically by Cardona during his employment. (*Id.* ¶ 19; *see also* Doc. No. 88-4.) The 2018 Arbitration Agreement is among the documents identified on the spreadsheet, which indicates that Cardona affixed his electronic signature to the document on September 5, 2018 at, F&D claims, 6:54 p.m.[4] (Doc. No. 88-4, at 1.)

Cardona has submitted a Declaration in which he states that, prior to working for F&D, he obtained an associate's degree in practical nursing and had approximately fourteen years of work experience with "companies not run by members of [his] family." (Doc. No. 117 ¶¶ 17, 18.) He, like Taylor, "does not believe" he entered into an arbitration agreement, did not know the meaning of the word "arbitration" before joining this lawsuit, and does not recall reviewing or signing an

---

[4] Counsel for Cardona points out that, contrary to the defendant's assertion that Cardona signed the arbitration agreement at 6:54 p.m., he would actually have signed it at 6:54 a.m., because other documentation in the record shows that F&D used a twenty-four hour clock. (*See, e.g.*, Doc. No. 88-2 (Column F).) As this was during a time period when Cardona was working as an Overnight Warehouse Supervisor (*see* Doc. No. 54 ¶ 3), that means that he would have been called upon to review and sign the documents at the very end of an overnight shift.

arbitration agreement on September 5, 2018. (*Id.* ¶¶ 3–4.) He states that, insofar as F&D's records show that he "signed the arbitration agreement one minute after [he signed] the policies relating to substance abuse and vacation and sick leave and in the same minute as the biometric policy and the employee handbook," he knows that he did not actually read the Arbitration Agreement. (*Id.* ¶ 7.) He states that he has no memory of a manager's explaining that he was required to sign an arbitration agreement, explaining the implications of any such agreement, or advising him that he could consult an attorney. (*Id.* ¶¶ 8–9.) Cardona also does not remember receiving a physical copy of the Arbitration Agreement. (*Id.* ¶ 10.)

Cardona does, however, recall using F&D's Workday system to watch training videos and to fill out forms related to safety. He states that he could only access it from F&D's breakroom computers. (*Id.* ¶ 11.) On the occasions he did access it, his supervisor would instruct him and his co-workers to go to the breakroom at either the beginning or the end of a shift to watch videos or "sign new safety-related documents." (*Id.* ¶ 14.) He remembers logging in, typing in his name, and "then the program automatically filled [his] signature on all the documents. [He] simply had to click along to complete the safety-related documents." (*Id.* ¶ 15.) He does not recall signing anything other than safety-related documents.

### 2. The Parties' Positions

F&D argues that, under Tennessee law, mutual agreements to arbitrate are clearly enforceable, an electronic signature constitutes valid acceptance of an arbitration agreement, and the agreement Cardona signed clearly covers FLSA claims. It requests that the court "require" him to bring his claims, if at all, through arbitration and to dismiss him as a plaintiff in this case. (Doc. No. 85, at 5.) As with its Motion to Dismiss Taylor, F&D does not seek to compel Cardona to arbitration.

Cardona argues that (1) under Tennessee law, there is a material factual dispute as to whether Cardona actually signed the agreement and, thus, as to whether a valid contract was formed; (2) even if he did sign the agreement electronically, there was no mutual assent to its terms, as required for the formation of a valid contract under Tennessee law, because F&D presented Cardona with the agreement on a "take it or leave it" basis and rushed him through the signing process, without explaining its terms, giving him the ability to bargain over those terms, or affording him time to consult with an attorney; (3) even assuming Cardona signed the agreement on September 5, 2018, that agreement would not apply to claims that accrued before that date; and (4) the waiver of the right to a jury trial is unenforceable, because the "manner [in which] F&D obtained the electronic signatures demonstrates that [Cardona] did not knowingly and voluntarily waive [his] right to a jury trial." (Doc. No. 115, at 6.)

In its Reply, F&D generally refutes each of these arguments. Regarding the retroactive application of the agreement, it contends that the language of the agreement is sufficiently broad to cover claims that arose prior to its execution and, even if it is not, Cardona hand-signed a predecessor version of the arbitration agreement in January 2017, which inarguably covers claims that arose prior to September 5, 2018.

### 3. *Formation of the Contract*

As discussed in connection with the Taylor Motion to Dismiss, a court asked to compel arbitration must first ascertain the existence of a "valid agreement to arbitrate . . . between the parties." *Javitch*, 315 F.3d at 624. Because the question of contract formation is one of state law, *First Options of Chicago*, 514 U.S. at 944, and the parties agree that Cardona lived and worked in Tennessee when he signed the Arbitration Agreement, the court must look to Tennessee law to determine whether a valid contract was formed.

Under Tennessee law, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). Tennessee statute creates "a rebuttable presumption that '[a]ll contracts in writing signed by the party to be bound . . . are *prima facie* evidence of a consideration.'" *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 751 (E.D. Tenn. 2011) (quoting Tenn. Code Ann. § 47-50-103). Thus, "in the absence of fraud[,] [a]n individual who signs a contract is presumed to have read the contract and is bound by its contents." *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 810 (Tenn. Ct. App. 2015) (quoting *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)). In addition, electronic signatures have the same effect as handwritten signatures. *See* Tenn. Code Ann. § 47-10-107(a) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form."); *Waddle v. Elrod*, 367 S.W.3d 217, 229 (Tenn. 2012) (recognizing that a party's "electronic signature on [an] email confirming the terms of [a] settlement agreement satisfies the signature requirement of the Statute of Frauds"). And "[a] contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation." Tenn. Code Ann. § 47-10-107(b).

Cardona first argues that F&D cannot prove his assent to the Arbitration Agreement because it cannot show that he actually signed it. He does not dispute the validity of electronic signatures generally. Instead, he asserts only that he does not remember signing an arbitration agreement, even though he concedes familiarity with the Workday platform. F&D has submitted screenshots of the Adobe Sign certification for his electronic signature (Doc. No. 157-4) along

with the Declaration of Jonathan Maule, F&D's Director of Human Resources. According to

Maule, F&D's Workday program also

> captured the fact that the employee e-signed the arbitration agreement and stored
> that information alone with the date and time of signature. Workday would only
> capture this information if an employee logged into his or her personal Workday
> account and electronically signed his or her electronic agreement.

(Doc. No. 157 ¶ 10.) In light of this documentation, Cardona's statement that he does not believe

he signed an arbitration agreement simply because he "do[es] not recall reviewing or signing an

arbitration agreement on September 5, 2018" is not sufficient to give rise to a material factual

dispute as to whether he, in fact, affixed his electronic signature to the Arbitration Agreement on

that date. *Accord Jones v. U-Haul Co. of Mass. & Ohio Inc.*, 16 F. Supp. 3d 922, 935 (S.D. Ohio

2014) (finding no material factual dispute as to whether the plaintiff's electronic signature on an

arbitration agreement was "authentic, valid and binding," "[i]n light of the evidence submitted by

[the employer] and the lack of any evidence whatsoever submitted by [the plaintiff] to the

contrary," despite the plaintiff's lack of recollection of signing the agreement and her contention

that her signature was not authentic); *Morgan v. United Healthcare Servs., Inc.*, No. 1:12-cv-676-

HJW, 2013 WL 1828940, at *3 (S.D. Ohio Apr. 30, 2013) ("To the extent plaintiff suggests she

does not remember [signing an arbitration agreement], this fails to create any issue as to whether

the parties had a valid agreement to arbitrate.").

Next, Cardona asserts that no contract was formed because there was no "meeting of the

minds in . . . in mutual assent" to the contract terms. (Doc. No. 115, at 11 (quoting *Walker*, 400

F.3d at 383).) He asserts that the circumstances surrounding his purported signature on the

Arbitration Agreement are "strikingly analogous" to those in *Walker*, insofar as he was presented

with the agreement at the end of his shift on a "take it or leave it" basis, with no bargaining ability,

no memory of any manager explaining the agreement to him, and no time to consult an attorney.

He believes it would have been "impossible" for him to consult with an attorney or understand the agreement given the amount of time he spent reviewing and signing the document.

As set forth above, an individual's signature on an agreement is *prima facie* evidence of his assent to it, and, absent evidence of fraud, a party who signs an agreement "is presumed to have read [it] and is bound by its contents." *Wofford*, 490 S.W.3d at 810. Cardona's claim that he did not have adequate time to review the agreement or consult an attorney is belied by the fact that the agreement is exceedingly clear, even upon cursory review. It expressly states in bold, capitalized lettering just above the signature line that, by signing, the employee affirms that he has had sufficient time to read and understand the agreement and has been advised of his right to seek legal counsel regarding its meaning and effect. (Doc. No. 88-2, at 6.) Cardona does not contend that he requested additional time to review the documents or to consult with an attorney or that, as a result of his intellect or education, he was incapable of understanding the agreement.

The court understands Cardona to be arguing that the Arbitration Agreement was an adhesion contract—a standardized form contract—and, as such, fundamentally unfair. However, adhesion contracts are only unenforceable in Tennessee when the terms are beyond the reasonable expectations of an ordinary person, oppressive, or unconscionable. *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 Tenn. 1996) (enforcing an arbitration agreement that was a contract of adhesion); *see also Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001) (enforcing an arbitration agreement that was a contract of adhesion where there was "no evidence that Plaintiff questioned Defendant about the contents of the Agreement or did not understand what it meant"). Cardona does not argue that the contract is oppressive or unconscionable, that is, that "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and . . . the terms are so oppressive that no reasonable person would make them on the one hand,

and no honest and fair person would accept them on the other." *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984). Nor does he point to any terms of the agreement that are outside the reasonable expectations of an ordinary person.

The court finds that an enforceable arbitration agreement was formed when Cardona electronically affixed his signature to the agreement on September 5, 2018.

### 4. *Claims Accruing Prior to September 5, 2018*

Not only did Cardona electronically sign the 2018 Arbitration Agreement on Workday in September 2018, he apparently also hand-signed an earlier agreement in early 2017, around the time he was initially hired by F&D. (*See* Doc. No. 159-1.) Although this document was not produced by the defendant until it filed a Reply, because F&D relies on it in response to Cardona's argument that the September 2018 agreement does not apply to claims accruing prior to that date, the court will consider it.

Cardona did not seek leave to file a surreply or otherwise contest the validity of his signature on the earlier agreement produced by F&D. As a result, it is clear that, regardless of when they accrued, Cardona's claims are covered by at least one arbitration agreement. The court further finds, however, that the 2018 Arbitration Agreement is sufficiently broad to cover claims accruing before that date. On its face, the Arbitration Agreement covers "*any dispute* between [the employee and F&D] that *may arise* from or in connection with" the employee's employment, or termination of that employment, with F&D. (Doc. No. 88-2, at 3 (emphasis added).) The agreement expressly defines "covered disputes" to include FLSA claims; it applies the limitations period for such claims set forth in the statute; and it precludes either party from "bringing or raising in court or another forum any dispute that was or could have been submitted to binding arbitration." (*Id.* at 4.)

First, a "dispute" is different from a claim or cause of action. A cause of action does not ripen into a dispute until the injured party actually makes a claim or, at the very least, provides notice to the other party of a potential claim or cause of action. The mere fact that an individual has been injured does not create a dispute unless the individual takes some action to redress that injury.[5] The Arbitration Agreement expressly extends to *any* dispute that "may arise" in connection with Cardona's employment by F&D. The court construes this language to encompass any dispute arising after execution of the arbitration agreement in connection with Cardona's employment, irrespective of the date the claim or cause of action that is the subject of the dispute actually accrued.

This conclusion is supported by the Sixth Circuit's opinion in *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646 (6th Cir. 2008). There, the plaintiff, an actuarial services consulting firm, made an error that adversely affected its client, SBC. The error occurred in 2001, but the plaintiff did not discover it until 2004, at which time it notified the defendant. In the interim, however, in 2002, the parties had executed an arbitration agreement that pertained to "any dispute

---

[5] Merriam-Webster online defines the noun form of "dispute" as a verbal controversy or debate. *See* https://www.merriam-webster.com/dictionary/dispute (last accessed Oct. 15, 2020). Synonyms include "contestation," "controversy," and "disagreement." *See* https://www.merriam-webster.com/thesaurus/dispute. The online version of Black's Law Dictionary defines "legal dispute" as a "contest," "conflict," or "disagreement" concerning the "lawful existence of (1) a duty or right, or (2) compensation . . . claimed by the injured party for a breach of such duty or right." *See* https://thelawdictionary.org/legal-dispute/ (last accessed Oct. 15, 2020). This definition, too, recognizes a distinction between the violation of a legal right and a contest or conflict regarding that violation.

Thus, for example, if an employer clearly violates the FLSA by failing to pay overtime to an employee as required by the statute, giving rise to a legal claim for damages, but the affected employee never contests the practice, no dispute regarding the illegal practice *ever* arises, regardless of when the violation occurred. Similarly, if one party to a contract breaches the contract, and the other party has knowledge of the breach but foregoes enforcement of the contract either altogether or for several years preceding the expiration of the statute of limitations, no "dispute" would arise until the non-breaching party gives notice of an intention to enforce the agreement.

or claim arising from or in connection with this agreement or the services provided by Watson Wyatt" to the defendant. *Id.* at 648. In 2004, when the plaintiff's error was discovered and disclosed, the plaintiff suggested that the defendant submit its damages claims related to that error to arbitration, but the defendant denied that the arbitration agreement covered claims that accrued prior to its execution.

The district court concluded that, because the arbitration agreement was silent as to retroactivity and Michigan law precluded contracts from being construed to operate retrospectively, the defendant could not be compelled to arbitrate claims accruing prior to execution of the arbitration agreement. *Id.* at 649. The Sixth Circuit disagreed. First, it noted that, when "an arbitration clause is broadly written, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators." *Id.* at 650 (quoting *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); other internal quotation marks and citations omitted). In light of that principle, it found that the "broadly worded" arbitration clause "encompasse[d] all claims 'arising from or in connection with . . . the services provided by Watson Wyatt," regardless of when the claims accrued. *Id.* at 652.

The facts underlying the Sixth Circuit's contrary conclusion in *Russell v. Citigroup, Inc.*, 748 F.3d 677 (6th Cir. 2014), are distinguishable. There, the court held that the plaintiff's agreement to arbitrate "all employment related disputes" did not mean that he was required to arbitrate "a case already pending in court when he signed the agreement." *Id.* at 679. The agreement in that case required arbitration of "all employment-related disputes . . . which are based on legally protected rights . . . and arise between you and [the defendant/employer]." *Id.* The court found that the agreement's "use of the present-tense 'arise,' rather than the past-tense 'arose' or

present-perfect 'have arisen,' suggests that the contract governs only disputes that begin—that arise—in the present or future. The present tense usually does not refer to the past." *Id.* at 679. That suggestion was further corroborated by the agreement's preamble, which stated that the company "looks forward to good relations" with its employees but recognized that disagreements "may arise," the resolution of which it believed "will be best accomplished . . . by external arbitration." *Id.* at 679–80. The court construed the text of the agreement and preamble together as manifesting an intention to "head off future lawsuits, not to cut off existing ones." *Id.* at 680.

Similar language in Cardona's Arbitration Agreement indicates that it, too, is meant to apply to *disputes* that "may arise" in the future—after its execution. (*See* Doc. No. 88-2, at 2 ("While [F&D] hopes that employment disputes *will not occur*, the Company believes that when such disputes *do arise*, it is in the mutual interest of those involved to handle them through binding arbitration . . . ." (emphasis added)).) *Russell*, however, did not address the distinction between the accrual of a cause of action and the existence of a dispute. Instead, it addressed the fact of an already existing lawsuit—which unambiguously qualifies as a "dispute"—and concluded that, however broadly construed, the arbitration agreement in that case could not be read to cover a lawsuit that was already proceeding in court at the time of the agreement's formation. In this case, conversely, when Cardona electronically signed the arbitration agreement in September 2018, no dispute had arisen and no lawsuit was underway. The earliest date upon which a dispute could have arisen would have been the day Cardona gave notice to F&D that he believed it was violating, or had violated, the FLSA. This apparently occurred when he opted into this lawsuit on May 26, 2020. (Doc. No. 44.) Cardona does not contend that he had already provided F&D notice of, or that he was even aware of, an existing dispute at the time he signed the agreement.

In short, the court finds that the 2018 Arbitration Agreement applies to causes of action that had accrued, but had not yet ripened into disputes, as of the date Cardona entered into the agreement.

### 5.   *Knowing and Voluntary Waiver of Right to Jury Trial*

Finally, Cardona, like Taylor, argues that the Arbitration Agreement is unenforceable, because the "manner [in which] F&D obtained the electronic signature[] demonstrates that [Cardona] did not knowingly and voluntarily waive [his] right to a jury trial." (Doc. No. 115, at 6.) The section of the joint Memorandum addressing F&D's separate Motions to Dismiss Taylor and Cardona makes the same argument as it pertains to both Taylor's and Cardona's agreements. As set forth above, the opt-in plaintiffs point to the Sixth Circuit's decision in *Morrison v. Circuit City Stores* in support of the claim that they did not knowingly and voluntarily waive their constitutional right to a jury trial. The *Morrison* factors—including "(1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances," 317 F.3d at 668—do not weigh in favor of Cardona any more than they weigh in favor of Taylor.

Cardona graduated from high school and obtained an associate's degree in practical nursing. He makes no claim to have been in dire financial straits or without options at the time he executed the September 2018 agreement. Although he claims not to have known the meaning of the word "arbitration" before joining this lawsuit (Doc. No. 117 ¶ 3), the arbitration agreement unambiguously explains that, by agreeing to it, the employee waives his right to a jury trial. This waiver is reiterated in bold, capitalized font:

**FOR THE SAKE OF CLARITY, THROUGH THIS AGREEMENT, YOU ARE GIVING UP YOUR RIGHT TO A JURY TRIAL AND YOUR RIGHT TO COMMENCE OR PARTICIPATE IN A CLASS ACTION OR OTHER FORM OF REPRESENTATIVE ACTION; YOU INSTEAD AGREE TO ARBITRATE ANY EMPLOYMENT-RELATED DISPUTE ON AN INDIVIDUAL BASIS ONLY.**

(Doc. No. 88-2, at 3.) As previously discussed, the agreement also expressly states that the employee, by signing the agreement "**KNOWINGLY AND FREELY**" enters into it and affirms that he had "**SUFFICIENT TIME TO READ AND UNDERSTAND**" its terms and has been advised of his right to seek legal counsel prior to signing. (*Id.* at 6.) Although Cardona claims that he was rushed, he does not indicate that he requested and was denied additional time to consider the documentation he went over online. He claims that he does not remember signing an arbitration agreement and complains that he was not given copies of the documents he signed, but he does not assert that he asked for them. He claims he was not given time to consult an attorney, but he does not indicate that he requested time to do so.

For the same reasons as those set forth above in connection with Taylor's opposition to the Motion to Dismiss his claims, the court finds that Cardona's waiver, too, was knowing and voluntary.

6.    *Conclusion: Motion to Dismiss*

The court finds, for the reasons set forth above, that a valid and enforceable agreement to arbitrate was formed between Cardona and F&D.

**C.    The Fee-Shifting Provision in Taylor and Cardona's Arbitration Agreements**

Taylor and Cardona both argue that, even if the Arbitration Agreements they entered into are valid and enforceable, the fee-shifting provision contained in each is unenforceable under the FLSA, because it "impermissibly purports to waive the Opt-in Plaintiffs' rights to recover attorney's fees and costs." (Doc. No. 115, at 14.) As set forth above, the specific provision to which

Taylor and Cardona object provides that, if either party to the Arbitration Agreement institutes a legal action against the other, with respect to a claim covered by the Arbitration Agreement,

> by any method other than by arbitration and then upon notice refuse[s] to proceed in arbitration, then the responding party (*i.e.*, the party who did not initiate the action or proceeding) shall be entitled to recover from the initiating party all costs, expenses, and attorneys' fees incurred as a result of such action, including all costs, expenses, and attorneys' fees incurred in connection with a motion or petition to compel arbitration. If as a result of such a motion or petition, a court compels arbitration pursuant to this Agreement, then the party seeking that order shall be entitled to its attorney's fees and costs incurred in pursuing that order or petition, and it is agreed that the court issuing the order or petition shall have jurisdiction to award such fees and costs immediately following the issuance of that order or petition and before the commencement or completion of the arbitration, and without regard to whether the party that successfully compels arbitration ultimately prevails on the claims to be arbitrated.

(Doc. No. 88-1, at 4; Doc. No. 88-3, at 4.)

The opt-in plaintiffs argue that this provision is unenforceable because it creates a "tremendous disincentive for employees to raise legitimate challenges to unenforceable arbitration agreements" or even to bring "good-faith defenses to contract formation and enforceability." (Doc. No. 115, at 15.) They also argue that, because individual overtime claims often involve small amounts of pay, even if they are successful on the merits of their claims, the fee-shifting provision could mean that their FLSA damages "are eliminated entirely by payment of attorneys' fees to defense counsel." (*Id.*) This result, they maintain, is "plainly contrary to the FLSA," which contains a mandatory provision making the employer liable for unpaid wages and liquidated damages. (*Id.*)

The defendant, in response, points out that the opt-in plaintiffs are simply incorrect in arguing that this provision would require them to forego attorney's fees if they prevail in arbitration, because the fee-shifting provision only pertains to fees and costs incurred in enforcing the Arbitration Agreement itself, not to substantive claims brought in arbitration. (Doc. No. 156,

at 11.) The Arbitration Agreement provides that, with respect to substantive claims pursued through arbitration, the arbitrator has the "authority to award costs and attorneys' fees to the prevailing party to the extent permitted by law." (Doc. No. 88-1, at 5; Doc. No. 88-3, at 5.) F&D also points out that the provision is mutual, permitting either party to recover fees if the other pursues covered claims in court rather than through arbitration. Finally, it argues that this type of fee-shifting provision has regularly been enforced by courts around the country, notwithstanding the single California case cited by the plaintiff.

The defendant is correct on all fronts. The provision, on its face, pertains only to costs associated with bringing a covered claim in court, including but not limited to the costs associated with compelling arbitration. It is not contrary to the FLSA and does not constitute a waiver of any substantive rights granted by the FLSA. *Accord Lillard v. Tech USA, Inc.*, No. CV ADC-20-308, 2020 WL 4925661, at *5 (D. Md. Aug. 21, 2020) (rejecting the plaintiff's argument that a similar fee-shifting provision rendered the arbitration clause unenforceable, stating: "This argument has nothing to do with Plaintiff's ability to effectively vindicate her FLSA rights; it is purely a matter of contract law. This Court and others have consistently upheld provisions such as this one when it is part of the plain language of the Agreement." (citations and quotation marks omitted)).

Consequently, the only potentially legitimate basis for invalidating the provision would be if it could be deemed unconscionable under Missouri or Tennessee law. However, the opt-in plaintiffs have not actually argued that the fee-shifting provision is unconscionable, and the mere fact that it creates a disincentive for bringing suits of this type or challenging the arbitration agreement, standing alone, does not make it unconscionable. Nor have the opt-in plaintiffs pointed to any precedent suggesting that either the Missouri or Tennessee Supreme Court would find that

such provisions are unconscionable or unenforceable under generally applicable state contract law.[6]

And other courts around the country, indeed, have regularly enforced such provisions. *See, e.g.*, *De Angelis v. Icon Entm't Grp. Inc.*, 364 F. Supp. 3d 787, 797–98 (S.D. Ohio 2019) (compelling arbitration but declining to award fees where the question of whether the arbitration agreement was enforceable remained to be determined by the arbitrator, while nonetheless recognizing that the arbitration agreement "clearly provides for attorney's fees and costs where, as here, one party must take action to enforce the arbitration agreement" and that "[s]uch provisions typically are enforceable" (collecting cases)); *Vanede, LLC v. Oxley*, No. 17-2865-SHM, 2018 WL 8299888, at *5 (W.D. Tenn. June 26, 2018) (awarding attorney's fees and costs incurred in bringing a motion to compel arbitration where the arbitration agreement provided that "[t]he prevailing [p]arty in any such action to enforce the arbitration provisions of this [arbitration agreement] shall be entitled to recover its attorneys' fees and costs for such action" (applying Tennessee law)); *Bracey v. Lancaster Foods, LLC*, No. RDB-17-1826, 2018 WL 1570239, at *8 (D. Md. Mar. 30, 2018) (awarding the defendant attorney's fees after it successfully moved to compel arbitration and the arbitration agreement provided for such fees); *Morris v. Homeowners*

_____

[6] Although the Missouri Supreme Court has not addressed the specific question, it has at least suggested that such provisions are enforceable. In *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859 (Mo. 2006) (en banc), the plaintiff objected to a fee-shifting provision that stated: "Purchaser shall be liable to Seller for all court, arbitration and attorney's fees and costs incurred by Seller in enforcing this provision." *Id.* at 859. Although the defendant argued that the clause was a "relatively standard provision that merely provides [the defendant] with its costs in compelling arbitration," *id.* at 860, the court found the clause to be ambiguous to the extent it referred to the costs of arbitration as well. Construing the ambiguous provision against the defendant as the drafter, the court found that the provision was unconscionable and unenforceable, insofar as it "put[] all fees for arbitration on the consumer." *Id.* Nonetheless, the court's treatment of the provision strongly suggested that shifting the cost of compelling arbitration upon the party that refused to arbitrate would not have been unconscionable.

*Loan Corp.*, No. 06-CV-13484-DT, 2007 WL 674770, at *8 (E.D. Mich. Feb. 28, 2007) ("The Court holds Plaintiffs responsible for reimbursing Defendant's fees and costs [in compelling arbitration], in accordance with their obligations under the Arbitration Agreement." (applying Michigan law)).

In the absence of any substantive argument by the plaintiffs as to why the cost-shifting provision in the opt-in plaintiffs' Arbitration Agreements is unconscionable, the court finds it to be enforceable.

### D.    Resolution of the Motions to Dismiss Taylor and Cardona

F&D seeks dismissal of the claims brought by opt-in plaintiffs Taylor and Cardona, arguing that they must bring their FLSA claims, if at all, through arbitration. In response, Taylor and Cardona contend only that they did not execute binding and enforceable arbitration agreements. Neither party seeks actually to compel the opt-in plaintiffs to arbitration, nor do they request a stay of the proceedings or otherwise address the impact of the FAA on the Motions to Dismiss.

Regardless, the court finds that the FAA does not actually apply and that no stay is required or advisable under the circumstances. Nor, in the absence of indication from either party that they request such a result, will the court compel arbitration. Rather, as discussed in the contemporaneously filed Memorandum addressing the plaintiff's Motion to Certify, the court finds that individuals who have signed an arbitration agreement are not similarly situated to Hammond, the named plaintiff, who did not sign an arbitration agreement or otherwise agree to arbitrate his FLSA claims. On this basis, the court will grant the defendant's motions addressed to the claims of Taylor and Cardona and dismiss these opt-in plaintiffs' claims without prejudice. *Accord Errickson v. Paychex, Inc.*, 447 F. Supp. 3d 14, 33 (W.D.N.Y. 2020) (dismissing without prejudice the claims of an opt-in plaintiff who had signed an arbitration agreement, on the grounds that the opt-in plaintiff was not similarly situated to the named plaintiff, who had not signed such an

agreement, and noting that the defendant had moved only for summary judgment as to the opt-in plaintiff's claims, arguing that the arbitration agreement "preclude[d] [her] from resolving her claims outside of arbitration" and that the defendant did not style the motion as one to compel arbitration).

### E. Motion to Dismiss Opt-in Plaintiff Cheuvront

#### 1. *Factual Background*

The factual circumstances of Craig Cheuvront's alleged agreement to arbitrate claims against F&D are very different from those of Taylor and Cardona. In support of the Motion to Dismiss his claims, F&D has submitted the Declaration of Adrienne Walker, Operations Manager of F&D's Hilliard, Ohio store at the time Cheuvront was hired to work there in March 2016. (Doc. No. 91 ¶¶ 1, 4.) As Operations Manager, Walker conducted the "majority of new employee orientations, which included reviewing Company policies with new hires and providing them with key documents and new hire forms." (*Id.* ¶ 3.)

Walker states that she was "involved" with Cheuvront's orientation, but she does not explain what form her "involvement" took. (*Id.* ¶ 5.) She asserts more generally that, during new-hire orientations, her practice was to provide new employees with a copy of the F&D January 2015 Employee Handbook ("Handbook"). A copy of the Handbook is attached as an exhibit to her Declaration. (Doc. No. 91-1.) After giving the Handbook to a new hire, Walker would "go through the document and explain the policies in the Handbook, including the Arbitration Agreement." (Doc. No. 90 ¶ 6.) This process allegedly took "a few hours." (*Id.*) After Walker "review[ed] the Handbook with new hires, they would take copies of the Handbook home with them. [She] would also instruct them to review the Handbook in full." (*Id.*) Somewhat astoundingly, since the event took place more than four years ago and she has presumably oriented many new employees since then, Walker "recall[s] this process being followed during Mr. Cheuvront's orientation." (*Id.*)

According to Walker, employees hired at the same time as Cheuvront "had three options regarding the Arbitration Agreement." (*Id.* ¶ 7.) They could (1) sign an acknowledgment of the Arbitration Agreement; (2) sign an opt-out form; or (3) take no action. (*Id.*) Cheuvront did not sign an acknowledgment, and he did not return an opt-out form—or, at least, neither of these forms is in his personnel file. Walker states that, if he had returned an opt-out form, it would have been maintained in his personnel file. (*Id.* ¶ 9.) Thus, he took "no action," but he did continue to work for F&D after receiving a copy of the Handbook. Id. ¶¶ 8–9.)

The Handbook attached to Walker's Declaration is fifty-five pages long, the cover and contents pages of which encompass five pages. It covers numerous topics, including information about F&D's culture, its policies regarding recruitment and hiring, discrimination and harassment, time-keeping, scheduling, overtime pay, leave time, employee benefits, job performance, workplace behavior and ethics, and so forth. The Handbook's Appendix begins on page 40. The Acknowledgment and Receipt of the F&D Employee Handbook is on page 45. F&D does not contend that Cheuvront completed and returned this Acknowledgment. In any event, the Acknowledgment does not reference the Arbitration Agreement itself—it only specifically cross-references the company's Code of Business Conduct and Ethics. (Doc. No. 91-1, at 46.)

The Arbitration Agreement begins on page 47 of the Handbook and spans three pages, plus a blank page, then the Acknowledgment of the Arbitration Agreement, another blank page, and, finally, the Arbitration Opt-Out Form. The Arbitration Agreement is unambiguously titled, in bold font, "Arbitration Agreement." After an introductory paragraph, it states, again in bold font:

> **The Company and you, on behalf of you, your heirs, administrators, executors, successors and assigns (hereinafter collectively referred to as "you" or "your") agree pursuant to this Arbitration Agreement ("Agreement") to arbitrate covered disputes, in lieu of litigating in court.**

(Doc. No. 91-1, at 48.[7]) It contains a description of the claims covered and not covered by the arbitration agreement, a class/collective action waiver, and a summary of the arbitration process. The last two sentences of the final paragraph of the agreement, prior to the Acknowledgment page, state:

> Your continued employment and/or your accepting employment with the Company subsequent to this Agreement's implementation on February 17, 2014 also shall constitute consideration and acceptance by you of the terms and conditions set forth in this Agreement. The parties agree that the consideration set forth in this paragraph is wholly adequate to support this Agreement.

(*Id.* at 50.) These sentences are not in bold font or highlighted in any manner.

Two pages later is the Acknowledgment of the Arbitration Agreement ("Arbitration Acknowledgment") (not to be confused with the Acknowledgment and Receipt of the F&D Employee Handbook). The Arbitration Acknowledgment contains two paragraphs, both of which are in bold, capital letters. It notifies the employee that he has thirty days after signing the agreement within which to exclude himself from the agreement by signing and returning the opt-out form. It then states that, by signing the agreement, the employee "knowingly and freely agree[s] to this mutual agreement to arbitrate any claims" that may arise between him and F&D. (*Id.* at 52.) This form contains spaces for the employee's printed and signed name and the date. The Opt-out Form is appended two pages later. (*Id.* at 54.)

The Arbitration Agreement does not state that the employee's employment is conditioned upon his agreement to arbitrate. Neither the Acknowledgment nor the Opt-out Form notifies the employee that his continuing to work for F&D without returning either of those forms will constitute his assent to the Arbitration Agreement, and neither suggests that returning the Opt-out

---

[7] Because the defendant included an unnecessary cover page with "Exhibit 1" on it, the court's CM/ECF pagination is not consistent with that of the Handbook.

Form is required for opting out *unless* the employee has already signed the Arbitration Acknowledgment and then, within thirty days, changes his mind and chooses to opt out of it. Specifically, the Opt-out Form states:

> Complete and return this form only if you **DO NOT WANT** to be covered by the benefits of the Arbitration Agreement ("Agreement"). This form must be completed and returned to People Services Department no later than 30 days after you sign the Arbitration Agreement with the Company.

(*Id.*)

Again, there is no evidence in the record that Cheuvront completed, signed, or returned the "Acknowledgment and Receipt of the F&D Employee Handbook," the "Acknowledgment of the Arbitration Agreement," or the "Arbitration Opt-Out Form."

### 2. *The Parties' Arguments*

F&D argues that Cheuvront entered into a valid and enforceable arbitration agreement that unmistakably covers FLSA claims and requires him to bring such claims individually rather than as part of a collective. It claims, specifically, that the Arbitration Agreement explicitly states that continued employment is one way of accepting the "terms and conditions" of the Arbitration Agreement and that, by continuing to work for F&D after receiving a copy of the Handbook, Cheuvront manifested his assent to the Arbitration Agreement. (Doc. No. 90, at 4–5.) F&D also asserts that the Arbitration Agreement is supported by adequate consideration in the form of the mutual agreements to arbitrate, as well as the employee's continued employment, F&D's agreement to pay the arbitrator's expenses, and its promise not to seek recoverable costs even if it prevails in arbitration. (*Id.* at 5.)

In his opposition to the motion, Cheuvront argues that: (1) absent proof of his actual notice of the terms of the Arbitration Agreement or a signed agreement, the defendant cannot establish his assent to the Arbitration Agreement, and no contract was formed; and (2) regardless, the

agreement fails for lack of consideration, because the Handbook specifically provides that F&D could modify "at any time, in its sole discretion, . . . anything stated in this handbook." (Doc. No. 114, at 5.) In its Reply, the defendant argues that the fact that F&D supplied him with a copy of the Arbitration Agreement is sufficient to establish his actual notice of its terms, and his continued employment constitutes his assent to those terms. (Doc. No. 158, at 3.) It argues, further, that even if Ohio had adopted a contrary rule, it would be preempted by the FAA. Finally, it disputes Cheuvront's assertion that the Handbook permits F&D to unilaterally modify the arbitration agreement and contends that, even if it did, the Arbitration Agreement itself provides for the reformation of any provision of it that is found to be invalid, illegal, or unenforceable.

### 3. *Mutual Assent*

Notably, Cheuvront has not submitted his own declaration or affidavit. The question, then, is whether Adrienne Walker's Declaration, standing alone, is sufficient to establish Cheuvront's assent to arbitration. It is not.

As set forth above, the matter of contract formation is one that the court must resolve, and the issue is governed by generally applicable state contract law, Ohio law in this case. *See*, *e.g.*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); *see id.* (recognizing that "[t]he relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration"). Under generally applicable Ohio law, the party asserting breach of contract has the burden of establishing, among other things, "the existence of a binding contract or agreement." *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995)). To prove that a binding contract was formed, the moving party must show "offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or

detriment), a manifestation of mutual assent and legality of object and of consideration." *Cooper v. City of W. Carrollton*, 112 N.E.3d 477, 484 (Ohio Ct. App. 2018) (quoting *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)). In Ohio law, the concepts of "mutual assent" and "meaning of the minds" are used interchangeably, and, "[u]nder either concept, the standard is objective." *Schlaegel v. Howell*, 42 N.E.3d 771, 777 (Ohio Ct. App. 2015).

At issue here are acceptance and manifestation of mutual consent, and, as set forth above, as the party seeking to establish the existence of a binding contract, F&D has the burden of proof. Ohio courts recognize that, "[w]hile mutual assent is usually manifested by offer and acceptance, in oral contracts, mutual assent may be manifested by other acts or failures to act." *Id.* at 778 (internal quotation marks and citation omitted). F&D argues that Cheuvront's receipt of the Handbook, which contained the Arbitration Agreement, standing alone, is sufficient to establish assent under Ohio law. The cases to which it cites, however, either do not support that proposition or are clearly distinguishable on the facts. Moreover, the standard F&D asks the court to adopt has been rejected by the Ohio courts, which clearly require proof of actual notice—rather than mere constructive knowledge—of an arbitration agreement before mutual assent will be found.

For instance, in *Jones v. Carrols, LLC*, No. 27385, 2015 WL 3623760 (Ohio Ct. App. June 10, 2015), the court expressly recognized a strong public policy in Ohio favoring arbitration, but it also found, as a matter of generally applicable Ohio contract law, that mutual assent is required to form a contract. "Axiomatically, a party cannot assent to a term of which the party is unaware." *Id.* at *2. Contrary to that principle, the trial court had found that the defendant had made "reasonable steps" to ensure that the plaintiff was informed of the mandatory arbitration policy the company employer had implemented two years after the plaintiff began his employment with the company, including by distributing a memo and posters to franchise operators with instructions

that the memo be disseminated to employees and that the poster be posted so workers would see it. The plaintiff denied seeing the memo or poster and claimed to have no actual knowledge of the policy. The employer argued that it had taken reasonable steps to inform the plaintiff of the mandatory policy and that that was all that it was required to do. The parties disputed both whether the plaintiff had actual knowledge and whether actual knowledge was required. The trial court did not resolve the factual dispute about whether the plaintiff had actual knowledge and, instead, decided that, because the defendant had taken "reasonable steps to inform" him of the policy, he was bound by it. *Id.* at *2.

The appellate court disagreed, finding that a showing that the employer had taken reasonable steps to inform the plaintiff of the arbitration policy was not sufficient and remanded for resolution of the question of whether, as a factual matter, the plaintiff had *actual* notice of the arbitration policy. It also distinguished the case from others in which assent had been found, on the basis that the cases either did not apply Ohio law, the plaintiff had actually signed the arbitration agreement or an acknowledgment of receipt of the arbitration agreement, or the plaintiff admitted having actual notice of the arbitration agreement. *See id.* at *3 (citing *Mannix v. Cty. of Monroe*, 348 F.3d 526 (6th Cir. 2003) (applying Michigan law); *Green v. Carrols Rest. Grp., Inc.*, No. 1:10-CV-23471 (S.D. Fla. June 9, 2011) (plaintiff signed acknowledgment of receipt of arbitration agreement); *Seawright v. Am. Gen. Fin. Serv., Inc.*, 507 F.3d 967 (6th Cir. 2007) (plaintiff conceded actual knowledge of arbitration agreement)).

In light of *Jones* and other Ohio state court decisions, the Sixth Circuit and district courts applying Ohio law to motions to compel arbitration have repeatedly applied an "actual notice" standard. Thus, for example, in *Dantz v. American Apple Group, LLC*, 123 F. App'x 702 (6th Cir. 2005), the court enforced an arbitration agreement where it was undisputed that all employees,

including the plaintiff, had received copies of the employer's dispute resolution program ("DRP"), had attended a training session related to the agreement, and had received a letter from the company's president stating that the DRP would be the "mandatory and exclusive means for resolving all work-related disputes." *Id.* at 704. In addition, the plaintiff had received and signed an acknowledgment form that stated in bold, capital letters that acceptance of the DRP was a condition of employment. Although the plaintiff added, with her signature on the form, "I cannot sign this as I would be lying. An attorney contacted me in regard to certain legal issues," the court held that this language did not absolve her from abiding by the agreement. *Id.* at 706. Instead, it found that the company had clearly manifested an offer to the employee that she agree to arbitrate work-related disputes in consideration for its agreement to continue to employ her, and, by continuing to work when she had actual notice of the terms of that offer, the plaintiff manifested acceptance of it. *Id.* at 707–08. In that context, where it was undisputed that the plaintiff had actual notice of the arbitration agreement, the court stated: "Mutual assent is manifested by [the plaintiff's] continued employment *after having been told explicitly* that the arbitration agreement was a condition of her employment." *Id.* at 708 (emphasis added). *Accord Stephens v. Frisch's Big Boy Rests.*, No. 1:19-9cv-54, 2020 WL 4754682, at *3 (S.D. Ohio July 30, 2020) (recommending enforcement of an arbitration agreement where there was no dispute that the plaintiff had electronically signed the arbitration agreement), *report and recommendation adopted*, 2020 WL 4748578 (S.D. Ohio Aug. 17, 2020);[8] *Doerman v. Meijer, Inc.*, No. 17-571, 2018 WL 4599890, at

---

[8] F&D relies heavily upon dictum from *Stephens*, in which the court also stated that it would have enforced the arbitration agreement even if the plaintiff had not signed it, because her "continued employment with Frisch's is sufficient evidence of her mutual assent to the arbitration agreement." *Stephens*, 2020 WL 4754682, at *3 (citing *Dantz*, 123 F. App'x at 708). This statement, however, appears to be premised upon the conclusion, as a factual matter, that the plaintiff was actually aware of the arbitration agreement (as evidenced by her signature on it). *See id.* ("[P]laintiff fails to raise a genuine dispute as to whether she assented to the terms of the

*4 (S.D. Ohio Sept. 25, 2018) (applying actual notice standard to deny a motion to compel arbitration, finding that the arbitration agreement the plaintiff admittedly signed was unenforceable for lack of consideration, because the employer could modify it at any time without prior notice, and that the plaintiff was not bound by subsequent amendments to the original agreement where the defendant failed to produce evidence that the plaintiff had actual knowledge of the amendments, and stating: "Although there are a number of cases dealing with the question of whether a party had reasonable notice of the arbitration agreement, this Court has not found a case from Ohio applying the reasonable notice standard in the absence of a signed contract."); *Sandor v. Gen. Elec. Co.*, No. 16-CV-1670, 2016 WL 6868452, at *3 (N.D. Ohio Nov. 22, 2016) (applying the "actual notice" standard to deny a motion to compel arbitration where the defendant failed to establish that the plaintiff had actual notice of a new company policy making assent to arbitration a condition of continued employment, even though it sent her emails with a hyperlink to the policy and the dispute resolution program, where the emails themselves did not provide notice of that condition and there was no evidence that the plaintiff had actually opened any of the links, and stating that the plaintiff could "not be bound by an arbitration agreement she did not accept"); *Blakley v. UBS Fin. Servs., Inc.*, No. 1:12-cv-30, 2013 WL 360378, at *1 (S.D. Ohio Jan. 30, 2013) (enforcing arbitration agreement were it was undisputed that the plaintiff had actually initialed and signed a Letter of Understanding ("LOU") that included an arbitration agreement), *report and recommendation adopted*, 2013 WL 866470 (S.D. Ohio Mar. 7, 2013).[9]

---

arbitration agreement."). To the extent, however, that *Stephens* arguably relied on a "reasonable notice" rather than an "actual notice" standard, this court finds it unpersuasive.

[9] The defendant also relies heavily upon confusing language in the *Blakley* report and recommendation, in which the court concluded that the plaintiff also had notice of the terms of a Field Management Compensation Plan ("FMCP"), which incorporated an arbitration agreement and provided that "[t]he continuation of your employment after receipt of this Plan and/or acceptance of benefits hereunder shall be deemed your consent and agreement to its terms."

In this case, because Cheuvront did not submit his own affidavit or declaration, Adrienne Walker's testimony that he received a copy of F&D's Employee Handbook upon his orientation is undisputed, and the court accepts it as true. (*See* Doc. No. 90 ¶ 6.) The Handbook incorporated a copy of the Arbitration Agreement. Walker, however, does not contend that she actually told Cheuvront that his failure to sign and return the Opt-Out Form would be deemed by F&D as evidence that he assented to the Arbitration Agreement. As discussed above, the Handbook was over fifty pages long; the statement that purports to notify employees that they would be deemed to have agreed to arbitration unless they returned the Opt-out Form is buried on page fifty; and that provision is not highlighted in any fashion. Even if Cheuvront had filled out and returned the Acknowledgment of Receipt of the F&D Employee Handbook, which he apparently did not, that would not have been sufficient to establish his assent to the Arbitration Agreement, because that Acknowledgment did not reference the Arbitration Agreement in any way. Even if Cheuvront had skimmed the Arbitration Agreement, there is no guarantee that he would have seen the sentence purporting to notify him that he would be deemed to have agreed to arbitrate even if he did not sign the Arbitration Acknowledgment. The Arbitration Acknowledgment did not provide that notice either. It states that, by signing it, the employee agrees to arbitrate. The form does not state

---

*Blakley*, 2013 WL 360378, at *8. The court, however, also repeatedly referenced the fact that the plaintiff did not dispute having signed the LOU, which also included the arbitration agreement. *See id.* ("Notably, plaintiff does not acknowledge that he gave affirmative, written consent to be bound by an arbitration provision when he signed the LOU. Given the existence of a signed and enforceable agreement binding plaintiff to arbitrate his discrimination claims, plaintiff's argument that he did not waive his statutory rights by virtue of not signing a second arbitration provision is unpersuasive."). Moreover, the court cited *Dantz* in support of the principle that, "where an at-will employee is made *explicitly aware* that agreement to an arbitration provision is a term of employment, the act of continuing employment constitutes implied assent such that the arbitration provision is enforceable." *Id.* at *8. The court finds, therefore, that the defendant's reliance on *Blakley*, in support of its broad assertion that merely providing the Handbook to the employee was all it had to do to establish notice of the arbitration provision, is misplaced.

that agreement to arbitrate was a job requirement—as it apparently was not—or that *not* signing it would have the same effect as signing it—that is, either way, the employee would be deemed to have agreed to arbitrate. And the Opt-out Form indicates only that it should be returned within thirty days after signing the Acknowledgment if the employee changes his mind and wants instead to opt out of arbitration. In other words, a reasonable employee looking at these forms would have assumed that *not* signing either of them would have signaled that he did not agree to arbitrate and that returning the Opt-out Form was only necessary if he had initially signed the Arbitration Acknowledgment and then changed his mind.

In short, because Cheuvront did not sign the Arbitration Acknowledgment and because Walker does not claim to have explained to him that a failure to return the Opt-out Form would signal his agreement to arbitrate, F&D has not satisfied the "actual notice" standard required by Ohio law. There is simply no evidence in the record that Cheuvront actually read the entire Arbitration Agreement or that anyone explained to him that he would be deemed to have assented to it, even if he did not sign and return the Arbitration Acknowledgment.

In an effort to avoid this conclusion, F&D argues that, insofar as Ohio has adopted a "special rule requiring employers to take additional steps to form arbitration agreements, it would be preempted by the FAA." (Doc. No. 158, at 6.) However, Ohio has not adopted a special rule that applies only to arbitration agreements. Instead, as a matter of generally applicable contract law, Ohio courts require proof of actual notice of the terms of an agreement before it will find the requisite assent necessary to the formation of a contract. The Sixth Circuit itself recognized as much in *Dantz*, when it held that "[m]utual assent is manifested by [the plaintiff's] continued employment *after having been told explicitly* that the arbitration agreement was a condition of her employment." *Dantz*, 123 F. App'x at 708. Modified to match the circumstances here, mutual

assent *would have been* manifested by Cheuvront's continued employment *if* he had been told explicitly that continuing to work would be deemed to be his acceptance of the Arbitration Agreement. Alternatively, assent would have been signaled by his actually signing the Arbitration Acknowledgment or admitting that he had actual notice that he would be deemed to have assented to the Arbitration Agreement, regardless of whether he took any affirmative steps to signal such assent. *Accord Jones*, 2015 WL 3623760, at *3; *see id.* at *2 (noting that it is "well established" under generally applicable Ohio contract law that, "in order for parties to enter a contract, there must be mutual assent to its terms" and that, "[a]xiomatically, a party cannot assent to a term of which the party is unaware"). There is no indication from the Ohio courts that the "actual notice" rule is a "special rule" applied only in the context of arbitration agreements.

The court, therefore, finds that F&D has failed to establish that Cheuvront agreed to arbitrate. Its Motion to Dismiss his claims will be denied. The court does not reach the parties' alternative arguments regarding the sufficiency of the consideration supporting the arbitration agreement.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant the Motions to Dismiss Opt-In Plaintiffs Fierce Taylor and Edgar Cardona (Doc. Nos. 84, 86) and dismiss without prejudice the claims of those plaintiffs. The Motion to Dismiss Opt-In Plaintiff Craig Cheuvront (Doc. No. 89) will be denied.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge